IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

GWEN FAULKENBERRY,
SPECIAL RENE SANDERS,
ANIKA WHITFIELD, AND
KIMBERLY CRUTCHFIELD                                                    PLAINTIFFS

v.                          Case No. 4:25-CV-592-DPM

ARKANSAS DEPARTMENT OF EDUCATION, ET AL.                DEFENDANTS

LITTLE ROCK SCHOOL DISTRICT'S REPLY
IN SUPPORT OF ITS MOTION TO INTERVENE

## I. Introduction

The Defendants' opposition rests on an outdated view of municipal standing and a misreading of the Federal Rules of Civil Procedure. Modern precedent squarely recognizes that political subdivisions like LRSD have standing to protect their institutional interests when state action violates federal law.

LRSD satisfies all requirements for intervention under Rule 24(a) and (b): it faces concrete injury from the challenged implementation of the LEARNS Act; its interests are not adequately represented by private plaintiffs; and its participation will aid the Court's efficient and informed resolution of issues that directly affect public education in Arkansas.

## II. Standard of Review

In the Eighth Circuit, "Rule 24 is construed liberally, and we resolve all doubts in favor of the proposed intervenors." *United States v. Union Elec. Co.*, 64 F.3d 1152, 1158 (8th Cir. 1995).

1

EXHIBIT
1

**III. Facts**

LRSD's proposed Complaint in Intervention alleges facts showing that the challenged Voucher Program is causing injury in fact to LRSD, which is traceable to the LEARNS Act, and which can be remedied by a favorable decision in this case:

> 7.(iii) Unlike public schools, such as LRSD, the private schools may establish qualifications or criteria for admission to their schools that discriminate against children on account of their individual characteristics or circumstances, including physical or mental disability or handicap. Thus, the Voucher Program discriminates against children with such disabilities, handicaps, or other circumstances that are not acceptable to all private schools.
>
> 9. The Voucher Program violates this provision by establishing and funding a separate system of free or nearly free private schools which diverts resources from public schools and diminishes the State's capacity to "maintain a general, suitable and efficient system of free public schools."
>
> 10. The Voucher Program violates Article 14 § 2 of the Arkansas Constitution, which requires that "[no] money or property belonging to the public school fund, or to this State, for the benefit of schools or universities, shall ever be used for any other than the respective purposes to which it belongs." The Voucher Program violates this provision by diverting money from the public schools of this state to a newly established system of publicly funded private schools.
>
> 25. The LEARNS Act represents a radical and unconstitutional departure from a public school system that has endured since the establishment of the State of Arkansas. If it continues to be implemented, the LEARNS Act will drain valuable and necessary resources from the public school system and create a separate and unequal dual school system that discriminates between children based on economic, racial and physical characteristics and capabilities.
>
> 52. As of early October 2025, on information and belief, more than 51,000 students had applied for vouchers and the expected cost of the Voucher Program for the 2025-26 school year had ballooned to over $326 million ($326,000,000), nearly $50 million ($50,000,000) beyond available revenue. (Source, Arkansas Democrat-Gazette, "*Arkansas Educational Freedom Account Program cost could Top $326M, report finds*", October 1, 2025).
>
> 53. For the 2025-26 school year and each year thereafter, the LEARNS Act declares that there will be no limitation on student participation in the

Arkansas Children's Educational Freedom Account Program; i.e., the program will be available, beginning with the 2025-26 school year, to all students who are residents of Arkansas. Ark. Code Ann. § 6-18-2506. This will result in another large increase in amounts allocated from public school funds to support the Voucher Program. This will also increase the size of the separate, publicly funded system of private sectarian schools which diverts resources from the constitutionally required "general, suitable and efficient system of free public schools".

54. LRSD is home to students who, on average, have greater educational needs than students enrolled in the private schools supported by the Voucher Program. As a result of the Voucher Program, LRSD has fewer students, and consequently fewer resources with which to meet the educational needs of those students.

