IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

GWEN FAULKENBERRY, et al.

No. 4:25-CV-592-DPM

Plaintiffs,

v.

ARKANSAS DEPARTMENT OF
EDUCATION, et al.,                     Tuesday, February 17, 2026,
Little Rock, Arkansas
Defendants,                            1:35 p.m.

ERIKA LARA, KATIE PARRISH,
and NIKITA GLENDENNING,

Intervenors,

LITTLE ROCK SCHOOL DISTRICT,

Intervenors.

**TRANSCRIPT OF MOTION HEARING**
BEFORE THE HONORABLE D.P. MARSHALL, JR.,
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**

On Behalf of the Plaintiffs:
MR. RICHARD H. MAYS
MS. HANNAH ALLISON GORE GIPSON
    Richard Mays Law Firm, PLLC
    2226 Cottondale Lane, Suite 210
    Little Rock, Arkansas 72202

On Behalf of the Defendants:
MS. MARY ERICA CROUSE
MS. AUTUMN HAMIT PATTERSON
    Arkansas Attorney General's Office
    101 West Capitol Avenue
    Little Rock, Arkansas 72201

On Behalf of the Parent Intervenors:
MR. BRYAN G. CLEVELAND
    EdChoice Legal Advocates
    111 Monument Circle, Suite 2650
    Indianapolis, Indiana 46204

**APPEARANCES CONTINUED:**

On Behalf of the Little Rock School District Intervenors:
MR. CHRISTOPHER HELLER
        Friday, Eldredge & Clark, LLP
        400 West Capitol, Suite 2000
        Little Rock, Arkansas 72201

*Proceedings reported by machine stenography.  Transcript prepared utilizing computer-aided transcription.*

P R O C E E D I N G S

THE COURT:  This is Faulkenberry and others against the Arkansas Department of Education and others.  Our case number is 4:25-CV-592-DPM.  Today is February 17th, 2026, and we're here for an extended hearing, which I look forward to, on all the pending motions.  There are a couple of motions to intervene and the motion to dismiss.

For the plaintiffs, we have Mr. Mays and his co-counsel, Ms. Gipson.  Good to see you.

For the Arkansas defendants, we have Ms. Patterson and Ms. Crouse.  Good to see both of y'all.

On the proposed intervenors, Mr. Heller for the Little Rock School District and Mr. Cleveland from Indianapolis.  Welcome.

I look forward to hearing from all of you and having a good conversation this afternoon.

Counsel, confession time.  I've gone back and forth in my mind on what the best architecture is for the hearing and I don't -- I still haven't made up my mind because I want to hear from everybody about everything.  And this is the matter on the docket for this afternoon and so I anticipate that we'll be at it a while, maybe take a break.  And I know from the 10,000-feet level it would make sense to talk about intervention first, but I think I'll put that on hold and us talk about the motions to dismiss -- or the motion to dismiss first.

Maybe, Mr. Mays, you and Ms. Patterson could say a few

words about intervention before you wrap up in the main event. And then we'll -- I'd like to hear -- shift gears and talk about intervention.

And everybody will have plenty of opportunity to talk. But that's -- that's my thought is to start with the deep issue unless it makes someone howl.

Any objection?  Okay.

Mr. Mays, I knew you would be ready to go and so -- and I knew, Ms. Patterson, you would be as well.  And so I'll hear from the State, the movant on the motion to dismiss.

MR. MAYS:  Your Honor, you want me to approach?

THE COURT:  I'll hear from Ms. Patterson first because she's the movant, but is there something you would like to say?

MR. MAYS:  There's something I would like to say that will affect your presentation.

THE COURT:  Okay.  Good.  Then come forward, Mr. Mays.

MR. MAYS:  I would like to tell -- advise the Court that we have -- the plaintiffs have determined to take a voluntary dismissal or ask the Court to dismiss the claims based upon the equal protection of the clause of the constitution. That leaves the claims based upon the establishment clause.

THE COURT:  Yes.

MR. MAYS:  And also we still oppose the defendant's motion to -- for the governor be dismissed based upon governmental immunity, sovereign immunity.  But we will

voluntarily or move to voluntarily dismiss the claims that we are asserting based upon equal protection, violation of the equal protection clause.

THE COURT:  Thank you, Mr. Mays.

Ms. Patterson, you can approach.  And did you wish to be heard on that request to nonsuit?

MS. PATTERSON:  No, your Honor.

THE COURT:  The motion's granted.  The -- and I -- I appreciate the plaintiffs focusing their fire.  I think it will help -- help the case.

The -- and for what it's worth, Mr. Mays, I believe that that's exactly the right decision on the equal protection issues.  I have not made up my mind on anything, but there were difficulties, challenges that the law presented on that claim to your clients, so . . .

MR. MAYS:  Thank you, your Honor.

THE COURT:  All right.  Ms. Patterson?

MS. PATTERSON:  Good afternoon.  And may it please the Court.  Autumn Hamit Patterson on behalf of defendants.

We're here today because plaintiffs have challenged the LEARNS Act, which empowers parents, including ones with limited resources, to choose the educational option that best fits their children's needs.  They allege that the act violates the establishment clause in Article 2, Section 24 of the Arkansas Constitution.

As explained in our briefing, the Court should dismiss all the claims, and it can do so on two grounds now that they voluntarily non-suited some of their claims.

First, all claims against Governor Sanders must be dismissed based on sovereign immunity.  And, second, all claims should be dismissed because the complaint does not state a valid claim under either provision.

In the motion to dismiss, defendants argue that sovereign immunity bars all plaintiffs' claims against Governor Sanders and that they cannot show that the narrow *Ex parte Young* exception to sovereign immunity applies that will allow them to overcome that immunity.  In their opposition, plaintiffs offer no argument in response.  This means that they have forfeited any argument that Governor Sanders is a proper defendant here.

THE COURT:  May I interrupt, Ms. Patterson?

MS. PATTERSON:  Yes, your Honor.

THE COURT:  I was wrestling around with whether it's forfeiture or waiver or abandonment or what's the right doctrinal category, do you think?

MS. PATTERSON:  Well, typically forfeiture would be the inadvertent omission of it, whereas, waiver is intentional. I think there is a basis to say that it's actually waived here because it was directly waived in a separate subheading and they seem to have chosen to not respond to it.  So I think it is possible to infer waiver here.  But definitely forfeiture also

would provide.  It's indisputably forfeiture, and that would provide a basis for this Court not to address it under *Rivera v. Banks* in the Eighth Circuit.

THE COURT:  To go -- to go a bit deeper on that point. I understand the argument from *Biogen* and that the governor -- the governor has no enforcement -- strong enforcement role here. Am I on the right track?

MS. PATTERSON:  I think *Biogen* is incredibly instructive here, yes, your Honor.

THE COURT:  Does it -- the papers make claim that this is the governor's -- one of the governor's signature priorities, legislative efforts that she has promoted and adopted.  Agreed?

MS. PATTERSON:  They have alleged that, yes, your Honor.

THE COURT:  Do you agree with it?

MS. PATTERSON:  We are at a motion to dismiss stage. We are to take all the allegations pled as true.  And she certainly has said in statements -- said supportive statements of the act.

THE COURT:  These are the easy questions, Ms. Patterson.  I would suggest that you concede what you need to concede or acknowledge.  Surely you're not going to fuss with me on that.  This is her -- this is the governor's law, isn't it?

MS. PATTERSON:  She has issued supportive statements of it and she did sign -- sign the law.  However, that's never

been deemed efficient to be a sufficient enforcement connection. They need to identify something that -- a specific method of enforcement is not sufficient.

THE COURT:  And I don't mean to imply that it is. This was -- this was preliminary.  What about the money piece? Is the governor involved in the funding piece?  The papers make claim that there is lots of money involved here and that additional money has been approved by the relevant parts of the General Assembly.  Is the governor involved in that at all?

MS. PATTERSON:  Well, I think here at the motion to dismiss stage, what's relevant is what they've pled.  And all they've pled as to the governor is in paragraph 17.  And the only enforcement authority they have alleged there is the fact that she signed the act into law and some unidentified executive orders.  And they haven't pointed this Court to any way in which she is actively enforcing the law where an injunction would give them any sort of relief.  So it creates not only a problem of them not overcoming their burden to show that sovereign immunity has been overcome, but it also goes to standing in that way.  I think that's where *Biogen* is very instructive, not only because it says that the general take care responsibility is not sufficient for methods of enforcement, but in that case the plaintiffs also argued that the governor's control and direction over administrative agencies responsible for the permitting in that case, that that was sufficient for enforcement.  And the

Eighth Circuit rejected that argument saying that they still didn't identify a specific action that linked the governor to the administrative enforcement of the act.  And the same is true here.

THE COURT:  Understood.  I think *Biogen* is very strong authority for the governor on -- and the defendants on this point.

I was at sea on whether the money issues were pleaded or whether I picked that up from the papers about the continuing appropriations and the amount of money involved here.

MS. PATTERSON:  My friend on the other side can correct me if there's some allegations in the complaint I missed that link the governor to those, but I'm, at this point, unaware of that.

THE COURT:  Okay. Got it.  All right.  Anything else on the governor?

MS. PATTERSON:  If the Court has no further questions on the sovereign immunity point, I'm happy to move on to the 12(b)(6) point.

THE COURT:  And the sovereign immunity point, that goes just to the governor?

MS. PATTERSON:  Yes, your Honor.

THE COURT:  Okay.  Very good.

MS. PATTERSON:  So turning to -- I'll take their claims in the order they presented them.  So I'll start with the

federal establishment clause claim.

As plaintiffs' complaint acknowledges and pleads directly, parents are the ones who are directing the funds under the LEARNS Act, and that means it does not violate the establishment clause under the binding Supreme Court precedent.

At paragraph 69 of the complaint, they allege that religious schools of all types participate, Protestant, Catholic, Jewish, and Muslim schools.  In paragraph 38 of the complaint they allege 80 percent of the approved schools are religious, conceding that 20 percent of the schools that participate are not.  And there are other allegations in that paragraph also concede that nonreligious schools are participating in the program.

They additionally attached an exhibit to their complaint, and that's Exhibit 1 at page 8, where it recognizes that parents are the ones who are distributing account funds to the school of their choice.  And in paragraph 3 of the complaint, they talk about it's the parent or guardian who chooses to enroll their child in a particular school.

And so their allegations demonstrate that where children choose to go to school, where this fund -- where these funds go is a result of voluntary choice.  And under Supreme Court precedent, that means it's not an establishment clause violation.

THE COURT:  Can I interrupt again?

MS. PATTERSON:  Absolutely.

THE COURT:  One of the themes that I took from your good briefs was this notion of parental choice.  In fact, it may be the first line of your motion and the first line of the brief.  And the -- and joined right with it, the neutrality point, that these funds are -- the account funds are available for any institution that the parents choose for their child to attend.  Do you agree with me that those are themes, important things that the state is developing here?

MS. PATTERSON:  Yes, your Honor.  I would say those are important things we've developed that align with the Supreme Court precedent in this area.

THE COURT:  Yes.  And, in fact, that's the next point. They're not only -- they're not floating things, they're not things in the air, but those are the things that the Supreme Court has said are important in determining whether there's an establishment clause claim that's been plausibly stated.  Are you with me so far?

MS. PATTERSON:  Yes, your Honor.

THE COURT:  Okay.  Do you need some water?

MS. PATTERSON:  Do you mind if I grab my water bottle?

THE COURT:  You get some.  And I'm going to get some, too.

And the precedent, I think, that you're drawing on, *Zelman*, *Espinoza*, the Maine case, *Carson* -- it starts with a C.  Help

me.

MS. PATTERSON: *Carson v. Makin*?

THE COURT: Yes. Isn't that the Maine case?

MS. PATTERSON: I believe we do cite it. I don't know. I think the other ones you mentioned are pretty helpful for us as well.

THE COURT: Sure. Those cases speak loudly and clearly about this choice and neutrality, the choice -- and the importance of choice and neutrality.

So consider a hypothetical case with me, please, where a state adopted a program, an account program, but explicitly said this is for religious institutions only. The -- we believe that good citizens are educated morally citizens and that that instruction is better done in sectarian institutions of any kind, but sectarian. Constitutional problem?

MS. PATTERSON: I think that the case law is not as clear as to that under *Zelman* because there it does talk about neutral government program and it does talk about going to a secular institutions and religious institutions. Of course, a lot of these cases are also applying the Lemon test, which we know is no longer good law. And so I don't know whether the Supreme Court would look to those cases exclusively or, given it would be a new situation, whether the Supreme Court would turn to the historical understanding test, and I think you might potentially get different answers in that.

THE COURT:  Talk to me some more about that.  I'm surprised by your answer.

MS. PATTERSON:  Yes.  Well, so in -- in *Zelman*, because in the cases discussed *Zelman*, *Mueller*, and the others, *Withers*, *Zobrest*, there the neutral government aid was going to religious and nonreligious schools, so you're not seeing the Court directly grapple with that.  In *Espinoza* the Court says a state need not subsidize private education, but once a state decides to do, it cannot disqualify some schools solely because they're religious.  So as we know --

THE COURT:  *Espinoza* is the playground case, right?

MS. PATTERSON:  No, your Honor.  The playground case, I believe, is *Trinity Lutheran*.

THE COURT:  Yes.  I'm sorry.  Yes.

MS. PATTERSON:  So *Espinoza* is the Montana tuition program.  And so we do know that religious schools have to be included.  I don't know of a case where it's been squarely presented of just for religious schools.

When it comes to Arkansas Constitution, I know there's -- there it's a no preference.  And we cite a law review article talking about that -- under that provision and as long as it's not a particular denominational preference, the State can advance religion and things of that nature.  But it's not as developed in Supreme Court precedent.  So I do think they apply the historical understanding and practices test.

And so I think there the question would be whether -- if it -- if government support for established church, whether that could be established as a hallmark, and I'm unaware of cases kind of fleshing that out. But I do know historically -- there has been a lot of federal assistance and aid given historically for religious schools. In the brief we point to a law review article discussing how the federal government provided aid to the establishment of some missionary schools to Native Americans and things of that nature.

So I think also under the historical establishment test, the burden would be on the plaintiff to show that it had a hallmark of a religious establishment. So I think it would depend on what the evidence in that case would be as to whether there's an historical analog. And given that circumstance is so different than what's before this Court, I have to confess I haven't gone to the deep dive of historical research regarding the solely religious aid. Because here what we have is --

THE COURT: The State doesn't think it would be an establishment of religion to set up a funding program exclusively for religious schools? Is that what you're telling me, Ms. Patterson?