62. As a consequence of the lower number of public school students in the foundation funding calculation, the local contribution to foundation funding thereby increases on a per-student basis. The per-student increase from the local contribution results in a reduction in the amount of foundation aid provided by the equalization funding to public schools, thereby providing the money which the State then gives to private schools and private providers under LEARNS.

69. Thus, the Voucher Plan is a funding plan which, by design, takes state money which otherwise would be used to enhance public schools and diverts that money to private schools and other providers under the LEARNS Act in violation of Article 14, §2 of the Arkansas Constitution.

89. The LEARNS Act violates these constitutional principles in that if a student leaves a public school, or never enrolls in a public school in the first instance, and enrolls in a private school, or chooses to home school, the LEARNS Act transfers from the taxes belonging to the State for the use and benefit of the public schools the amount of money calculated by the State as the cost of that student's education to the private school, home school or other private provider of that student's tuition, fees, uniforms, supplies, equipment, access to technology and other materials.

92. LRSD also seeks (i) an injunction to be issued to each of the Defendants prohibiting them from further implementation of the LEARNS Act Voucher Program; and (ii) a declaratory judgment that the Defendants have acted beyond the scope of their constitutional authority in implementing an unconstitutional law.

124. The State is employing the funding mechanism for public schools to support a different group of private schools by effectively diverting local tax revenues to fund vouchers, all in violation of the foregoing provisions of Article 14, Section 3 of the Arkansas Constitution.

**IV. LRSD Has Article III Standing to Intervene**

LRSD satisfies all requirements for Article III standing. It faces concrete institutional injuries from the State's implementation of the LEARNS Act, asserts its own legal interests, and presents a live case or controversy suitable for judicial resolution. Defendants' claim that LRSD lacks standing as a "creature of the state" misreads precedent and ignores the modern understanding of Article III standing and the Supremacy Clause.

### A. Modern precedent allows political subdivisions to challenge state actions under the Supremacy Clause and federal law

The Supreme Court and multiple courts of appeals have long held that political subdivisions may bring claims under the Supremacy Clause and federal law. These cases draw a clear distinction between (1) constitutional provisions conferring individual rights—such as the Fourteenth Amendment—and (2) structural provisions, like the Supremacy Clause, that preserve the federal-state balance. The former do not apply to municipalities; the latter do.

The Fifth Circuit's decision in *Rogers v. Brockette*, 588 F.2d 1057 (5th Cir. 1979), is squarely on point. There, a Texas school district challenged a state statute under the Supremacy Clause, arguing it conflicted with federal law. The court held that municipal-standing cases such as *City of Trenton v. New Jersey*, 262 U.S. 182 (1923), and *Hunter v. City of Pittsburgh*, 207 U.S. 161 (1907), were substantive interpretations of specific constitutional amendments, not "standing" precedents:

> We think these cases are substantive interpretations of the constitutional provisions involved; we do not think they hold that a municipality never has standing to sue the state of which it is a creature. In fact, correctly interpreted, these cases do not deal with "standing," in the sense in which we use the term, at all.

*Rogers*, 588 F.2d at 1068–69. Thus, when the LRSD alleges conflict between state and federal law, it acts not in defiance of the state, but in obedience to the Constitution.

This reasoning has been widely adopted. See *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628–30 (10th Cir. 1998) (allowing political subdivision to sue the state under the Supremacy Clause); *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 369–70 (D.N.J. 2020) (rejecting "creature of the state" theory and recognizing standing for counties to assert federal preemption claims); *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 73 (2d Cir. 2019) (same).

Together, these cases establish that political subdivisions like LRSD may sue their state when asserting that state action conflicts with federal law. That is precisely the posture here.

### B. LRSD alleges a distinct and cognizable injury-in-fact

LRSD's injury is concrete, particularized and continuing. The LEARNS Act's implementation directly alters LRSD's authority, finances, and statutory obligations to operate public schools. These are typical institutional injuries that satisfy Article III. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Duke Power Co. v. Carolina Envtl. Study Grp.*, 438 U.S. 59, 72 (1978). As *Rogers* held, such interference with a district's management and funding of its schools easily satisfies Article III's injury requirement.