MS. PATTERSON: No, your Honor. What I'm saying is that *Zelman* and the cases we've cited, they are discussing programs like this program here of neutral government aid for both religious schools and nonreligious schools. So that's

what's clear in the case law.  And for that new circumstance in context, it would be -- the Court might apply the historical understanding and traditions test, in which case it would be the plaintiffs' burden to show that it matches that analog.  And so I guess my answer is that the case law is not developed in that area, but that's not the issue before this Court.  Here we're dealing with an issue of neutral government aid being where parents can choose whether to direct it to religious schools or nonreligious schools or enroll their children in charter schools or the traditional schools and all of the things of that nature. So just very different from the situation we have here.

THE COURT:  I was removing, of course, the neutrality premise.  That's all I was doing.  But -- but what I hear -- what I hear the State defendants saying is, well, then look to history and tradition.  We're not sure whether that would be constitutional or not.  Correct?

MS. PATTERSON:  I think the burden is always on the plaintiff to prove it.  And so I would be interested to see what, in that case, the plaintiff would point to.

THE COURT:  Okay.  The -- you were moving, and helpfully so, on to the choice issue.  Let's talk about that.

Is the choice -- your brother Mays articulates in the complaint and in the briefing that the choice here is not real because that -- the number of counties where there is no alternative to a public school other than a religious school.

Does that -- does that state a plausible claim, that attack on the choice aspect of the cases?

MS. PATTERSON:  So I didn't understand my friend on the other side to be making that argument.  I understood him to be arguing an equal protection clause claim, that individuals in rural parts of Arkansas were being denied this benefit on an equal basis because there were not any private schools available in that area.  I don't recall him making the sort of argument that you're advancing now about whether certain schools in certain areas, the only option are religious schools.  I don't know if there are any allegations to that effect.  What --

THE COURT:  Assume that there are.

MS. PATTERSON:  I think --

THE COURT:  Remember the map at the back of the complaint that had the blanks and the --

MS. PATTERSON:  I do remember the map at the end of the complaint.  I thought those were just of schools, private schools.  I don't recall --

THE COURT:  I thought it was the stars were private schools.

MS. PATTERSON:  Yes, your Honor.  I see Exhibit 6.  It has stars for private schools, circles for public schools, and then it has some colors for letter grades.

THE COURT:  Failing schools.

MS. PATTERSON:  Yes.  I don't see any indication

regarding which are religious and which are not religious.

THE COURT:  But the complaint alleges facts about the percentages of religious and nonreligious schools where the money is flowing and where they are located, and we don't have stars all over the map.  So isn't the reasonable inference there that there are not -- in fact, isn't it directly alleged that there are not private nonreligious schools available in every county?

MS. PATTERSON:  I don't know where that is alleged in the complaint.  I know there are allegations that there are complaints without any private schools.  I cannot recall a paragraph or complaint where it is distinguishing between what counties have -- I don't know that there's an allegation that says only this county only has religious private school options. So I'm just not aware of that allegation.

In 38, that's where -- paragraph 38 is where they say 80 percent of the private schools are religious and they talk about some of the distribution of funds.  I don't remember that geographic distribution allegation in the complaint.

THE COURT:  And maybe it's in the equal protection allegations claim, now abandoned.  Can I consider those allegations on -- the factual allegations in connection with the First Amendment claim?

MS. PATTERSON:  You could consider the factual allegations, but, again, I believe the factual allegations were

just about the existence of a private school or not in a certain county, not whether that private school was a religious school or not.  I still don't think there's those allegations to support the argument that you're suggesting.

I also think, though, when you look at the Supreme Court cases the high percentage of involvement of religious schools or the high percentage of funds being directed towards religious schools has not been deemed significant to the analysis.  In *Zelman*, there, 82 percent of schools participating were religious.  So you have a higher percentage than what we have here, where, according to their own complaint, it's 80 percent.  And also there 96 percent of the students participating were enrolled in religiously affiliated schools.

And so the Court said that the issue is whether it's going to be parents' true choice and whether it's the parents making the decision.  And that's what you have here.  And as they allege, it is the parents making the decision about whether to send their children to a private school, a private Christian school, a private Muslim school, a private secular school, a magnet school, a charter school of that.  And because it is that neutral -- that decision, a private party, that means there's no establishment clause violation.

You also see this in *Espinoza* where the Court said that an establishment clause objection would have been particularly unavailing because the government support only goes to the

religious schools as a result of private choice.  So --

THE COURT:  So if I could interrupt, please.

MS. PATTERSON:  Of course, your Honor.

THE COURT:  So I'm trying to plumb this notion of choice, which we've agreed, I think, that the Supreme Court has said is very important and which you've emphasized in your argument.  How much of a choice is it if there is no nonreligious private school available?  I'm a parent.  I don't like what's going on in the public schools.  How much of a choice do I have if the only available institution in my community or county is a religious school?

MS. PATTERSON:  Well, your Honor, a couple responses to that.  One, there still would be the option of home schooling, and some funds are available under the LEARNS Act for that.  And regarding the choices of private schools available, that is something that obviously changes over time what schools are available or not.  And that is not an attributable to the government, that's a result of private parties.

And, again, the Supreme Court has said that the percentage of people choosing religious schools, the percentage of funding going to public schools is not what's relevant.  It's that they have a choice.  And it's private actors, not the government.  And here everything you're talking about is a result of private actors and things that change.

THE COURT:  Do you know -- pardon me -- do you know

the expression Hobson's choice?

MS. PATTERSON:  Yes, your Honor.

THE COURT:  What does that mean?

MS. PATTERSON:  I was going to ask some people mean slightly different things, so I'm happy to hear your interpretation of that.

THE COURT:  You first.

MS. PATTERSON:  That it's not a real choice.

THE COURT:  Yes.  Exactly.  Hobson was -- ran a livery stable and when you showed up and wanted a horse, he said here. He picked the horse for you.  Is there a Hobson's choice here?

MS. PATTERSON:  There is not, your Honor.  There are multiple choices.  And they don't even allege in the complaint that I saw that it is.  They do mention that in their equal protection clause claim based on individuals living in rural counties, they allege that they don't have equal access to the government benefit because that government benefit might not be as useful to them.  But they have dropped that claim, and for good reason because -- but it's still individual private choices that are reflecting what the choices are.  And they're constantly changing over time of new schools opening and closing and the possibility of home schooling, charter schools, magnet schools, things of that nature, online schools.

And so I just disagree that it's the case.  And I don't see any allegations in their complaint alleging it really is a

non-option of they only have to go to a religious school or something of that nature.  I don't see those allegations or that evidence.  And, regardless, that would be not a result of a government action, that would be private choice even if that were the case.

THE COURT:  I think I disagree with you on what's alleged and argued about the circumstances facing parents, but I need, I guess, to reread the papers to be sure.

MS. PATTERSON:  And while my friend on the other side's talking, I'll happily go back and look at those allegations relating to the equal protection clause section. But I do -- my recollection is that it was just talking about whether there was a private school or not, not whether that private school was religious or not.

THE COURT:  You mentioned the home schooling option. What about the single parent family or the -- both parents have to work where home schooling is not a real choice?

MS. PATTERSON:  The act is still increasing the choices.  Whether or not everyone is in a situation where they can take advantage of it, it doesn't mean that it's not a neutral government program.

THE COURT:  I'm not sure I follow that.  If the -- I guess we're back to my hypothetical of -- or what if you -- let me change my hypothetical.  What if you've got an account program or voucher program that says this is for all schools,

all private schools, but we know that there are only a handful of private schools in the state that are not connected with a religious institution.  Pick your number.  One, six, whatever it may be.  And so comparing the facts on the ground, don't you have to measure this -- this appeal to neutrality with the appeal to choice by the -- by the facts, at least as alleged or for if we're talking on the motion to dismiss, but --

MS. PATTERSON:  Well, again, the facts as alleged are that 80 percent of approved schools are religious, which means that 20 percent aren't.  And in *Zelman* it was 82 percent of schools that were religious.  And so, as the facts allege, there's not an establishment clause violation under binding precedent.

And I also think *Zelman* is helpful because the Supreme Court talks about the fact that percentages are also fluctuating over time and the fact that people -- there's more religious schools in certain parts of the country than others doesn't mean that in one state a neutral government aid program would be permissible and in another state it wouldn't be just because of the fact that some states have higher percentages of private schools that are religiously operated than other states.  So I think that sort of analysis is foreclosed by Supreme Court precedent.

THE COURT:  One of the things that struck me about *Zelman* was the whole pie of the approach to the Cincinnati

schools.  That is, you had community schools, you had magnet schools, and you had this small-ish voucher program that was also a part of it.  Does that make any difference here that the LEARNS Act is focused just on these accounts or vouchers and that it isn't addressing education more generally?

MS. PATTERSON:  Well, first, I would disagree with your characterization of the LEARNS Act.  It does have other features, for example, allowing for some special literacy tutors in public schools and making some changes regarding charter school applications and things of that nature.  And I'm sure there's a lot of other things as well.  So I guess one pushback would be that, if you were to look comprehensively, there are a lot of options here provided, including under the LEARNS Act, not just religious -- religious schools.

And I think secondly I would say in *Espinoza* the Court -- which, granted, it's a free exercise clause case, but the Court goes out of its way a couple times to refer to why an establishment clause objection would not be valid in that case. And there you don't see any sort of that wholistic analysis. What you see is when you're dealing with a neutral program that you have to allow religious entities to also benefit from that. And they say that repeatedly at 474.  F487 is when they're incredibly explicit even talking about private education of a state need not --

(Court reporter interruption.)

MS. PATTERSON:  A state need not subsidize private education, but once a state decides to do so, it cannot disqualify some private schools solely because they are religious.  And there's no discussion of the broader program.

THE COURT:  Another hypothetical.  What about an account program that said just private schools, but not any private school that's associated with a religious institution or that has religious instruction?  Constitutional or no?

MS. PATTERSON:  I think that would create some free exercise problems.

THE COURT:  Clearly.  Yes.  I think it's -- it's the combination of *Espinoza* and *Zelman* maybe.  Or maybe it's the Maine case, actually, where you can send your child, if there's no high school available, you can send it to any institution, but we're not going to accept religious institutions.  So maybe that's the closest.

MS. PATTERSON:  I think that would also be helpful in that hypothetical.

THE COURT:  Okay.  What else, Ms. Patterson?

MS. PATTERSON:  If the Court has no further questions, I can briefly move on to the Arkansas constitutional claim.

THE COURT:  Do they not -- well, you touched on this, I guess -- let me sidetrack you again.  Do I have enough in the -- in the record about history and traditions or do I need more, both in terms of the federal claim and the state religion clause

claim?

MS. PATTERSON:  You have enough to decide it here based on their allegations and their arguments.  Here they argue that they have an establishment clause claim, one, because they urge this Court to apply Lemon, which of course the Court cannot do.  And, two, they alternatively offer the Court a historical argument, but the only argument they have presented is that they argue it is -- it contradicts Thomas Jefferson's statements about there being a wall of separation between the church and the state.  The Supreme Court has recognized that that is not a perfect analogy for how we approach things and things of that nature.

They did not actually advance an argument that it violates -- or it is a hallmark of religious establishment.  So I think our first argument would be that they have forfeited any argument.  And, as pled, it doesn't -- the Court doesn't need to reach that issue because we have on-point binding precedent that makes it clear what they've alleged is not an establishment clause violation under *Zelman* and some of these other cases.

THE COURT:  Okay.  And on the state religion clause cases, same analysis or something different?

MS. PATTERSON:  So in the *Cortez versus Independence County* case that we cite in the brief, there the Arkansas Supreme Court analyzed the challenged law issue which is where there was a bond being issued to help pave -- or repave a

parking lot for a chapel at a religious church. And they -- they asked whether it was giving a preference when interpreting the Arkansas Constitution. And they said it wasn't because any college would be entitled to the same kind of bond if all statutory requirements were met, so it wasn't showing one preference of one denomination or another, one religion or another. And so it was constitutional. And then the Court turned to apply Lemon when analyzing the U.S. Constitution -- U.S. constitutional claim. So that indicates that there is a different analysis.

However, here plaintiffs have not made any argument under the Arkansas Constitution. We presented our argument in our opening brief, and in response they didn't offer anything. So we would say that is forfeited. And so that is a reason to dismiss the claim as well. It fails under that case as explained. And even if they were right, that it should be interpreted in lockstep with the federal constitution, even though they introduce no case indicating that, then it fails for the reasons already explained.

THE COURT: All right. I did not have a chance to study the Hofstra law review article about the Arkansas Constitution that's cited in the footnote of your brief, but the citation made it sound like that there was a section about Arkansas and that preferences were fine under the state constitution, religious -- preferences favoring religious

institutions.  I suppose building on what you just said, as long as it's not one denomination over another.  We can't support the Catholics but be mean to the Baptists.

MS. PATTERSON:  That's my understanding.  And I will say that article does discuss it and mention Arkansas Constitution, but it does so along with some other states.  So it's not a deep dive in just the Arkansas Constitution.

THE COURT:  Got it.  But you don't think I need that deep dive either as a matter of state law or federal law on history and traditions to decide the case?

MS. PATTERSON:  I think that it's clear their claim fails under -- under the cases that we cite.

THE COURT:  So that's a no?

MS. PATTERSON:  Yes.  I mean, they haven't presented or preserved that argument.  And the cases we cite show that their claim is squarely foreclosed by the cases because it is on all fours with *Zelman*.

THE COURT:  Unless I disagree, right, given our back and forth about the cases?

MS. PATTERSON:  Yes.  If you -- and if you disagree, we would say that it is consistent with historical understanding because it's not -- it's -- it doesn't have any of the hallmarks of religious establishment here.  It's a neutral government aid program where parents are voluntarily choosing where to send their children.  And so in that way it's -- as they allege in

paragraph 69 and 38, the government funds are being directed via parental choice to a wide variety of different types of schools.

THE COURT:  Got it.  I've kept you for almost 45 minutes, Ms. Patterson.  Did you want to say a word -- just a word or two about intervention before I hear from your brother Mays?

MS. PATTERSON:  Your Honor, I was going to have my colleague Ms. Crouse get to argue that.  So I don't want to take that away from her.  Would you like her to come out now or give Mr. Mays an opportunity to present?

THE COURT:  I'll just move on to Mr. Mays and the merits of the motion to dismiss and we'll focus on intervention here in a little bit.

MS. PATTERSON:  All right.  Thank you, your Honor.

THE COURT:  Thank you for tolerating my questions and answering.

Mr. Mays?

MR. MAYS:  I brought half my office with me.