### C. LRSD sues to protect federal supremacy and institutional integrity, not "individual rights"

LRSD's claim is structural, not personal. The District seeks to ensure that state actions conform to federal constitutional and statutory mandates—not to assert individual due process or equal protection rights. When a political subdivision raises a Supremacy Clause claim, it does so to vindicate federal supremacy, not to protect its own

sovereignty. See *Branson Sch. Dist.*, 161 F.3d at 628–29 ("Such suits advance federal, not local, interests.").

That distinction is dispositive here. LRSD challenges the state's compliance with the U.S. Constitution and federal law, not the existence or distribution of state power over a political subdivision of the state.

### D. Defendants' Reliance on *Ysursa v. Pocatello Education Association* Is Misplaced

Defendants cite *Ysursa v. Pocatello Education Association*, 555 U.S. 353 (2009), to argue that LRSD—like all political subdivisions—"has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator." Defs.' Resp. 3 (*quoting Ysursa*, 555 U.S. at 363). That argument misreads *Ysursa* and ignores the context of the decision. *Ysursa* does not control this case, and it does not bar LRSD from asserting its federal Supremacy Clause and constitutional claims.

*Ysursa* held that Idaho's ban on payroll deductions for union political activities did not violate the First Amendment. The Court reasoned that the Constitution "does not confer an affirmative right to use government payroll mechanisms for the purpose of obtaining funds for expression." *Id.* at 355. The decision simply reaffirmed that the state is not constitutionally required to subsidize speech through its subdivisions.

Critically, *Ysursa* did not address standing. The plaintiffs—unions and local governments—were allowed to litigate their claims through final judgment. The case resolved the merits of a First Amendment challenge, not whether municipalities could sue. As *Rogers* explained years earlier, these "creature of the state" cases are substantive constitutional holdings, not jurisdictional bars. *Rogers, supra,* 588 F.2d at 1068–69.

6

Also equally as critical, *Ysursa* addressed a state's internal management decision, not a conflict between state law and federal supremacy. LRSD's claims are grounded in the Supremacy Clause and other provisions of federal law that limit state authority.

Thus, *Ysursa* provides no support for denying LRSD standing. It involved individual free-speech rights, not structural constitutional enforcement.

### E. Defendants' Reliance on *Delta Special School District v. State Board of Education* Is Likewise Misplaced

Defendants' reliance on *Delta Special School District No. 5 v. State Board of Education*, 745 F.2d 532 (8th Cir. 1984), fares no better. *Delta* involved a school district's Fourteenth Amendment challenge to a state student-transfer statute. The Eighth Circuit affirmed denial of a preliminary injunction, holding that "a political subdivision of a state cannot invoke the protection of the Fourteenth Amendment against the state." *Id.* at 533 (citing *City of Trenton*, 262 U.S. 182).

That holding is limited to the Fourteenth Amendment and has no application to LRSD's Supremacy Clause. *Delta* did not involve any assertion that state law conflicted with federal law, nor did it consider the structural principle that federal law is supreme over conflicting state law. Its reasoning was confined to substantive equal-protection and due-process rights that municipalities lack as "persons" under those specific amendments.

Furthermore, *Delta* does not address the modern understanding of Article III standing. As *Rogers* and subsequent decisions have explained, the older "creature of the state" doctrine was a merits rule, not a jurisdictional bar. Courts today consistently hold that local entities have standing when they allege concrete injury and raise federal

7

preemption or Supremacy Clause claims. See *Branson*, 161 F.3d at 628–30; *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 369–70 (D.N.J. 2020).