THE COURT:  Well, I'm right there with you.  I can't -- I can't escape the paper, Mr. Mays.

MR. MAYS:  When you're arguing Supreme Court decisions, it adds up to a lot of printing.

THE COURT:  It does.

Ms. Black, can we give Mr. Mays more volume on that tech mic?

MR. MAYS:  Your Honor, I apologize for my voice.  I have no idea what's going on except that my doctor told me there wasn't anything I could do about it.

THE COURT:  Understood.  Apology accepted, of course. I'm just glad you're here.  And mine may slip and fade, too.

So what say the plaintiffs, Mr. Mays, on the motions to dismiss -- on the motion to dismiss?

MR. MAYS:  Your Honor, I have quite a bit to say about it.  I've done a lot of -- a lot of study on this, probably more than anything I've worked on in the last year or so.  And it's been a study in frustration in some ways because the jurisprudence of the Supreme Court, United States Supreme Court has been -- has had a steady trail of adherence, strict adherence pretty much to the, what I would say to the establishment clause of the Constitution.  And it seems to go in phases, that they have gradually gotten away from a stricter interpretation into a more -- a more, I would guess you'd call it, open or liberal interpretation of it.

The first case that they decided that is relevant here in my opinion was the *Everson* case, *Everson versus Board of Education*, which was decided in 1947, quite a while ago under -- if you -- judging by Supreme Court time.

THE COURT:  Yes.

MR. MAYS:  And the *Everson* case had a quotation in it that said the establishment clause, establishment of religion

clause in the First Amendment means at least this, and they named five things -- six things that they thought that it stood for.  Several of them don't really relate to this.  The ones that do are the second one.  One is that neither the state nor the federal government can pass laws which aid one religion, aid all religions, or prefer one religion over the other.

In this case the -- and this decision and the First Amendment, of course, the establishment clause is binding on the states through the 14th Amendment.  I don't think there's any question or challenge to that.

The LEARNS Act in this case passes law -- is a law which favors all religions in the sense that it may not single out any particular denomination or a particular faith for receipt of the LEARNS Act funds.  It gives it to anybody who qualifies to be a private school.  But under the decision in *Everson*, that's not -- that's not constitutional.  A state cannot pass a law which aids all religions.

And I have to say that someone giving tuition grants to students who can pick -- pick the school they want to go to, $7,000 per year for grants to these schools is certainly an aid to religion.

The other -- the other point that the *Everson* case made about what the First Amendment establishment clause means is that no tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they

may be called, or whatever form they may adopt to teach or practice religion.  Now, that was the *Everson* decision as it -- as I see applicable to this case.

Under that *Everson* decision, it seems to me that -- it's pretty clear that the LEARNS Act is unconstitutional because it favors -- it benefits religion, a number of religions.  Any of them.  They have Jewish private schools, they have Islamic private schools, they have Episcopal schools, they have Baptist, fundamental, and others.  They all can get those grants.

My complaint with it is that it's -- that you do it under the guise of -- of the parents being able to choose those schools and the money is directed to those schools at their choice.  To me that is a subterfuge.  It is not -- it is not -- doesn't shield the state -- or it should not shield the state to have a law that says if the parent -- if the money's given to the parents, then they can give it to the school.

I mean, if you had a man who -- or a person who was wealthy and they wanted to give a hundred thousand dollars to a private religious school, that's his prerogative.  He can do that.  It's his money.  But the money does not belong to the people who are giving it to them in this -- or who are purported to give it to them in this case.  The money belongs to the State of Arkansas.  It is tax money.  There's no question about that.  It is never ever given to the parents or the student.  It is put into accounts at the Department of Education with their name on it,

but the money -- they never touch the money.  In fact, the LEARNS Act specifically provides that they shall never ever be given that money.

THE COURT:  There's a reversion, isn't there --

MR. MAYS:  Yes.

THE COURT:  -- to the state at the end of that period?  May I interrupt --

MR. MAYS:  If the money isn't all used up or if the student should go back to public schools or quit schools --

THE COURT:  Or graduates.

MR. MAYS:  Or graduates.  The money that's left, if there is any, and that account reverts -- it never did leave the state actually.  It's still in the name of the state.  It's at the Department of Education until the -- until the ClassWallet, which is the government contractor, it's the state's contractor, distributes the money according to the rules for either tuition or for supplies or such as that.  It never becomes the money of the student.  It never becomes the student's parent's money.  It is always the state's money.  It's just dedicated to or used for that student's expenditures.

THE COURT:  May I interrupt, Mr. Mays?

MR. MAYS:  Your Honor, you can take it from here if you want to.  I've pretty much said what I think is important.

THE COURT:  Well, first, I appreciate your argument from *Everson* and giving me a reason to go back and read the

Battle of the Titans with Justice Black on one side and Justice Jackson and Frankfurter on the other.  And I learn from it, of course.  But I feel like to some extent you are arguing the position that Justice Souter articulated in his dissent in the *Zelman* case, which is the Ohio school voucher case where he traces these periods.  I heard echos when you first started speaking of the periods in the doctrine and how it shifted a little bit and it shifts again and shifts again.

MR. MAYS:  I enjoyed reading Justice Souter's dissent, yes.

THE COURT:  But it is a dissent.

MR. MAYS:  Well --

THE COURT:  And that's why I was pressing your sister Patterson on the State's position because *Zelman* is such a strong precedent for the State here.  That's why I think we have to attend to this choice principle that's articulating the decision, the neutrality principle -- sorry, that's not articulating, that's the wrong word -- animating the decision. That's what I was suppressing her on, do we have true choice here or do we have true neutrality or is it at least plausible that, put better, given where we are in the case, have the plaintiffs made a plausible showing that there is no real choice here in certain instances and that there is no neutrality here? So take it from there.

MR. MAYS:  Well, in that regard, your Honor, I was

listening to your questions to Ms. Patterson about the school -- how many private religious schools there are in the state. There are quite a few of them.  In fact, since this program has been initiated, when they first started it I think they had something like 116 or 115 private schools listed in the program or that had been approved by the Department of Education.  That number is up to 165 now.

And I -- I haven't counted the religious schools in the new list.  I did in the -- when they first came out with a list. Approximately 90 percent of the schools that were on the approved list in 19 -- I mean, in 2023 were religious schools. I dare say that that has not diminished any, and I suspect strongly it has increased because a lot of the schools that have been added have been in rural areas where a lot of the schools that are private schools are religious schools.  But they've also increased some in the Central and Northwest Arkansas where you have large population centers and so -- for Arkansas.

I think the percentage is certainly around 80 to 85 percent religious schools.  And where you don't -- in an area where you don't have many schools except the public schools, and they're few and far between -- some counties and some areas only have two or three public schools -- and when you have private schools in those areas, if you're going to take advantage of the LEARNS Act, you don't have much choice as to where to go.

But to me the choice issue is an illusion.  It doesn't --

they give the -- they give the parent a choice and certainly the parent, if they want to go a private school, they have the right to make a choice, I guess.  That's part of the decisionmaking process.  But to endorse that with state money, public money, and without -- I mean, and to pay this -- pay the parents -- or to -- not to pay the parents -- to allow the parents to choose the school and then pay the school because of that is, to me, making a mockery of the establishment clause.

It's nothing but a -- you can go to a private school if you want to, there's no question about that.  And everybody's free to do that if they pay it for themselves.  But there's nothing that says you can -- you can choose a private school to send your children to and expect to have it paid by the state.  That is a -- seems to me a clear violation of the establishment clause because those schools are nothing more -- I mean, and they're -- I'm not belittling religious schools, they're good schools for the most part, but they're an extension of their church, they are extensions of their faith.  But they teach and they acknowledge -- their websites -- I listed a lot of those websites in the complaint.  They are quite open about incorporating their religious beliefs into their curriculum for the schools.  They are clearly teaching religion to the students.

And, as such, giving money to those schools, whether you -- especially when you never give the money to the students, you're

just -- you're using the students as a basis for choosing where they want to go, they make that decision, but it's not -- it's not a dedication of the money to the students.  The money never leaves the ownership of the state.  It stays in the possession of the state, it's owned by the state, and it reverts back to the state if it's not used up.

I don't know how much more clear it can be that this is not these individuals' money.  They can choose to do whatever they want to with their money, but it's state money and not individual people's money.  And you can't use state money to enhance a religion.  That's pretty clear from all these -- not just *Everson*, but the other decisions that follow it.  There's a whole bunch of them.

THE COURT:  Let me -- let me interrupt you again, Mr. Mays.  I understand the argument from the -- the argument from principle that you're making here and reality on the money.

MR. MAYS:  Yes.

THE COURT:  In terms of the Supreme Court's recent precedents, though, which I have to follow, the Court in *Zelman*, for example, blesses this part of what Cincinnati was doing for its failing schools that allowed vouchers, as you call them, in connection with other things and it said it's fine and it's not an establishment because the program is open to all private schools and because the parents are choosing which school their children are going to go to.

That's why I was -- I was pulling you in to this recent precedent, the playground case, the Maine case.  Where, because of a robust provision of the Maine Constitution, no money to religious schools where there were no high schools and the Supreme Court reverses.  Deal with that recent precedent, please, sir.

MR. MAYS:  Well, I'll try, your Honor.  The Court has said, as I recall, that the -- that the -- using the parents as a vehicle for choosing the school is one element they look at, but they -- as I recall, the Supreme Court said there are other elements to take a look at, too.  And we haven't even begun to talk about the other elements as to what the schools do, their curriculum, the amount of money that goes to these schools.  We're up to over $300 million now today that has been invested in the last three years -- including this one, three school years -- in this LEARNS program.  Three hundred -- over -- it's about $330 million.

There are reports that have to be filed by the schools.  There are directions that are given to the schools by the state.  There are criteria, tests that have to be given that the state dictates be given.  They're not totally satisfactory to a lot of people because they're not the same tests that the public schools get and you can't compare apples and oranges to apples and apples.  But the Court has also said, Supreme Court, that they look to the degree of entanglement of schools of the

subject, the school or the religious institution that is getting the money with the government that's giving it to it.  If there's excessive entanglement, then it becomes a state actor and it is part -- it violates the establishment clause.

We haven't even looked at that.  We've been talking so far about the parental choice, which -- which is a big selling factor for the governor, but it's a fiction.  The choice is limited only to selecting a school.  But even at that, the school -- the state -- the parents are doing that at the state's permission.  The state has given them permission to do that in order to get to the money.

But there are other factors that I think we haven't looked at and probably shouldn't at this point because it's part of the evidence that would be presented if we were allowed to go forward.

But the question here today, as I understand it, is whether we have stated a claim or whether we have standing.  And we, I think -- I don't think there's any real challenge to the fact that we do have standing.  Each one of the plaintiffs meets standing requirements in a number of ways.

First, they're all taxpayers.  The tax money is being used to provide funding to these schools.  They're all teachers. They have an interest in teaching.  They have an interest in the educational system.  And most of them, I think all of them, for that matter, have children or grandchildren that are in schools.

They are interested in not only whether they might be able to -- might -- might choose at some point putting their child in a -- in a private school.  If not -- I mean, they teach in public schools.  But the effect of this -- of this experiment of giving money to the private schools and seeing what happens is -- is something that they're interested in because it could affect their jobs and their teaching.

THE COURT:  I took the state -- or the defendant's standing arguments to be targeted at equal protection, not the First Amendment claims.

MR. MAYS:  Well --

THE COURT:  And so -- but your sister Patterson will tell me here in a minute if I misunderstood.  I thought that they were.  So . . .

MR. MAYS:  The first -- the Court -- the Supreme Court has said, as I recall it -- and this is in the decision that I happen to have here.  It's the -- let me get it.  Sorry to take so long, your Honor.

THE COURT:  No, that's okay.  I'll be rooting around looking for something here in a minute so I'll need patience, too.

MR. MAYS:  The name of the case is *Flast*, F-l-a-s-t, *versus Cohen*, 392 U.S. 83.  The *Flast* case said that taxpayers had standing to challenge under the equal protection clause, which I don't -- I mean, the --

Graham Higdon, RMR, CRR, United States Court Reporter
graham_higdon@ared.uscourts.gov (501)604-5115

THE COURT:  Establishment?

MR. MAYS:  Establishment clause, yes.  And there are several other cases that support that.  I can provide them to you.  I happen to have them here with me.

But they have carved out an exception.  Normally the law is, as I've said that as I found out by reading all these cases, is that payment of taxes at the federal level doesn't always give you standing.  But the *Flast* case, the United States Supreme Court carved out an exception to that and said as far as the establishment clause is concerned, paying taxes gives you standing to challenge the state or the government's contributions or money given to religious institutions.  So I would -- I ask the Court to consider that.

THE COURT:  Of course.

MR. MAYS:  Thank you.  Do you have any other questions?  I find it easier to answer questions than I do to make a presentation.

THE COURT:  I do.  I know it shocks you, but I can't help myself, Mr. Mays.  You know me too well.  What about the governor and her -- that *Biogen* case from the Court of Appeals is stout authority for the governor being governor is not enough, that she's got to have some direct involvement in enforcement and your colleagues say not enough here.

MR. MAYS:  I read -- the read the *Ex parte Young* case and it says that -- this is at page 159 and 209 U.S. at page 159

*-- Ex parte Young* says, "In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer" -- it didn't specify any which one, just any officer -- "must have some connection with the enforcement of the act."  Some connection.  It doesn't say they have to be the chief enforcer.  The attorney general would probably -- is normally the person who is affected by this, but in this case we've joined the governor.  Frankly, I really don't care whether the governor is in the case or not.  We filed the suit against them because of the -- we sued everybody who we thought might be responsible.

But I was listening to your questions to Ms. Patterson about that and the reason -- the reason that I think she should not be dismissed is because she has been -- as the Court asked Ms. Patterson earlier -- she has been the main promoter of the LEARNS Act.  She has not -- and it hasn't been a passive promotion.  She has been highly involved in every aspect of the LEARNS Act from its initiation, from its introduction.  They had a big press conference in the capitol when she introduced the act to submit to the legislature to adopt or to consider, and the legislature did that.  They went through it in very quick time.  And when the -- when they adopted it, she issued a big press release.  She issued a proclamation on -- it's -- it's an executive order, 23-08, and it was issued when she became governor on January 11th.  And it's an executive order to

prioritize the LEARNS Act.  And she lists -- it's about a six-page document -- she lists all of the reasons why she thought we needed to have a LEARNS Act, including that 70 percent of people who are incarcerated cannot read at a fourth grade level, 35 percent of the Arkansas third graders were reading at grade level, only that amount, more than 140,000 Arkansas students attend schools rated D or F.  There's a whole lot of other things why she thinks that we needed to have the LEARNS Act.  And she then directed the Department of Education to do a whole bunch of studies and issue reports and so forth that cover about four pages in the proclamation.