Indeed, even the Supreme Court has repeatedly entertained suits against a state by a subdivision of the state, including cases under the Supremacy Clause. *See Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 252-53 (2011) (considering suit by independent state agency against its state for violation of federal law alleged to conflict with state law); *Nixon v. Mo. Mun. League*, 541 U.S. 125, 130-31 (2004) (considering Supremacy Clause challenge by municipalities and utilities against state statute); *Lawrence Cty. v. Lead-Deadwood Sch. Dist.*, 469 U.S. 256, 258 (1985) (considering Supremacy Clause challenge by county against state statute); *Bd. of Educ. v. Allen*, 392 U.S. 236 (1968); *see also Romer v. Evans*, 517 U.S. 620, 623-24 (1996) (state constitutional amendment preventing local anti-discrimination ordinances violated the Equal Protection Clause); *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 487 (1982) (state statute prohibiting a local busing desegregation plan violated the Fourteenth Amendment). Considering this authority, *Delta*'s limited Fourteenth Amendment reasoning cannot be extended to bar Supremacy Clause claims that, by definition, advance federal—not local—interests. *See Rogers*, 588 F.2d at 1069.

> Hundreds of federal laws apply nationwide to states and their political subdivisions. They impose various responsibilities and prohibitions on states and political subdivisions that are intended by Congress to apply nationwide. If the Supremacy Clause means anything, it means that a state is not free to enforce within its boundaries laws preempted by federal law. Lawsuits invoking the Supremacy Clause are one of the main ways of ensuring that this does not occur.

*Tong,* 930 F.3d at 73. Defendants' reading of *Delta* would nullify the Supremacy Clause by foreclosing any local challenge to unconstitutional state action. That outcome is

incompatible with the Constitution's structure and has been rejected by modern courts that have considered the issue.

### F. *Gomillion v. Lightfoot* Confirmed That States' Authority Over Political Subdivisions Is Not Unlimited

Even before *Rogers v. Brockette* and other modern decisions clarified that political subdivisions may bring Supremacy Clause challenges, the Supreme Court had already rejected the absolutist view of state control in *Gomillion v. Lightfoot*, 364 U.S. 339 (1960). In *Gomillion*, Black plaintiffs challenged Alabama law "redefining the boundaries of the City of Tuskegee" arguing that enforcement of the statute would constitute discrimination against them and would constitute "discrimination against them in violation of the Due Process and Equal Protection Clauses of the 14th Amendment to the Constitution and will deny them the right to vote in defiance of the Fifteenth Amendment." *Id.* at 340.

The District Court granted the State's Motion to Dismiss, finding that it had "no control over, no supervision over, and no power to change any boundaries of municipal corporations fixed by a duly convened and elected legislative body, acting for the people in the State of Alabama." *Id.* at 340-41. The Fifth Circuit affirmed the District Court. *Id.* at 341. The Supreme Court granted certiorari because "serious questions were raised concerning the power of a State over its municipalities in relation to the Fourteenth Amendment and Fifteenth Amendments." *Id.*

The "sole question" before the Court was whether the plaintiffs' allegations "entitle them to make good on their claim that they are being denied rights under the United States Constitution." *Id.* The State of Alabama, echoing *Hunter v. Pittsburgh* and *City of Trenton v. New Jersey*, argued that its power over municipal boundaries was absolute and unreviewable in federal court. The Supreme Court emphatically disagreed:

9

> A correct reading of the seemingly unconfined dicta of *Hunter* and kindred cases is not that the State has plenary power to manipulate in every conceivable way, for every conceivable purpose, the affairs of its municipal corporations, but rather that the State's authority is unrestrained only by the particular prohibitions of the Constitution considered in those cases.

*Gomillion*, 364 U.S. 339, 344–45 (1960).

That passage put to rest the broad "creature of the state" theory that Defendants rely on. *Gomillion* made clear that state control over municipalities ends where federal constitutional limits begin. From that point forward, the Supreme Court recognized that political subdivisions may invoke federal law to challenge unconstitutional or ultra vires state action.