When the LEARNS Act was adopted -- or after it was adopted, she issued statements -- there was a lawsuit, of course.  And the first lawsuit was whether the emergency clause that had been affixed to the LEARNS Act was valid.  I thought it a rather strange case.  I didn't have anything to do with it.  But when the Supreme Court decided in favor of the government, she issued a rather lengthy statement that said it was a historic victory for Arkansas parents, teachers, and students, and a crushing defeat, she says, for the partisan extremists who tried to undermine our kids' futures.

The Court may detect a certain amount of enjoyment that I'm getting from reading.  And here's the critical part.  "My administration will continue to implement our transformational reforms which empower parents to choose the best school for

their family, prohibit indoctrination, raise teacher pay from one of the lowest to one of the best in the nation," and so forth.  It's an ongoing project.

THE COURT:  And this is -- the Supreme Court reversed on intervention on that state case on the merits of the LEARNS Act, we'll say.  That's still going on, correct?

MR. MAYS:  Well, that's a different lawsuit from the one she's bragging about.  This one only dealt with the -- when the -- when the emergency clause went into effect.

THE COURT:  I see. Okay.  I'm sorry.  I had moved on to the recent dispute about intervention.

MR. MAYS:  Now that I'm on this, I'm enjoying it.  She wrote a letter to the Joint Budget Commission of the Legislature on March 6th of 2024 in which she asked for more money.  And she said in the letter that the LEARNS Act was the largest overhaul of Arkansas school system in modern history, but signing the law was just the first step.  Implementation is where the rubber meets the road, she says.  Implementation.  That's now what she's now involved in is the implementation of the act.

THE COURT:  Is that -- pardon me for interrupting, but I will again.  Is that administrative order attached to the complaint?

MR. MAYS:  I think it is.

THE COURT:  And so I was -- I was pressing your sister Patterson on this funding piece.  And I know in general that

there have been a sort of series of funding efforts and more money is needed, more money is needed.  But -- and so I wasn't sure of the governor's role, if any, in all of that.

MR. MAYS:  We also have to remember the governor is the head of the executive branch of government.  She controls the Education Department.  The Education Department has been fleshing out rules for the LEARNS Act.  It has established in her name the -- a group of people after the law was initially passed to provide guidance and to serve as a committee to help formulate the way that it should be put together and the way it should be operated.  There were about 30 or 40 people appointed by her to serve on this committee.  She has been involved in many of the activities, continuing -- continuing involvement.  And all of the activities involve the LEARNS Act.  And every time she makes a speech, every time she writes a letter to the legislature or something, she touts the LEARNS Act as her principal -- as the jewel in her crown of achievement, so to speak.

She is going to be continuously involved and will be in the future.  And she's the biggest fan of the LEARNS Act in the state of Arkansas.  She has said openly and repeatedly that every student in the state who wants to go get a voucher to go to the private schools will get one and it will be funded, she says.

Now, I mean, that's pretty strong.  And her support, of

course, is critical to the state doing the things that it's doing. And her direction -- it's not just a passive -- a passive engagement on her part. She is actively involved in every aspect of this and she directs a lot of it. And she ought to be a party because she's the controlling and main motivation for it in the state of Arkansas. It's not the attorney general. He enforces it, but she tells him to, I would tell you.

THE COURT: I understand the point, Mr. Mays. What else on the motion to dismiss?

MR. MAYS: I think that's -- I've written a brief, which I know the Court's read.

THE COURT: With enjoyment and edification. I've read more than once all the parties' briefing and it's very good, and I mean that, far above average. It's helped me.

MR. MAYS: I wasn't fishing for that, but I enjoy hearing it.

THE COURT: It's true. It's true. Like you, I have enjoyed studying up on all of this and spending time with the papers and the cases.

MR. MAYS: I think -- I got into this case because when I was growing up and when I was a young lawyer I always understood that there was a separation between church and state. James Madison's law between church and state. And I always heard that, I always believed it. And I -- there are a lot of changes taking place in the world today and a lot in the law of

the United States, some of which I don't like, some of which I -- but a lot of which I can't control.  The reason I got into this case is because I didn't like what was going on here and I thought I could do something -- or at least try to do something for it to try to reverse it.

I think the Supreme Court is wrong in using the students choice issue as allowing money to be diverted from public schools to private schools, particularly religious private schools.  I think it's clearly a violation of the -- of the establishment clause.  As far as my opinion is concerned, I'm disappointed the Supreme Court has gone the direction it has.  I hope it will go another direction because, you know, apparently they change their minds frequently and there's always the possibility that at some point another court will do that.

So I ask the Court to -- I know -- I know there's precedent here that's not entirely favorable to us, but it's still early in the game.  I don't think that it's really solid law and well established that the mere intervention of choice by a parent as to where they want their child to go to school should be determinative as to whether there's a violation of the establishment clause.  Thank you.

THE COURT:  Thank you, Mr. Mays.

Ms. Patterson, rebuttal on the motion to dismiss?

MR. MAYS:  Your Honor, while she's going -- I'd like to introduce one of my clients who's here.

THE COURT:  Of course.

MR. MAYS:  I'm sorry to interrupt.  Ms. Whitfield.

MS. WHITFIELD:  Yes.

MR. MAYS:  Would you stand up, please.  This is Anika Whitfield.

THE COURT:  Good afternoon, Ms. Whitfield.

MR. MAYS:  Doctor, isn't it?

MS. WHITFIELD:  Yes.

MR. MAYS:  Dr. Anika Whitfield.

THE COURT:  Understood.  Thank you.

MR. MAYS:  Sorry to interrupt.

THE COURT:  Ms. Patterson?

MS. PATTERSON:  I have a few claims in response, your Honor.  First, you are correct, our standing argument only went to our equal protection clause claim.  Since they have to show standing for each claim, we were not asserting a standing argument as to the establishment clause claim.

THE COURT:  Thank you.

MS. PATTERSON:  Regarding the arguments that were just made about the governor.  I was flipping through the complaint exhibits.  I don't see any administrative orders.  I see bills related to funding, so perhaps that is what my friend on the other side was referring to.  But acts of legislation that don't give the governor enforcement authority are not sufficiently identifying a method of enforcement under binding precedent.

The *Biogen* case and the *Interactive Digital* case.

THE COURT:  Doesn't *Biogen* hold that governor as governor is not enough, that kind of chief executive authority?

MS. PATTERSON:  Yes, your Honor.  The take care clause is not enough.  And even when they allege to controls certain departments without being able to point to something more specific, that was insufficient.  And the same is true here. And so she must be dismissed.

THE COURT:  And the signature legislation, that doesn't matter in law?

MS. PATTERSON:  Not under binding precedent.  What matters is whether the plaintiffs can identify a specific enforcement authority and they have not been able to do so here. Which also makes sense for the standing aspect of it in terms of their injury would not be redressable if the defendant is not able to enforce it because an injunction would not be giving them relief.

THE COURT:  That's a -- that's an interesting point. Well, maybe we're drifting.  If it's the governor's signature act and if she's been very involved and all these points of moving things along, then maybe an injunction to say stop, under *Ex parte Young*, maybe that would make a difference.  But I don't think we've got the facts pleaded and the information --

MS. PATTERSON:  Yes, your Honor.  I've never seen a case saying that.  And that would be a dramatic departure from

anything I've seen in case law.  The law is continuing to be enforced as the legislature passed it and they are not able to identify enforcement authority.  So under binding precedent *Biogen* and *Interactive Digital* she has to be dismissed.

And then turning back to some of the arguments they made as to the 12(b)(6).  First, I did go back and look at the complaint as I said I would.  I believe what your Honor was referring to earlier were the allegations at paragraph 44 to 45.  In there plaintiffs allege in paragraph 44 they're referring to Exhibit Number 6, which you referenced, and notes which schools are private and which schools are public and then the failing grades, doesn't indicate which are religious.  And then in paragraph 45 they are alleging that some parents would not have the practical option to use a voucher program to attend any private school.  So there is no allegation regarding religious versus nonreligious private school.

THE COURT:  Thank you.

MS. PATTERSON:  And then in *Zelman* at page 658, the Court also talks about the fact that many families are choosing to direct their funds towards a religious school does not show that there's not a real option.  So I think that also is relevant to showing that just because here the percentages that are alleged in the complaint, taking them as true, that's not sufficient to show that it's not a voluntary choice.  The allegations show it's a voluntary choice.

And then one other thing that I think I heard from my friend on the other side is he suggested that it might be relevant as a constitutional matter whether the money goes from a parent to the school or straight -- it seemed like he was arguing that there was a problem because the money was going from the state to the school.  He acknowledges the parents directing it, but that the money was going from the state to the school.  But that isn't a problem under Supreme Court precedent. In *Mitchell v. Holmes* at 815 to 16, the Court said that private choice was what matters, not direct versus indirect, which seems to what he was indicating.  And also in *Carson v. Makin*, there the school district was transferring the money to the private school.  So you had the money going from the government to the school.  So there's nothing in the case law indicating that that is relevant.  All of the Supreme Court case law indicates what matters is that it is the choice of the parents of that neutral government aid, and that makes it not an establishment clause violation.

THE COURT:  *Carson's* the Maine case, right?

MS. PATTERSON:  Yes.

THE COURT:  Okay.

MS. PATTERSON:  Sorry.  *Carson*'s Maine, I believe. Earlier I was talking to you about the Montana case.  So did not want to confuse the states and offend them in that way.

THE COURT:  And the Montana case is *Espinoza*.  I think

I'm the one that confused that earlier and said it was the Maine one.  A question -- I didn't want to interrupt your rebuttal points.  Any other points you wanted to make?

MS. PATTERSON:  I was going to have one point regarding the Arkansas constitutional provision, but if you had a question regarding the federal claim, I'm happy to stick there for a little bit.

THE COURT:  Thank you.  This is on the federal claim.  These -- these new -- pardon me -- newer precedents that you and I have been wrestling with and show the evolution of the doctrine, in my view, of the establishment clause doctrine in the last 20 or 25 years, weren't most of them decided on a record, not at the motion to dismiss stage?

MS. PATTERSON:  That is possible.  I would have to go back.  Off the top of my head I don't know.  But I don't think the Court needs to do that here because we're assuming all of the facts as they've alleged them.  So developing evidence of the points that we're taking as true isn't going to help them because the facts showed that in *Zelman* 82 percent were religious, 96 percent -- so we're taking their allegations as true.  And based on the binding case law, it's not sufficient to constitute an establishment clause claim.

THE COURT:  It's a good answer.  Two summary judgment cases.  One on stipulated facts.  Maine was on stipulated facts before Judge Hornby.  And the Missouri case, the playground

case, is on a motion to dismiss.  So three to one in terms of the record issues.  Do you know Judge Hornby or know of him?

MS. PATTERSON:  I don't, your Honor.

THE COURT:  I encourage you to look up some of the things he's written.  He's got -- he's got a wonderful article about sentencing called "Speaking in Sentences" that I often encourage young people to read who are interested in that.  And then he has a series of fables in law about the animals in Forest Glen and how they practice law.  And it's wonderful stuff.  It's in the green bag.

MS. PATTERSON:  Well, thank you for that.  I appreciate it.  I'm always looking for good recommendations.

THE COURT:  We could all do with a good dose of fables in law.

You would like it, too, Mr. Mays.  He's -- he's maybe closer to your vintage than mine, but an older lawyer was on the Maine Supreme Judicial Court and then the district court.

Anyhow, I'm drifting.  What else, Ms. Patterson, before we take our break?

MS. PATTERSON:  And so the final point I wanted to say regarding the state-law claim is the Court could also dismiss it under *Pennhurst* because that makes clear that it's not proper for a federal court to issue an injunction directing a state official to comply with state law.

THE COURT:  Now you've given me something else to

think about because I've been wrestling with *Pennhurst* on the Little Rock intervention and the state claims there. I hadn't -- I hadn't moved in my mind to the plaintiffs' federal claims and whether *Pennhurst* had traction on them as well. You think it does?

MS. PATTERSON: Not on the Arkansas constitutional claim, your Honor.

THE COURT: I'm sorry, on the plaintiffs' Arkansas constitutional claims?

MS. PATTERSON: Yes.

THE COURT: Thank you. All right.

Thank you, counsel. Let's take a break and then come back and talk about intervention. And to the extent either of the proposed intervenors want to speak briefly on the motion to dismiss, you have free rein -- not free rein, that's too strong -- you got some rope to do that, but talk to me mainly about intervention, please. We're in recess.

(A recess was taken 3:02 p.m. to 3:20.)

THE COURTROOM DEPUTY: Court is back in session.

THE COURT: Thank you. Everybody be seated or come forward as they chose.

Let's shift to intervention.

Mr. Cleveland, for the parents?

MR. CLEVELAND: That's correct, your Honor. I'm here on behalf of three parents who are beneficiaries of the Arkansas

EFA Program:  Erica Lara, Katy Parrish, and Nakita Glendenning.

Of course, as the beneficiaries of the program, my clients believe they are entitled to intervene as of right under Rule 24(a), though we have also alternatively moved for permissible intervention under Rule 24(b).

There's four factors that the Eighth Circuit applies for a Rule 24(a) motion: the timeliness of the motion, the interest relating to the property or transaction, the potential impairment of that interest by the pending litigation, and whether the potential intervenors' interests are adequately represented by the existing parties.

Now, for my clients -- if you had a question you can go ahead, your Honor.

THE COURT:  I think you're on pretty solid ground on all of them except for the parens patriae issue.  Doesn't the state adequately represent your clients' interest?

MR. CLEVELAND:  And I don't think so, your Honor. Because under the Eighth Circuit's decision in the *National Parks Conservation Association Case* cited in our briefs, the party who is going to suffer the direct financial harm from the order sought by the plaintiffs has an interest that's narrower than the public interest at large and, thus, has an interest that's distinct from the state.

THE COURT:  Is that *Mille Lacs* case or is it another case?

MR. CLEVELAND:  This is a different case.  I did cite *Mille Lacs* in my case, but this was the *National Parks Conservation Association versus E.P.A.*  It's at 759 F.3d 969.  It's a 2014 decision from the Eighth Circuit.

THE COURT:  I wonder if you might be over-reading the precedent.  Think with me for a minute in terms of principle.  Is it true that any beneficiary of a government program has standing as of right to intervene when that program is challenged?  Is that -- can that possibly be the law?