The Fifth Circuit in *Rogers v. Brockette*, 588 F.2d 1057 (5th Cir. 1979), expressly relied on *Gomillion* to explain this distinction. It noted that the *Hunter* and *Trenton* line of cases are substantive holdings that the Constitution does not interfere in states' internal political organization — not jurisdictional bars to suit.

Concurrently, *Gomillion* and *Rogers* demonstrate that the Constitution and the Supremacy Clause provide both the source and the justification for LRSD's standing here. The federal courts have long recognized that political subdivisions can — and must — challenge state laws that violate the higher authority of the United States Constitution.

### G. Summary

Defendants' standing arguments rely on an outdated line of authority that no longer governs the relationship between states and their political subdivisions. The early twentieth-century decisions in *Hunter v. Pittsburgh* and *City of Trenton v. New Jersey* were never meant to bar municipalities from accessing federal courts; they were substantive interpretations of specific constitutional amendments, not jurisdictional

10

rulings. Those cases simply held that a city has no independent due-process or contract-clause rights against its own state.

That view was explicitly limited by the Supreme Court in *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), which clarified that state authority over municipalities is "unrestrained only by the particular prohibitions of the Constitution considered in those cases." *Id*. at 344. *Gomillion* established that state power over its political subdivisions is not absolute. When a state's actions violate the federal Constitution, those actions are subject to judicial review.

Building on *Gomillion*, the Fifth Circuit in *Rogers v. Brockette*, 588 F.2d 1057 (5th Cir. 1979), explained that political subdivisions have standing to bring federal Supremacy Clause and preemption claims. In doing so, they do not challenge the State's authority but uphold the higher authority of the Constitution. Modern courts, including *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619 (10th Cir. 1998), and *County of Ocean v. Grewal*, 475 F. Supp. 3d 355 (D.N.J. 2020), have reaffirmed that principle: municipalities and school districts may sue their state when state law conflicts with federal law.

Collectively, *Gomillion, Rogers*, and their progeny reaffirm that the "creature of the state" doctrine cannot be used to insulate state conduct that violates the federal Constitution. The Supremacy Clause makes federal law "the supreme Law of the Land," binding every level of government. In challenging a conflicting state statute, LRSD seeks to uphold that constitutional order.

Accordingly, LRSD's standing matches with the Constitution and long-settled precedent. The Court should reject Defendants' reliance on the outdated *Hunter–Trenton* doctrine and allow LRSD's claims to proceed.

**V. Sovereign Immunity Does Not Bar LRSD's Claims**

Defendants' sovereign-immunity argument mischaracterizes both the nature of LRSD's claims and the reach of the Eleventh Amendment. LRSD does not seek damages from the State; it seeks prospective relief to prevent ongoing violations of federal law. Such relief falls squarely within the *Ex parte Young* exception and is fully consistent with controlling precedent.

### A. LRSD seeks prospective relief to stop ongoing violations of federal law.

Under *Ex parte Young*, 209 U.S. 123 (1908), state officials may be sued in their official capacities for prospective declaratory or injunctive relief to prevent continuing violations of the Constitution or federal statutes. The Supreme Court has reaffirmed this principle. *See, e.g., Verizon Md. Inc. v. PSC*, 535 U.S. 635, 645 (2002).

LRSD's claims fit easily within this doctrine. It seeks declaratory and injunctive relief to prevent Defendants—state officials—from enforcing state statutes that conflict with federal law. *Id*.

LRSD has not sought damages. The Eleventh Amendment therefore poses no bar to its claims.

### B. *Pennhurst* Does Not Apply to LRSD's Federal Claims

Defendants' invocation of *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984), is misplaced. *Pennhurst* prohibits federal courts from ordering state officials to comply with state law, but it explicitly preserves jurisdiction over claims alleging violations of federal law. *Id*. at 106. *See also Allen v. Minnesota*, 867 F. Supp. 853, 865 (D.Minn. 1994) (rejecting Eleventh Amendment defense to injunction against

state official, and noting that the *Ex parte Young* exception is specifically recognized in *Pennhurst*).