MR. CLEVELAND:  I think generally under Rule 24 because the test there -- the Eighth Circuit, you know, has a couple different lines of case law on it -- was about whether the orders sought by the plaintiffs is one that would directly affect the potential intervenor financially versus one that would only potentially lead to a cause -- a chain of causation that would affect them down the line.  So not every beneficiary, but it's about whether the orders sought by the plaintiffs is one that would have a direct financial impact.

THE COURT:  That's slicing the onion awfully fine.  Assume -- assume the case that you stand to lose your benefits, whatever they may be, the potential intervenor does, is that enough to sort of slide around the parens patriae doctrine and intervene as of right?

MR. CLEVELAND:  I think, you know, the *National Parks* seems pretty close to that because what you have there is the

EPA was opposing a request for a particular type of regulation and the power plant that intervened as of right in that case was one that was asserting essentially the same interests as the EPA in imposing the regulation sought.  And so the only difference that was in that case was not in the argument presented, but in the narrower financial impact on the power plant.

And so I think, under that case, that it does when you have like there, an order sought that would get a regulation, increase the cost of the power plant, would be directly analogous to here where the order sought is one that would stop the state defendants from sending money to my clients' accounts.

THE COURT:  How much of the doctrine does that leave intact that the state is presumed or the governmental entity is presumed to speak for all of us, including those who are benefitting directly and stand to lose that benefit?  I'm not sure what -- what's left there.

MR. CLEVELAND:  The Eighth Circuit cases that reject proposed intervenors are usually ones that are asserting either contingent harms or noneconomic harms.  So those ones where you have ones that start sounding more in policy rather than financial impact.  So there is that competing line of case law, that *National Parks Conservation* is good law in tandem with when they narrow it to you have to have a direct financial interest in the case.

THE COURT:  You've resisted so far the temptation to

cite the Tennessee case where the Court of Appeals reversed me on standing and the cost of a regulation, the potential cost that would be incurred.  Do you know the decision?

MR. CLEVELAND:  I'm not sure I'm familiar with that one, your Honor.

THE COURT:  Oh, well, it's -- it's a proposed EEOC regulation about healthcare benefits.  Anyhow.

MR. CLEVELAND:  Understood.

THE COURT:  The -- whatever my concern may be on the parens patriae doctrine and the intervention as of right, isn't the hill shorter on permissive intervention?

MR. CLEVELAND:  Certainly, your Honor.  And so under permissive intervention I think, you know, the parents add the value of giving the equitable interests that are at issue in the injunction sought here as well as, as the Arkansas Supreme Court said it, putting a human face on the actual effects of the program that's being addressed.  And because the motion was put in at the -- to intervene was put in at the early stage of litigation before anything occurred, there would be no risk of prejudice to the parties.

THE COURT:  What about the potential of overly complicating things or tangling it up?

MR. CLEVELAND:  Oh, I don't think that usually happens with parent intervenors because the parents' overwhelming interest is in reaching a swift end to litigation.  They don't

like the legal cloud that litigation puts over their program. And so usually, I think pretty universally all my parent clients want litigation ended as quickly as possible.  So in serving that interest I usually have a very strong interest in bringing litigation to a conclusion to keep my clients happy.

THE COURT:  Getting it done.  Doesn't the Court of Appeals instance that in the permissive intervention cases, the lay or tangles and to all of that?

MR. CLEVELAND:  Yeah.  I mean, that's a factor that's addressed in permissive intervention.  So a question would be if there's any sort of risk of that.  And I don't think there would be here because the actual factors are inevitably part of any sort of injunctive discussion.  And so we would just be bringing the fuller perspective to that.

THE COURT:  Can I shift you into the merits and draw on your expertise in this area of the law in other states?

MR. CLEVELAND:  Certainly, your Honor.

THE COURT:  You heard the conversation earlier, my conversation with your colleagues.  Has there been litigation about the adequacy of choice or the reality of neutrality, these principles that were concerning me earlier in the afternoon?

MR. CLEVELAND:  I think most of that has gone away after *Zelman*.  The first thing after *Zelman* was more of a lobbying pressure in order to get either in legislation or in regulation some way of narrowing the availability of these sort

of out drifts to religious programs or having some sort of effect on the programs in that regard.  But you don't see as much after *Zelman* as far as having the sort of there's a violation from the impact of the program because of the way that it pretty well foreclosed that as a claim.  You saw it -- you know, the *Espinoza*, *Carson*, all those cases were sort of the follow-ons to that because the question became, well, if the state can't be compelled under the establishment clause to have some sort of responsibility for what's happening in the private sector where it can be used, is it permitted to regulate it under the free exercise clause if it has some concerns about money going to the religion, towards the -- not a legislation, actually a regulation issue in Montana.  That's where, of course -- well, no, the free exercise clause also prohibits the state from having the sort of discriminatory approach to where the aid can be used.

So I think the effects of the interpretation of the establishment clause under *Zelman* and the free exercise clause under *Espinoza* and *Carson* mostly means that these challenges have largely gone away in other states and tends much more towards funding challenges in state court as opposed to any sort of establishment clause or equal protection claim.

THE COURT:  Funding challenges like the ones articulated by the school district here, at least before -- before the claims or potential claims were refined in terms of

the state constitution --

MR. CLEVELAND:  Right.  They're pending in circuit county in Pulaski right now and I believe they're also -- some of them are in the proposed complaint in the school district here.

THE COURT:  Right.  That's the kind of thing you're seeing in other states?

MR. CLEVELAND:  Correct.

THE COURT:  What about the direct funding or funding to charter schools, the public/private school distinction, the Oklahoma case where it was four, four, and so no opinion.

MR. CLEVELAND:  Right.  And part of that was a little bit separate from the school choice programs because, you know, there is permission in case law to heavily regulate public schools and have sort of a way that you have public school curriculum operate your traditional public school.  And in the private school context it's been much more -- those are not operated by the state so the state doesn't have as much of a hand there.  And so the fight in the charter school context is because you have private operators with a public school, so does that fall on the line of sort of a state action and what can and can't be done there versus are you in the private school market where this is just scholarships going out towards entities that are operating in the free market.  And so that's why, you know -- it's a question of which of those two boxes does it fit into

after the public school cases and *Zelman* those private schools.

THE COURT:  I wonder if the future of the litigation there is, in a sense of past, your brother Mays was striking these themes of the dangers of entanglement, that the cases were wrestling with 40 and 50 years ago.  I wonder if those will return in a new form and place in the doctrine.

MR. CLEVELAND:  I suspect probably more in the charter school context than in the school choice context just because it's pretty well considering the case law where parents choose to use the scholarships are not state entities, whereas making that argument with charter schools is a much further leap, of course.

THE COURT:  Yup.  That's the Oklahoma case, right?

MR. CLEVELAND:  Exactly, your Honor.

THE COURT:  And do you -- do you and your colleagues do this kind of work on charter schools all over the country, too, or just on choice issues?

MR. CLEVELAND:  It's primarily on school choice.  We haven't done as much on charter schools just because part of it's restricted based on our original mandate from the Milton Rose Friedman Foundation and the way their estate is set up the offer where I work.

THE COURT:  What else on intervention or the merits?

MR. CLEVELAND:  Well, I think on intervention, I would -- procedurally that the state said they have no objection and

there was no brief filed in opposition.

And I think on the merits, I'll note that, you know, given the talk about religious schools today, I think it would be peculiar if, you know, two of my clients, one that's going to a school that's not religious, but for autistic children, or one that's sending her children to home school, it would be odd if both of them were not allowed to have scholarships just because some other parent might use it for a religious school.  So I think it's important just to keep in mind that there's multiple permissible uses under the program.

I believe that's all I have, your Honor, so it's request intervention into the suit either as of right or permissive.

THE COURT:  Thank you, Mr. Cleveland.

Mr. Heller, why not you next and then I'll hear from the parties their thoughts on intervention.  You've been patiently waiting over there in the corner of the table.  Thank you.

MR. HELLER:  Thank you, your Honor.  Chris Heller on behalf of the Little Rock School District.

And I'll say a few things for the record that I'm sure the Court knows.  But to set the stage for the arguments in favor of intervention, permissive or as of right for the Little Rock School District, the Arkansas Constitution requires that the state ever maintain a general sufficient free system of public schools.  The school board is charged with fulfilling that mandate.  The legislature has chosen to use the vehicle of

school districts to fulfill that mandate.  So there's a state statute, Arkansas Code Annotated 6-13-620 which gives the school board that responsibility to make sure the schools in the district provide a general, efficient, free system of public schools.

And our argument in our complaint and intervention is that the state has violated that obligation to ever maintain a robust system of free public schools by creating an entirely separate school system.  And that's when -- I do have some things to say on the merits and this is partly a predicate to that as well.

But we've got a separate system which consists of 80 or 90 percent religious schools.  That's different than what happens in any of these other cases.  And the state is providing students funding to attend those schools to the detriment of the public schools.  As Mr. Mays pointed out, this year alone is over 300 million and growing.  And it's doing that in a way that violates the Federal Constitution as well as the Arkansas Constitution by providing a system of primarily religious schools and funding those schools.

So, yes, there's a parental choice involved, but it's a very circumscribed choice, especially as relates to your discussion with Mr. Patterson about what's available where. What counties, if there is a private school at all, it's only a religious school.  And the choice among these schools, in many places, the only real choice is a religious school.

So I'll -- when I get to my short few points about the merits, I'll talk more about why I think this is important. This is something entirely different in context from what happened in *Zelman* or *Trinity* or *Espinoza* or *Carson against Makin*.

THE COURT:  The -- thank you for the introduction. May I interrupt and question?

MR. HELLER:  Sure.

THE COURT:  I took the district's last brief to be calf rope on the state-law claims, but we should be allowed to intervene on the federal law claims.  Did I misread it?

MR. HELLER:  Well, I think that is the correct reading, your Honor.  I had a case that I thought -- but it was only a district court case -- that tried to distinguish *Pennhurst* and really didn't do a good job of it.  So I think that's right.  I think we're going to be restricted by *Pennhurst* on challenging the state-law claims.

And the reason I wanted to talk about the Arkansas Constitution is just to talk about intervention and the district's responsibilities and how they differ from what the parents may present, as important as that is, to the Court in this case.

THE COURT:  The -- and I appreciate your candor there and your considered judgment on that, Mr. Heller, about what fights to fight and which not.  The, what I'll call dual system

concern and arguments and claims, aren't those primarily for the Arkansas courts to sort out like they did the *Lakeview* litigation?

MR. HELLER:  Well, I think -- and *Pennhurst* probably made this claim -- but with that type of ruling -- I want to say guidance, but maybe binding precedent -- it's going to result in different things, including bifurcation as well as resort to state court.  And so -- and that's already happening here.  Mr. Mays and his clients have a case raising constitutional issues about the LEARNS Act in state court.  So I don't think *Pennhurst* or any other case that I'm aware of presents a bar to LRSD attempting to intervene on the federal issues in federal court.

THE COURT:  And just because I'm curious, is the district in the state case currently?

MR. HELLER:  No.

THE COURT:  Okay.

MR. HELLER:  Not currently.

THE COURT:  All right.

MR. HELLER:  And that one had gone on I guess for more than a year before they even got to the point of deciding intervention, but I think we were concerned about time.

THE COURT:  Yeah.

MR. HELLER:  And for whatever reason, the board voted to intervene in this case rather than that one.

THE COURT:  Got it.  All right.  Helpful.  Now --

thank you for tolerating the interruption -- back to what you want to say.

MR. HELLER:  Well, I think Mr. Cleveland set out the factors for intervention of right under Rule 24, and I think Little Rock School District fits all of those.  It's got an important interest in this case partly because of its statutory responsibilities and partly because of its, you know -- mainly because of its obligations to students.  And what happens or what is happening in this case with respect to the LEARNS Act is the state is funding people who are already going to private school and making it more attractive for new people to go to private schools, which are primarily religious schools, to the detriment of the public system that the Arkansas Constitution requires the state to support.

And the way -- I think this is in the main complaint in our complaint and intervention -- the way the funding system works is essentially funding for every student who leaves the public schools takes funding with them and that leaves less money for the students who remain.  And often -- I think the Court said something in the earlier discussion about what about people, the way both parents have to work or they don't have a car, not everybody can home school, not everybody can go to private school, and that's true.  So the more people who leave, who have the ability to leave, the tougher the job for public schools because they are left with often students with more educational

challenges.  And I think it's pretty clear from the *Lakeview* case and it's clear in the research that parents that don't have -- parents who aren't educated, parents who don't have books in the home, parents who don't have the ability to drive their student to some other school or home school, those are the students that the public school has to educate with less resources the more that's lost or spent on the LEARNS Act students.

So that's our interest is that creates a significant problem.  And the school district every year is cutting its budget and employing fewer people and accommodating, educating fewer students.  And that trend we -- is, we think -- we think we can show will be exacerbated and is being exacerbated by the LEARNS Act.  I mean, that's what we've alleged.  That this money being unconstitutionally diverted from public schools to private schools, primarily private religious schools, has a negative impact on LSRD and other public schools.

The state's, I think, primary -- or at least first objection to LSRD's intervention was based on standing.  And primarily on the argument that as a political subdivision, the Little Rock School District can't challenge the state that created it.  But that law is old law and I think changed for good with the case that's a United States Supreme Court case, *Office For Protection and Advocacy Against Stewart*, which talked about --

THE COURT:  Is that a case cited in your brief, Mr. Heller?

MR. HELLER:  Yes.

THE COURT:  And what is the name?

MR. HELLER:  It's *Virginia Office For Protection and Advocacy Versus Stewart*.  It's in our reply brief.  And it's at footnote four of the state's, maybe, surrebuttal.  But in that case a state agency sued the state and the Supreme Court said that that -- it reviewed the cases about the political subdivision doctrine and said that doesn't apply as a per se bar under *Ex parte Young*.  It said what's required is a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks perspective relief.

THE COURT:  What's the citation for the Virginia office case, please?

MR. HELLER:  Your Honor, that's at 563 U.S. 247.  It's a 2011 decision.

THE COURT:  Thank you.

MR. HELLER:  And just reading from the bottom of the syllabus, it stands for the proposition that *Ex parte Young* allows a federal court to hear a lawsuit for prospective relief against state officials brought by another agency of the same state.

THE COURT:  And -- but is the -- is the case making -- or does it involve the kind of claims we have here?  That is, a

First Amendment claim made applicable to the states through the Fourteenth Amendment?  Because the older decisions were clear that no Fourteenth Amendment claim by local subdivision -- local -- local divisions, political subdivisions.