LRSD's primary claims arise under the Supremacy Clause and the U.S. Constitution—quintessential federal questions. Because LRSD challenges the State's compliance with federal law, not its adherence to state law, *Pennhurst* is irrelevant.

To the extent LRSD's proposed complaint includes any state-law counts, those claims can be severed or dismissed without prejudice. But those ancillary issues do not—and cannot—extinguish this Court's jurisdiction over LRSD's core federal claims.

### C. Sovereign Immunity Does Not Shield State Officers Acting Unconstitutionally

The State's argument also ignores the fundamental constitutional principle that no official is above the Constitution, the nation's supreme law. As the Supreme Court has long held, "the state has no power to impart to [anyone] immunity from responsibility to the supreme authority of the United States." *See Board of Trustees v. Davis,* 396 F.2d 730, 732 (8th Cir. 1968)(*quoting Ex parte Young*, 209 U.S. 123, 167 (1908).

The Pulaski County interdistrict desegregation case provides an example. On November 30, 1982, LRSD filed a lawsuit alleging that the State of Arkansas and the State Board of Education, among others, were in violation of the Fourteenth Amendment to the United States Constitution. *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist.*, 778 F.2d 404, 408, (8th Cir. 1985). "[T]he District Court dismissed the claim against the State of Arkansas but refused to take similar action concerning the State Board, holding that the Board is the proper party in light of its general supervisory relationship with the individual school districts, and the allegations that it has carried out its duties in a manner which increased segregation in Little Rock." *Id.* The dismissal of the State of Arkansas,

the District Court said, "had no practical effect on the disposition of the lawsuit". *Id.*

On April 13, 1984, a few months after the United States Supreme Court decision in *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984), the District Court issued its decision on liability. *Id.* at 409. In that opinion, the District Court "reiterated its holding that the State Board was a 'necessary party who must be made subject to the Court's remedial order." *Id., citing Little Rock School District v. Pulaski Special Sch. Dist.*, 584 F.Supp. 328, 352-53 (E.D. Ark. 1984). Following remedial hearings, the District Court "entered further findings concerning the State Board's liability and reaffirmed the State Board's remedial responsibilities" on November 19, 1984. *Id., citing Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist.*, 597 F.Supp. 1220, 1227-28 (E.D. Ark. 1984). On appeal, the Eighth Circuit Court of Appeals found "no error in the District Court's imposition of remedial responsibilities on the state through the State Board." *Id.* at 411-412, n.4.

Forty years after its decision in *Pennhurst*, the United States Supreme Court held that a consent decree between individual plaintiffs and officials of the State of Texas concerning implementation of the Medicaid Act was "enforceable under *Ex parte Young*." *Frew v. Hawkins*, 540 U.S. 431, 436-37 (2004). The Court noted that "[t]he Eleventh Amendment confirms the sovereign status of the States by shielding them from suits by individuals absent their consent", the *Ex parte Young* standard "allows courts to order prospective relief":

> To ensure the enforcement of federal law, however, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law.

*Id.* at 437, *citing Ex parte Young*, 209 U.S. 123 (1908).

Among the cases cited in support of the Court's finding that the *Ex parte Young* standard allows courts to order prospective relief was *Milliken v. Bradley*, 433 U.S., 267 (1977), a school desegregation case. The Court granted certiorari in that case to consider "whether, consistent with the Eleventh Amendment, a federal court can require state officials found responsible for constitutional violations to bear part of the costs of [remedial education] programs." *Id.* at 269.

The state officials argued that the District Court's order violated the Eleventh Amendment. *Id.* at 288. The Supreme Court rejected that argument, holding that the required education programs were "part of a plan that operates *prospectively* to bring about the delayed benefits of a unitary school system", and that "such prospective relief is not barred by the Eleventh Amendment. *Id.* at 290. (emphasis in original).