MR. HELLER:  Well, there's a -- I'm not sure off the top of my head, your Honor, what the constitutional provision was in that case.  But the case did say that there is no warrant in our cases for making the validity of an *Ex parte Young* action turn on the identity of a plaintiff.

So -- and this -- it reviewed the cases that were featured in the opening brief of the state, including *Hunter* and the Baltimore case and City of Trenton and all those cases --

THE COURT:  Yes.

MR. HELLER:  -- and came to that conclusion.  And then later, the Eighth Circuit in -- and I'm not sure if this case is in your brief.  I think it's one I just found, but it's called *Iowa Migrant Movement for Justice versus Bird*, and that's at 157 F.4th 904.  And that quotes the *Office For Protection and Advocacy* case, including the language that there's no warrant in our cases for making the validity *Ex parte Young* action turn on the identity of the plaintiff.

THE COURT:  I don't -- you cited the delta -- the *Delta School District* case, or that both parties did and argued that, but I don't recall that more recent Eighth Circuit authority.  That's helpful.  Thank you.

MR. HELLER: And then --

THE COURT: I'm struggling on this one because the 10th Circuit case and the Second Circuit case, it seems to me, building on *Rogers*, but those cases articulate why -- what I'll call a structural claim -- should be allowed under the supremacy clause, but the supremacy clause doesn't create causes of action. And the district can't sue under 1983. And so I'm just struggling to put the pieces of the puzzle together on how that First Amendment and Fourteenth Amendment claim by the district gets through the door.

MR. HELLER: Maybe this is another piece, but another one of the state's arguments was that LSRD had not identified a particular federal statute that conflicted with the LEARNS Act. And, you know, of course our position was the LEARNS Act conflicts with the constitution. And that's backed up by a case also in the Eighth Circuit in 2021, it's called *Courthouse News Service versus Gilmer*, 48 F.4th 908, that says *Ex parte Young* applies to conflicts between state statutes and the U.S. Constitution. And that was a First Amendment case.

THE COURT: By the name courthouse --

MR. HELLER: Courthouse News Service.

THE COURT: Yeah, there you go.

MR. HELLER: Yeah, versus Gilmer.

THE COURT: Your brother Tull is smiling somewhere with you talking about the newspapers.

MR. HELLER:  And so one other thing I think is helpful, your Honor, and we've cited this case, maybe just the district court version at the time, I'm not sure which one, but it's called *Ocean County Board of Commissioners against the Attorney General of New Jersey*.  And that -- in that case in the district court opinion, which is --

THE COURT:  I have it here, Mr. Heller.

MR. HELLER:  Okay.

THE COURT:  475 F.Supp 3d 355?

MR. HELLER:  Right.  And there's a whole section on the plaintiffs' standing to sue.  And it reviews the law and talks about that this *Ex parte Young* exception would apply to suits by political subdivisions against states and says that the Second Circuit, Fifth Circuit, and Tenth Circuit all agree with that.  The only circuit that disagrees with that is the Ninth Circuit.

And then on appeal we can add the Third Circuit because at 8 F.4th 176, the Third Circuit affirmed that and explained all the reasons again, that starting with the *Gomillion* case, which is in our brief.  Here's a quote from that appeal case.

"Things changed, however, in 1960 in *Gomillion versus Lightfoot*," and goes on to talk about how these other cases in the Second, Fifth, Tenth and Ninth and Third Circuit allowed political subdivisions allowed to sue the states, including that First Amendment case in the Eighth Circuit.

So I think that addresses the state's issues.  If the Court -- if you got some questions, I'd be happy to answer before I say something about the merits, if I may.

THE COURT:  Let me flip back to my notes and see what hard question I have to ask you, Mr. Heller.

You agree that states aren't persons and can't sue under 1983?

MR. HELLER:  I do.

THE COURT:  Okay.  And we covered *Pennhurst*.

My list of the state-related claims that would drop out of the proposed amended -- or proposed complaint and intervention, three, four, five, six.  Does that sound right to you, all the state-law --

MR. HELLER:  Right.

THE COURT:  -- claims?  What about the *Swinton* point that I gently poked your brother Cleveland on on complicating things, making -- tangling it up?  Isn't that what the district is going to do here?

MR. HELLER:  You know, we were, but now we can't.  I mean, I think that's the answer.  It was a concern when -- that we would complicate and possibly delay when we had the state court claims as well in addition to what the original plaintiffs pleaded.  But now that those are out, I don't think complication is a problem.

THE COURT:  Okay.  I think that's it on my list of the

intervention points.

MR. HELLER:  Well, and this is sort of some surface observations about the cases we've been discussing on the merits.  I think the context is important, right?  So here we have something that's unlike what happened in any of those cases.  We've got, essentially, a separate school system that's primarily religious schools that states -- state funded.  And I don't think the character of it changes just because maybe ten or 20 percent of those schools are not religious schools.

So take *Zelman*, for example.  That was a case about vouchers based on financial need.  This is not.

THE COURT:  It's -- the vouchers there were for poor folks, weren't they?

MR. HELLER:  Right.

THE COURT:  In Cincinnati.

MR. HELLER:  Yes, exactly.  And here, you know, as I think we've all seen, some extremely large proportion, maybe 80 to 90 percent of the people who were receiving vouchers the first year it opened to everybody to attend private schools were people who were already attending private schools.  So this isn't about financial need.  So *Zelman* clearly had a purpose that didn't include religion.

*Carson against Makin*, the Maine case.  It's the same situation.  These rural counties -- the most rural state in the country -- these rural counties did not have schools.  So to try

and solve that problem, the Maine legislature says, well, we'll give -- if you don't have a secondary school, you've got to provide funds for students to attend a private school.  And once you do that, once you have to do that, you can't discriminate against religious schools.  So the point there was discrimination.  And it's in the context of need.  There were kids in counties that just didn't have a school and they had a problem to solve.  It wasn't about trying to create a separate program of state-funded religious education.

*Espinoza* has some context as well.  I think, if I read it correctly, it was a program about tax credits for people who fund scholarships for students to attend private schools.  The legislature allocated $3 million to that program and it's set to expire in 2023.  Now, the case was decided in 2020 or 2021 I think, so maybe it was a five-year program.  But the context compared to this is minuscule and short term.  This is a hundred times as much money and growing and an entirely different program.

So that's my only point.  In listening to the arguments is that it seems like beyond the parental choice, you know, how the money's directed, that kind of thing.  There's some context to these cases that is important to keep in mind in deciding why the Court ruled the way it did.

THE COURT:  Helpful and appreciated.  A question or two.

MR. HELLER:  Sure.

THE COURT:  I meant to try again with my hypotheticals.  Assuming the legislature said the General Assembly said, "We think moral Arkansasers are better Arkansasers, and so we're going to support just religious private schools."  Constitutional problem?

MR. HELLER:  Yes.

THE COURT:  What if, on the other hand, the General Assembly said, "We want to support just nonreligious private schools.  Here's our account program to take care of just them, but no -- no parochial school needs to apply."  Constitutional problem?

MR. HELLER:  Well, it depends, because that's exactly what we have.  We've got supposedly a general, suitable, and efficient system of free public schools funded by the legislature.  That's what they do.  I don't think there's a constitutional problem with that.  But when you go to private schools --

THE COURT:  No, I'm sorry.  I wasn't clear.  I mean we've got our public schools.  Assume our public schools, right?  But the legislature says, "We're going to support nonreligious private schools" --

MR. HELLER:  Yes.

THE COURT:  -- "with an account program."

MR. HELLER:  Yes.  Constitutional problem.

THE COURT:  Yes.  That's Maine, right?  Everybody can -- the Maine case.  That's everybody can participate except -- except religious institutions.  That's a free exercise problem.

MR. HELLER:  Right.

THE COURT:  So in between those two constitutional ditches, how is a court, as a matter of principle, to decide what -- where there is any play, if any -- where there's play, if any left, in the joints between the establishment clause and the free exercise clause?  I've just mixed the metaphors, but you understand.

MR. HELLER:  Yeah.  This is where judges earn their money, right?  This is the kind of -- you know, you've got important constitutional considerations on both sides.  And that's part of the reason I raised the merits issues I did because I think that provides some guidance why, you know, what is the reason, what is the motive.  And some of the cases actually look for that, is the intent to promote religion or a particular religion or something like that.  So it's easy for me to answer that.

You know, in Maine these rural counties needed secondary schools.  In *Zelman* they're trying to provide an education for kids in poverty.  Here, we're just creating a system of -- and it's not fortuitous.  It's, you know, who's on the state's list, and who's on the state's list is primarily religious schools.  And, you know, that's -- I'm sure, as Mr. Mays said, that most

of the private schools in the state are religious schools.  So maybe that was inevitable that it was going to turn out that way.  But that's -- to me looks more like a decision to promote and support religion than what happened in *Zelman* or *Carson* or -- what's -- *Espinoza*.

THE COURT:  Thank you.  Mr. Heller, anything else?

MR. HELLER:  No, your Honor.  Thank you.

THE COURT:  Thank you.

Ms. Crouse?

MS. CROUSE:  Good afternoon.  And may it please the Court.  Erica Crouse on behalf of defendants.

The school district's proposed intervention is not appropriate here.  The school district lacks standing, lacks a cause of action, and advances arguments that would duplicate existing litigation already before the Court.  And, big picture, its intervention would be case disruptive.  But Rule 24 does not permit intervention simply in multiplied parties or arguments before the Court.  An intervention here is not appropriate under binding case law nor this Court's discretion as to prudential and docket management considerations, thus, the motion should be denied.

The State has identified at least two threshold defects that I would like to address.  The first being lack of Article III standing.

But before I wade into my affirmative points, I would like

to make just two clarifications into response to things my friend on the other side raised.

I would like to direct the Court to page 5 of the State's sur-reply, footnote four, where we cited the case that my friend cited, *Virginia Office For Protection in Advocacy v. Stewart*. That's a 2011 case from the Supreme Court that --

THE COURT:  I need -- Ms. Crouse, if you'll just slow just a little bit.

MS. CROUSE:  Absolutely, your Honor.

THE COURT:  I need to find the right stack of paper. I remember footnote four because it was the here's the circuit split; is that right?

MS. CROUSE:  Yes, your Honor.  This goes to my friend's argument about the circuit split.  And we had some discussion on pages four and five of our brief discussing that, of our sur-reply.

THE COURT:  I think footnote one may be the circuit split.  I'm sorry.  I was misremembering.  Footnote four.

Can I different -- different judges have different preferences, but may I tell you one of mine?

MS. CROUSE:  Yes, your Honor.

THE COURT:  Substantive footnotes are not effective because I flat missed -- maybe it's just me, but I flat missed this case.  The type's smaller.  I'm reading along in the text. I don't want to do the yo-yo up and down.

MS. CROUSE:  Yes, your Honor.

THE COURT:  So --

MS. CROUSE:  I think just to clean up kind of what we were -- or what the Court was discussing with my friend, that case is about overcoming immunity, but not standing, as explained in our footnote.  And there -- if -- it's my recollection that the plaintiff was an association, which is, you know, further irrelevant to the Court's inquiry here because the school district is a political subdivision, and that's a point that none of the parties seem to dispute.

THE COURT:  It's odd that the parent could sue the child.  Right?  I mean, the city is -- or the school district is the child of the state.  Arkansas could abolish all of them tomorrow if it wanted to.

Let me take a minute to read footnote four --

MS. CROUSE:  Yes, your Honor.

THE COURT:   -- and try to absorb here.

So your first point is that this Virginia agency was independent, it's not dependent like school districts.  Am I --

MS. CROUSE:  Yes, your Honor.  And the cases in Arkansas are very clear that school districts are -- and that's not something the other side disputes either -- that school districts themselves are political subdivisions of the state, as they are creatures of the state.

THE COURT:  Yes.

MS. CROUSE:  And that's something the Arkansas Supreme Court has been very clear on.

THE COURT:  Yes.  You've covered that -- defendants have covered that well.

Justice Scalia's opinion for the court where he at least plows some ground on this political subdivision issue; do you remember the case I'm recalling?

MS. CROUSE:  It's not coming to mind at this moment, your Honor.

THE COURT:  Okay.  Well, since I can't remember the name of it either let's move on, or let's come at it all another way.  Why isn't the Tenth Circuit case or the Tenth, the Second, and now your brother Heller says the Third, why -- those more recent cases that build on *Rogers*, why are they not correct that political subdivisions can sue states in certain instances? Would you agree with that?

MS. CROUSE:  Yes, but with one caveat.

THE COURT:  Okay.  What's the caveat?

MS. CROUSE:  I believe that the caveat in some of the cases that my friend cited is that those decisions go to substantive issues and they're not necessarily standing decisions.  So they might not be as helpful here as the other side has made them seem.

THE COURT:  Okay.  I thought you were going to take me toward the it's supremacy clause structural issues, not personal

right issues like the First Amendment and the Fourteenth Amendment.

MS. CROUSE:  Yes.  And that's certainly something that the State has covered in its briefing, that the school district lacks that personal connection.

And I would also like to draw the Court's attention to a Southern District of New York decision that my friend on the other side cited in their brief in support of their motion, that is *Board of Education v. Allen*.  And that case is not helpful to that very point because there the issue was that individual officials were claiming that they were being forced to choose between obeying a statute they believed to be unconstitutional and, thus, violating their oath under threat of removal.  But here there is no comparable personal stake theory, only that the school district is seeking to intervene to press its additional claims not on behalf of specific students, but what I would characterize as a larger policy disagreement with the General Assembly.

And to that point as well, as a political subdivision, the school district lacks standing to assert federal constitutional claims against the state.  And to the extent that some of these cases all go to substantive decisions rather than standing decisions, that would mean that its claims -- it seems to be conceding its claims would fail as a substantive matter, but just not as standing.  And so that's something we had teased out

on page 6 of our sur-reply, but I'm --

THE COURT:  And I'm not sure -- I'm not sure that I'm following you there.  Because when I -- when I think of the irreducible minimum of standing is this injury and traceability and redressability, in my mind that leads me to the merits, to the substantive issue.  And so I'm having trouble separating these distinctions that you are drawing in the cases when you say don't pay any attention to this one and that one because it's not about standing, it's about the substantive issue.

MS. CROUSE:  Your Honor, to that point I think that the issue before the Court before we wade even into the merits discussion that we've heard from today is that the school district cannot satisfy that first prong, the cognizable injury. And that goes to your point about the child suing the parent. As creatures of the state, political subdivisions, like the school district, lack constitutional rights against their creators.  And the Supreme Court has been instructive here, specifically in *Ysursa V. Pocatello Education Association*, 55 U.S. 353 from 2009, the Supreme Court made clear that as a political subdivision, entities like the school district, are created by the state for the better ordering of the government. So, thus, the school district has no privileges or immunities under the Federal Constitution with which it may invoke in opposition against the will of its creator.