When state officers act contrary to the Constitution or federal law, they act *ultra vires*—beyond their lawful authority—and sovereign immunity affords them no protection. *See Martin v. Haas*, 2018 Ark. 283, at 7-8, 556 S.W.3d 509, 514-15. The very purpose of *Ex parte Young* is to ensure a federal forum exists to enjoin unconstitutional state action.

Because LRSD alleges ongoing violations of the Supremacy Clause and other federal constitutional provisions, sovereign immunity provides no defense.

## VI. LRSD Meets the Requirements for Intervention as of Right

### A. LRSD has a protectable interest in the subject matter of this litigation

The litigation challenges the legality of state actions that directly control LRSD's governance and funding of its schools. That gives LRSD a clear "interest relating to the property or transaction that is the subject of the action." See *Foster v. Smith.*, 2025 U.S. Dist. LEXIS 183044 (E.D. Ark, Sept. 18, 2025).

### B. Disposition of this case may impair LRSD's ability to protect its interests

An adverse judgment upholding the challenged state actions would directly bind LRSD and foreclose it from independently asserting its rights in later litigation. That satisfies Rule 24(a)(2)'s "practical impairment" test. *See Marino v. Ortiz,* 484 U.S. 301, 304 (1988) ("The rule that only parties to a lawsuit, or those that properly became parties, may appeal an adverse judgment, is well settled.")

### C. LRSD's interests are not adequately represented by existing parties

Private plaintiffs represent the interests of individual taxpayers and parents—not the institutional, financial, and statutory interests of a public school district. *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist.*, 738 F.2d 82 (8th Cir. 1984) (Court of Appeals reversed District Court denial of teachers associations' motion to intervene in the school-district consolidation case because their interests were unrepresented).

Plaintiffs' constitutional focus differs from LRSD's administrative and statutory concerns regarding funding, governance, and compliance with federal education mandates.

The district's obligations under Arkansas and federal law create institutional interests that no private party can adequately represent.

## VII. Alternatively, Permissive Intervention Is Warranted Under Rule 24(b)

Even if intervention of right were in doubt, LRSD should be granted permissive intervention because:

- Its claims share common questions of law and fact with those already before the Court; and
- Intervention will promote judicial efficiency and prevent conflicting rulings.

Defendants' concerns about "delay" are unfounded. The Court can manage scheduling and page limits to prevent duplication. Allowing LRSD's participation will enhance the factual record, not clutter it — especially given the district's firsthand knowledge of LEARNS implementation.

If the Court prefers, it could limit LRSD's participation to briefing and argument on overlapping constitutional issues—an approach federal courts regularly employ to balance efficiency and fairness.

## VIII. Defendants' Alternative Suggestion of Amicus Status Is Inadequate

Amicus status would deprive LRSD of the ability to develop a factual record, present evidence, or protect its institutional interests on appeal. Because LRSD is directly subject to the disputed state actions, it should the full procedural rights of a party, not the limited voice of an amicus.

## IX. Conclusion

The Defendants' opposition rests on a view of municipal standing and state immunity that federal courts have long since rejected. LRSD faces direct, concrete injury from the challenged actions, asserts federal claims fully cognizable under *Ex parte Young*, and meets every requirement for intervention under Rule 24. Accordingly, the Court should grant the Little Rock School District's Motion to Intervene.

Respectfully submitted,

Christopher Heller (Ark. Bar No. 81083)
Khayyam M. Eddings (Ark. Bar No. 2002008)
Liz K. Harris (Ark. Bar No. 2018111)
Friday, Eldredge & Clark, LLP
400 West Capitol, Suite 2000
Little Rock, Arkansas 72201-3493
Telephone:   (501) 370-1506
Telephone:   (501) 370-1417
Telephone:   (501) 370-1802
Email:        heller@fridayfirm.com
Email:        keddings@fridayfirm.com
Email:        lharris@fridayfirm.com

By:    _/s/Christopher Heller_____
         Christopher Heller

*Attorneys for Plaintiff Intervenor Little Rock School District*