There's other cases before the Supreme Court, like *Holman*

*v. Miller* where the Court was clear that -- that a -- that such a creature of the state, a political subdivision has no standing to invoke constitutional claims in opposition to the will of its creator.

And so here the State's position, the school district, as a creature of the state, improperly seeks to assert constitutional claims against its creator and, thus, lacks a cognizable injury and cannot establish standing, which would require this Court to dismiss under Eighth Circuit precedents, like *Mausolf v. Babbitt* where the Court stated those wishing to intervene in federal court must have Article III standing.

THE COURT:  Let me interrupt, Ms. Crouse, and ask you to slow down just a little bit.  I know I speak too slowly at times, but our court reporter can -- needs a break.

MS. CROUSE:  Yes, your Honor.

THE COURT:  *Armstrong* is the Justice Scalia an opinion I was trying to recall.  It's about Medicaid funding and who can sue.  It's not a constitutional rights case.  But he did seem to clear some brush early on in the opinion along the lines that your brother Heller suggested on -- on claims that can be made against the state and the *Ex parte Young* exception.

I'm looking at -- only got the Supreme Court reporter, but this is at 135 S. Ct. 1384.  "It is true enough that we have long held that federal courts may, in some instances, grant injunctive relief against state officers who are violating or

planning to violate federal law," quoting *Osborn* and *Ex parte Young.* You wouldn't disagree with that, would you?

MS. CROUSE: No, your Honor.

THE COURT: No. But it's the who's pursuing the claim that you're -- that the State is focused on at this point.

MS. CROUSE: Your Honor, I think a helpful distinction goes back to our discussion of the *Allen* district court case that my friend had cited. And that's a case where even the Fifth Circuit has recently indicated that *Allen* has been undermined by more recent Supreme Court cases. But even if we set aside the differences of the circuits on some of these issues, the pre-*Allen* cases, like if -- *Allen* is on shaky ground. The pre-*Allen* cases here, you know, by the Eighth Circuit and the Supreme Court say very decisively that political distinctions cannot invoke the protections of the Fourteenth Amendment against the state. And those are cases that you're familiar the State has cited, like *Delta Special School District*, *City of Trenton*, and --

THE COURT: And *Delta School District* is close, isn't it, because it's a school --

MS. CROUSE: Yes your Honor.

THE COURT: -- district dealing with a choice issue and arguing that there will be constitutional violations if it goes -- it does or doesn't do something. I forget the particulars.

MS. CROUSE:  Yes, your Honor.  That is a very helpful case to the State here because the Eighth Circuit instructed very specifically that a political subdivision of a state cannot invoke the protection of the Fourteenth Amendment against the state.  Which is consistent with the understanding that political subdivisions are creatures of the state, which is something that the Arkansas Supreme Court identified in *Durham Special School District v. Johnson*, dates as far back to 1870. That school districts along with, quote, kindred subdivisions like townships are creatures of the state.

And within that context, we've since had the Eighth Circuit cite that in -- in *Herts v. Smith*, 45 F.3d 581 in 2003.  And then in other decisions from the Eighth Circuit and Supreme Court, as I mentioned, in *Delta Special School District v. City of Trenton*, both the Eighth Circuit and the Supreme Court has been clear that political subdivisions may not invoke the restraints of the Fourteenth Amendment against the power of the state, against its parent.

Yes, your Honor.

THE COURT:  What else, Ms. Crouse?

MS. CROUSE:  So I had -- I had mentioned that the State has identified two threshold bars.  The other I'd like to turn to very briefly is that the school district lacks a cause of action.  It's related, but it's independent grounds for dismissal.

As a political subdivision, it is not a person and, thus, it lacks a cause of action.  Courts have recognized, for example, that where a city is not a person, it cannot be bring a Section 1983 claim.

THE COURT:  And your brother Heller conceded that point.

MS. CROUSE:  Yes.  Yes, your Honor.

THE COURT:  Yup.

MS. CROUSE:  And I know that the Court had mentioned wrestling with sovereign immunity, and I'm prepared to briefly turn to that, but it also sounds like my friends on the other side have conceded that their state law claims are improper.  So they're just seeking essentially to duplicate issues, that's our position.  But if they are -- to the extent they're arguing those additional claims beyond the waived of state claims, our position is they lack standing to bring those claims in the first place.  And if they want to make additional arguments, they can submit an amicus brief, as we've already indicated, because there's no reason to allow them to become a party because that's what interjects the type of delay and entangling issues that the Court has addressed today.  Even having other counsel at this hearing today introduces additional schedules, travel.  And so those are some of the more prudential and docket management concerns that the State has identified in its briefing.

THE COURT:  I understand the point.

MS. CROUSE:  As -- yes, your Honor?

THE COURT:  I would -- I would respectfully suggest that all lawyers and all courts need to be tolerant of personal obligations, and that's -- that's not a strong point to make in this court.

MS. CROUSE:  Thank you, your Honor.

THE COURT:  Okay.

MS. CROUSE:  As to intervention as of right, if we set aside the threshold defects that we've discussed today, the school district cannot satisfy any of the conditions as to intervention of right.  First, there's no statutory grant of an unconditional right to intervene under Rule 24(a)(1).

So then we turn to Rule 24(a)(2).  And the school district must establish all three factors.  And State's position is that it has not and cannot.  Those factors as presented by the Eighth Circuit in *Chiglo v. City of Preston* include that the movant has identified -- or has a cognizable interest in the subject matter of the litigation.  The interest may be impaired as a result of the litigation and the interest is not adequately represented. And the Supreme Court has since -- or the Eighth Circuit has since clarified that a proposed intervenor must clarify all three conditions.

THE COURT:  Do you agree that the first two are probably met, that the district has an interest and it would be

affected by the litigation?

MS. CROUSE:  Your Honor, the State's position is that the Court need not address those because, to your point, there's the remaining issue of the adequate representation, which is a sticky issue.  And because the -- a proposed intervenor must establish all three, the Court can likely base its ruling just on that.  But I'm happy to discuss those other two factors in more detail if the Court would like.

THE COURT:  No, thank you.  You can go to three.

MS. CROUSE:  As to adequate representation, existing plaintiffs assert identical constitutional claims to the school district which seeks the same objective and same relief sought.  And here -- and I'd like to clarify that a bit more.  The school district's claim interest here that we heard about moments before is preventing any funds from being received by private sectarian schools.  And that's precisely the interest that's already being pursued by plaintiffs who raise the establishment clause and Arkansas constitutional claims that we heard today earlier in the merits discussion.  And because the school district seeks the same thing that plaintiffs seek, it's our position that it has not shown that it can -- that plaintiffs cannot adequately represent its interests and, thus, under cases like -- from the Eighth Circuit, like *Arrow v. Gambler*, where the Court found a presumption of adequate representation existed where prospective intervening interests was identical to that of

an existing party.

THE COURT:  Is that a parens patriae case?

MS. CROUSE:  I can confer with my colleague and confirm that with the Court.

THE COURT:  It's not essential.  The State doesn't oppose the parents' intervention, right?  In fact, you support it.

MS. CROUSE:  We do not support it, your Honor.  I just want to clarify that we took no position on it.  We do not oppose it.  But to that point, unlike parent intervenors who seek to assert their rights on behalf of their children, the school district's here is not purporting to assert the rights of its children.  And as we discussed before, it lacks that personal stake and it should, most, participate as an amicus.

THE COURT:  Your brother Cleveland was pulling me into the cases, though, about a financial interest.  The districts have a financial interest, don't they, given that dollars -- students out are dollars out and they have a statutory obligation to fulfill the state's constitutional obligation on providing this education to their students; is there not a sufficient interest in there that's not adequately represented by the plaintiffs?  Sorry to interrupt.

MS. CROUSE:  Your Honor, from the interest that they identified in their briefing, it so closely tracks the interest that plaintiffs have already advanced in their briefing up until

now that I would disagree with that characterization.  And we also have case law where courts have noted that motivations or difference -- motivations with the same end goal or same relief sought do not defeat adequacy of representation.

THE COURT:  I remember that from your brief.  That was well covered.  The sur-reply I think it was --

MS. CROUSE:  Yes, your Honor.

THE COURT:  -- on differing motivations.

What else by way of wrapping up, Ms. Crouse.

MS. CROUSE:  Yes, your Honor.  Turning briefly to permissive intervention.  It's our position that the Court need not even get to permissive intervention.  But I would just like to flag and emphasize for the Court that the Eighth Circuit instructs that the principal consideration in ruling for a 24(b) motion is whether the proposed intervention would unduly delay or prejudice the adjudication of the parties' rights, and that would be the rights of the existing parties before the Court.

And that is true because the purpose of intervention is to promote efficient and orderly use of judicial resources.  And the Supreme Court has reflected a similar concern on judicial efficiency within this context, warning that cases of large public interest, such as this one, often prompt nonparties who desire to present their views in the Court, yet, quote, such interventions may result in accumulating arguments without assisting the Court.

And here, contrary to what the school district argues, the mere existence of comments, questions of law, or facts does not automatically entitle an applicant to intervene.  As the Ninth Circuit -- as the Ninth Circuit highlighted in *Venegas v. Skaggs*, a case that we cited in our brief, which the Eighth Circuit cited in *Union Electric Co* 64 53 -- 53d at footnote nine.

And so here, the State's position as I briefly addressed before, is that Rule 24(b)'s principal consideration here weighs decisively against intervention.  Intervention here would splinter focused constitutional dispute where the motion to dismiss is already briefed and waiting the Court's decision into a more complicated type of case.  We've already had kind of this hybrid state federal law claims issue going on today, which is precisely the type of inefficiency that the discretionary inquiry is meant to avoid.

And to that point, intervention would delay and complicate the case at the expense of the existing parties, which is the type of delay and prejudice that the State has identified as the type of textbook delay that would weigh against permissive intervention.  But to the extent that intervention remains discretionary, the Court must independently consider whether intervention will unduly delay or prejudice the adjudication of the original parties' rights under separate rule, Rule 24(b)(3).

And so here the -- if the Court finds it helpful to hear

from the school district, defendants have already made clear they would not oppose its participation as an amicus so long as the State would be permitted to respond to any arguments advanced.  But if the Court has no other questions, the State will rest on its briefs.

THE COURT:  Thank you, Ms. Crouse.

MS. CROUSE:  Thank you, your Honor.

THE COURT:  Mr. Mays, do you wish to be heard on the intervention issues on behalf of the plaintiffs?

MR. MAYS:  Just briefly, your Honor.

THE COURT:  Okay.

MR. MAYS:  Your Honor, we did not file a response to the petition of the three ladies.

THE COURT:  The parents?

MR. MAYS:  The parents.  They also filed -- we have a companion suit that's going on in state court, as you know.  It doesn't involve the issues here, but the same people to intervene, moved to intervene in that case and I resisted the motion.  Judge Welch granted -- or denied the motion to intervene.  And then a year and a half later after it appealed to the Supreme Court, we finally get to resume the case again. I thought I better be a little more judicious about my objections.

I think -- as I thought in that case and I think now, the three parents, the parents don't really add anything to the

issues in this case.  The issues here are not whether the LEARNS Act is a good idea or -- whether the students are treated properly at certain schools and improperly in others and what their experiences have been.  The issues here are primarily whether this is a constitutional program.  Whether it's a good idea or not is irrelevant and how the students have been treated is irrelevant.  It's a question of whether or not, under the law, that -- under the LEARNS Act law it's unconstitutional or not.

And looking at the motions that the parents filed in that case and in this case as well, they don't mention anything about bringing any expertise to the table on that issue.  I don't think it would be a good idea to bog the case down with individual issues of the students if that's what they're -- if that's what their testimony's going to be, and I don't know what else it would be.

Mr. Cleveland undoubtedly has a lot of choice -- or a lot of expertise in this particular area, but he's not going to be a witness, I hope.

THE COURT:  No more than any good lawyer, we'll say.

MR. MAYS:  He could probably bring something to the table there, but not in the way that -- not as an intervenor.

So my position is that basically the parents have really no basis for intervening in the case, at least based on the pleadings they filed.

THE COURT:  What about the school district on the other hand?

MR. MAYS:  The school district is a different matter. Yes.  They do have some legal issues that are -- that are involved here and they could weigh in on the constitutional issues.  I had not taken a position on their intervention either, although I do think that they have a much better claim for intervention than the parents do.

Also, on the parents' intervention, under federal law, as I understand it, the issue of whether the intervenors' interests are adequately represented by a state party, there's a presumption in federal law that if there is a governmental entity who is a party to a case that's charged with protecting the interest that's involved, that there's a presumption that that agency will do that.  And in this case I don't think that that presumption has been overcome.

THE COURT:  Thank you, Mr. Mays.

MR. MAYS:  Thank you, your Honor.

THE COURT:  You are welcome.

Mr. Heller, a last word as the movant on motion to intervene or not, your choice.

MR. HELLER:  Let me just make three brief points, your Honor.  One is that the *Ysursa* case -- and I may be pronouncing it wrong, Y-s-u-r-a [sic], I think it is -- doesn't mention the word standing.  So I searched it for the word standing and I

don't think it's in there.

And I'd just like to point out one other Eighth Circuit case that has to do with the State's threshold objections.  It's called *Digital Recognition Network* Against *Hutchinson*, and that's -- might be time for my glasses after this afternoon -- 803 F.d 952.  And that case talks about as well what the *Virginia Office of Protection and Advocacy* meant for the case law generally and the question of -- it relates to the question of the child suing the parent or something like that.  And the point they make about the state is that they talk about the reasoning in the *Virginia Office* case.  The Court reasoned that unconstitutional state legislation is, quote, void, closed quote, and that a state official's enforcement of that legislation, therefore, is, quote, a proceeding without the authority of, comma, and what which does not affect the state in its sovereign governmental capacity.  And that's quoting *Ex parte Young*.  Enforcement of unconstitutional legislation is simply an illegal act on the part of the state official and the state may not immunize officials from suit for such violations of the constitution.

THE COURT:  And that's an Eighth Circuit case?

MR. HELLER:  Yes.  Eighth Circuit, 2015.

THE COURT:  At the risk of extending an already long hearing, does the Little Rock School District have to enforce the LEARNS Act?  It is certainly affected by it, but I took your

points earlier and on the papers is that it's a drain, the creation of this -- the account program as a great drain on the district that's meanwhile still having to meet its constitutional obligations.  But I don't know that you're having to enforce it.

MR. HELLER:  Well, there -- there may be a thin line between having to follow it and having to enforce it, but we do. For example, I mean, we can't, under the LEARNS Act, for example, offer any rights, by contract or by policy, to our employees beyond what the -- otherwise appears in the LEARNS Act or state law at the risk of losing funding for teacher salaries that are required by the LEARNS Act.  So there are some things like that that are --

THE COURT:  This is the no more Teacher Fair Dismissal Act piece of it.

MR. HELLER:  That's repealed and this is what replaced it.

But my point was about the idea that when an unconstitutional law is passed, the courts say, including the *Virginia Office* case, that in the Supreme Court that that act is void.  So you're not really suing the state.  You're not -- the reasons for sovereign immunity to preserve the dignity of the state and the separation of the federal and state governments aren't really involved because it's not -- you're just challenging something that is unconstitutional and void and that

the state can't immunize against.

And there's just one other point about who can raise issues and the standing issues and the other Eighth Circuit case I mentioned before.  It's the --

THE COURT:  *Courthouse News*?

MR. HELLER:  No.  This one is the *Iowa Migrant Movement For Justice* --

THE COURT:  Yup.

MR. HELLER:  -- case it's a 2025 Eighth Circuit case. And it deals with the question of who can sue.  And there, in that case the Iowa Attorney General was arguing that that Migrant Movement For Justice lacks an equitable cause of action because it's an organization and it's not subject to prosecution under the act.  And the Court says again, the Supreme Court has stated there's no warrant in our cases for making the validity of an *Ex parte Young* action turn on the identity of the plaintiff.  *Ex parte Young* action requires a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.  Iowa MMJ's complaint does so.  And so that's the end of the inquiry.

THE COURT:  Thank you.

MR. HELLER:  Thank you, your Honor.

THE COURT:  Thank you, Mr. Heller.  Helpful.

Counsel, give me a few minutes, please, to let my mind come

to rest.  If I can impose on you to lurk around.  At least some things have been decided -- or will be decided by agreement, but I may can go deeper than that.  So we'll be out for a bit.

All rise.

Sorry, I shouldn't have said that.  I should have let the clerk do that.  Never mind.

(A recess was taken 4:35 p.m to 4:54 p.m.)

THE COURTROOM DEPUTY:  Court is back in session.

THE COURT:  Y'all may be seated.  I should say that unlike what I said on the way out.

Counsel, thank you for your patience with me and my questions.  And I admire the effort that is obvious in all of y'all's work in getting ready for today and I thank you.  The Court couldn't do its job without counsel.  As Judge Arnold, Richard Arnold used to say, the lawyers make it go.  And he's right, you do.

I will do -- because our case needs to move along, I will do the best that I can and then enter a for-the-reasons-stated-on-the-record order.  After I make my ruling I'll be open for questions to clarify things.  So get ready for that.

The State defendants' motion to dismiss is partly granted and partly denied.  Governor Sanders is dismissed for the reasons argued, notwithstanding this being her signature piece of legislation.  Under *Biogen* and the other precedent, I don't

believe that she has a sufficient role, direct role in enforcement for the Court to keep her in the case.

I confirm my ruling, Mr. Mays, granting your motion to voluntarily dismiss the equal protection claims. The claims as claims, that is an argument that the Fourteenth Amendment's equal protection clause has violated by the LEARNS Act, those are out of the case.

The state-law claims that you raised for your clients, Mr. Mays, the state constitutional claims, those are dismissed without prejudice.

Ms. Patterson, thank you for helping me see the light on the *Pennhurst* issue there.

The First Amendment claims, Mr. Mays, the establishment clause claim will go forward -- that's the denial -- and so that slice of the case survives for now. Justice Black's words in *Everson*, like almost everything he wrote, are clear and beautiful and succinct, but the First Amendment law has moved -- has moved since then. And *Zelman* is, I believe, the governing rubric, informed by the other cases that we discussed here this afternoon, *Trinity*, *Espinoza*, the Maine case that starts with a C whose name escapes me, *Carson*, maybe. And so the Court has to take all of those into account.

The allegations read as truth, and drawing reasonable inferences from them, to my mind, state a plausible claim that the LEARNS Act account system is -- violates the establishment

clause.  The -- because the claim that it violates the establishment clause is plausible, because *Zelman* emphasizes these principles, Ms. Patterson, that you and I discussed about neutrality and parental choice.  And, indeed, the LEARNS Act, as the State defendants emphasize in their brief, is about empowering parents and giving them choices to make.

Mr. Heller makes a strong point, one that occurred to me, too, but one always likes to hear the things that you thought of emphasized or echoed by others, and that is context matters.

Ms. Patterson, I think it is certainly possible to read *Zelman* and broadly as the State does, but I don't know that it is the best reading.  And at this point in the case I view it more narrowly -- or narrower in the sense that we're talking about Cincinnati and a range of choices that parents had in response to a failing school system there -- no, a failed school system.  Among those were a modest voucher, especially for those in financial need.  And there were community schools, there were magnet schools, of course there were public schools.

And so at this point in the case, what I have by way of allegations are that in a number of counties in Arkansas there is no such choice because there is no private school.  That in a statewide program, not just in a city, approximately the same percentage of private schools are religious, that is about 80 percent, those that have been approved by the -- by the state for participation.  I have the map helpfully attached to the

complaint which indicates where those private schools are and where they are not.  And in my mind at this point on a thin record, reading the allegations in the light -- in the light favorable to the plaintiffs, I think there is a reasonable inference that in some counties the parent faced with a failing public school, or an imperfect one, does not have a real choice, that it's more of a Hobson's choice.  And I'm thinking of the -- a parent single or both parents that are working and that can't do home school.  The percentages that I have in the record, the data that's in the record at this point is strikingly strong in terms of the percentage of schools that are religious schools.

And as you said, Mr. Mays, I think we can all agree that the case is not about whether those are good schools or whether we want our children to go to those schools.  It's not that at all.  But here the --

What's going on, Sherri?

THE COURTROOM DEPUTY:  Houdini's in the hall.

THE COURT:  Sarah Helen, can you go --

THE COURTROOM DEPUTY:  Adam went.

THE COURT:  What?

THE COURTROOM DEPUTY:  Adam went.

THE COURT:  OH, okay.  Thank you.

Sorry.  I've lost my train of thought here.

The case is not about religious education and whether it is a good thing.  It is, instead, about whether there is a

plausible claim here that the state of Arkansas is, because of the facts on the ground, impermissibly favoring religious over education over paying for the public schools.  That's poorly stated.  And I apologize for the interruption and the coherence, whatever coherence I might have had in my thinking.  That's now discombobulated.

Ms. Patterson, I pressed you on the state of the record and the procedural stance of our most recent cases, the *Zelman* paradigm.  And, as I said, it is striking to me that two of the four cases are on summary judgment.  The third was on stipulated facts, that's the Maine case in front of Judge Hornby.  And the fourth, the playground case, was on a motion to dismiss.

Applying *Twombly* and *Iqbal*, considering -- looking for the plausibility of the claim, I think the claim -- the establishment clause claim is plausible.  It is -- perhaps, Mr. Cleveland, to your point about what's going on in other parts of the country.  It's not the strongest case.  It's not the strongest claim in the world, but it's there.

And I will do a better of giving a definitive answer to the claim and whether it should proceed with a more complete, factual record about whether -- especially on this deep issue of choice and whether there are real choices there or whether, in effect, the state is supporting religious instruction.

The -- so that's it on the motion to dismiss.  Partly granted and partly denied as I said in those particular ways.

The parents' motion to intervene with permission is granted.  I don't need to reach the as of right point.  As I indicated during the argument, I'm concerned about the erosion to -- perhaps to complete nonexistence of the parens patriae presumption.  But no one can dispute that parents have a particularly strong interest in the education of their children, and, particularly, parents who are participating in the account program and benefitting from it and stand to lose that benefit if the Court were to find the program unconstitutional.

And so, Mr. Cleveland, I look forward to having you and your clients in the case.

MR. CLEVELAND:  Thank you.

THE COURT:  I'm confident that you will help the Court as I make decisions as we go along.

Mr. Heller and the Little Rock School District, with great reluctance I'm going to leave that motion pending with directions.  I need the proposed intervenor, the LSRD to file a new proposed complaint and intervention shorn of all the state-law claims and that articulates with the precision you've done here today, the district's interests.

I am inclined, for the reasons that I mentioned as to the parents, to grant the district intervention.  I think its interests in the case that are affected by the case are different from the -- the plaintiffs because of the district's statutory obligation to provide -- to discharge the state's

obligation to provide free and open and adequate public schools. And also because of the, I think, essentially undisputed financial effect on the public schools of the LEARNS Act and the account program.  But I have doubts and I could not get through them today or get to clarity on whether the district, because of what it is, whether it has standing to sue its parent, the state.  I appreciate the new cases that were cited today, but I've not time to read or digest them and think about them.  So in a word, counsel, I'm still bumfuzzled about that issue.

So I need an amended complaint, an amended proposed complaint and intervention, Mr. Heller.  And with it I need a ten-page brief from the district, supplemental brief that leads me through these -- the standing issue and shows to me to the extent you can based on precedent why the creature of the state can sue -- why the state's political subdivision can sue the state on a First and Fourteenth Amendment issue.

I don't yet see a sufficient connection to the supremacy clause.  I don't yet see where the district will be enforcing an unconstitutional act.  But I'm concerned that I'm missing something.  And before I make the final call on that, I want to see this, please, this revised complaint, and have the benefit of a supplemental brief from the district on that issue.

Ms. Crouse, the remaining State defendants, of course, can respond by the time allowed by law, but ten pages.  No substantive footnotes, please.  And then the district can do a

short reply.  And I'll make the best decision I can on whether the district stays in.

Let me circle back around to the merits.  I think my mind's coming back to -- in focus on that.

Mr. Mays, the claim is not about the wall of separation.  It's just not, not given the Supreme Court's precedent that I have to apply.  But it is about, I do believe, whether this is truly a neutral program and whether, on a few more facts, whether the choice is real or not there for the parents in our state.

I will do a better job on making the final decision on that with the focus on those recent establishment clause cases, the *Zelman* -- and the free exercise clause cases that inform them, *Zelman*, *Espinoza*, *Carson* I think it is, and *Trinity*.

So now let me get a drink of water and then I'll ask everybody what, if any, clarification that I could provide.

Ms. Patterson, you first.

MS. PATTERSON:  No, your Honor.  I think I understand what you're saying today.

THE COURT:  Okay.  Ms. Crouse?

MS. CROUSE:  No, your Honor.

THE COURT:  Okay.  Mr. Cleveland?

MR. CLEVELAND:  No questions, your Honor.

THE COURT:  All right.  I've just worn you all out, haven't I?  That's what's going on.

Mr. Mays, question?

MR. MAYS:  Your Honor, I'd like your clarification on the ruling you made on the -- you said we could go forward with our case on the -- on the constitutional issue of violation of the establishment clause and then -- but I understood you later to say that you were going -- you were going to do some additional review of the cases that related -- recent -- some of the recent decisions of the Court.  So are we to go forward with the case at this point?  Okay.

THE COURT:  You are.  I'm sorry, Mr. Mays.  I was unclear.

MR. MAYS:  No, no.

THE COURT:  It's -- the plaintiffs' establishment clause claim considered in terms of -- let me get my case name right -- considered in terms of this recent precedent, *Zelman*, *Trinity Lutheran*, *Espinoza*, and *Carson*, it proceeds.  I hold that you've stated a plausible establishment clause claim.

MR. MAYS:  Okay.  So --

THE COURT:  And I want more facts to be able to make a better call on the merits about choice, the reality of the choice, and the neutrality or not of the program.

MR. MAYS:  That's very clear.  I appreciate that.  Are you going to issue a scheduling order?

THE COURT:  I will.

MR. MAYS:  Okay.  Thank you.

THE COURT:  You are welcome.  The -- I need to read more cases and think about it is on your brother Heller and the district and the standing issues that have been pressed so well by the State on why the district can't sue the state.  It's those -- those cases, ones previously cited and the new one cited today that I need to wrestle more with.

Mr. Heller?

MR. HELLER:  No questions, your Honor.

THE COURT:  How long would you like to file the proposed amended complaint and the brief?

MR. HELLER:  I feel like I'm wrestling with myself to come to a compromise, but would two weeks be acceptable?

THE COURT:  Two weeks is acceptable.  That's exactly what I was hoping for.  I think that's quick enough to keep us moving, but not a backbreaker and not so long it will lose traction.

I do think -- I would -- counsel, I would ask you, and, Mr. Mays, this goes to the scheduling order --

Ms. Black, I have not issued one; is that right?

THE COURTROOM DEPUTY:  Correct.

THE COURT:  Okay.  I will issue a scheduling order.  I would ask counsel to consider whether, as in the Maine case, *Carson*, if I'm remembering right, an alternative would be developing a list of stipulated facts in terms of the number of schools that are participating and how many are religious and

how many are private and a county-by-county chart of what the options are and the texture of the record that a district court had to wrestle -- had the benefit of in *Zelman*, but that I do not yet have.  So I can apply *Zelman* and those later cases and make the best decision I can.

If you can do it, wonderful.  Maybe you can do it in part and not in part.  But I encourage counsel to think creatively on how y'all can compile a record so the Court can make an informed decision on motions for summary judgment, probably.

There's one other thing.

Ms. Patterson, you and I started talking about this.  I would find it helpful to have more on the history and tradition point.  I think --

Mr. Mays, there's not much, if anything, left of the Lemon case after *Kennedy*, the coach praying on the 50-yard line case.  And, instead, I'm supposed to look at history and tradition.  And in addition to our facts on the ground here about what's going on in Arkansas and what choices parents have, it would help me to have the scholarship and argument from history, which is what the precedent, I think, tells me that I'm supposed to look at as the second -- as the second layer here on this.

So, okay.  Anything else, counsel?

MR. HELLER:  No, your Honor.

MR. MAYS:  Not from the plaintiffs, your Honor.  Thank you.

THE COURT:  Thank you all.

Ms. Patterson, anything?

MS. PATTERSON:  No, your Honor.

THE COURT:  Good.

Mr. Cleveland, traveling mercies.

MR. CLEVELAND:  Thank you.

THE COURT:  All right.  We'll see you then.

THE COURTROOM DEPUTY:  All rise.

THE COURT:  We're in recess.

(Proceedings concluded at 5:20 p.m.)

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/Graham Higdon, RMR, CRR      Date:  March 11, 2026
United States Court Reporter

Graham Higdon, RMR, CRR, United States Court Reporter
graham_higdon@ared.uscourts.gov (501)604-5115