**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**

GWEN FAULKENBERRY; SPECIAL RENEE SANDERS; ANIKA WHITFIELD; AND KIMBERLY CRUTCHFIELD,

*Plaintiffs,*

v.

ARKANSAS DEPARTMENT OF EDUCATION; JACOB OLIVA, in his official capacity as Secretary of the Arkansas Department of Education; SARAH MOORE, PH.D., chairwoman of the Arkansas State Board of Education; LISA HUNTER; JEFF WOOD; RANDY HENDERSON; LEIGH S. KEENER; ADRIENNE WOODS; KEN BRAGG; KATHY MCFETRIDGE-ROLLINS; AND GARY ARNOLD, PH.D., members of the Arkansas State Board of Education; SARAH HUCKABEE SANDERS, Governor of the State of Arkansas; THE ARKANSAS DEPARTMENT OF FINANCE AND ADMINISTRATION; and JIM HUDSON, in his official capacity as Secretary of the Arkansas Department of Finance and Administration,

*Defendants,*

ERIKA LARA; KATIE PARRISH; AND NIKITA GLENDENNING,

*Intervenor-Defendants.*

Civil Action No. 4:25-cv-00592-DPM

# MEMORANDUM OF LAW IN SUPPORT OF INTERVENOR-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................ ii

INTRODUCTION ........................................ 1

LEGAL STANDARD ........................................ 2

ARGUMENT ........................................ 2

I. *Zelman* forecloses Plaintiffs' Establishment Clause challenge. ........................................ 2

A. The neutrality framework from *Zelman* is based on the benefits offered, not the state of the private school market. ........................................ 2

B. The Arkansas EFA Program satisfies the *Zelman* standard. ........................................ 3

II. The EFA Program does not resemble any historical establishment of religion. ........................................ 6

A. The Establishment Clause targeted six categories of historical religious establishments, all centering on coercion. ........................................ 6

B. The EFA Program does not fit any of the categories of historical religious establishments ........................................ 8

1. The Arkansas EFA Program funds independent parental choices, not established religious institutions. ........................................ 8

2. The Arkansas EFA Program does not replace traditional public schools and their civic function. ........................................ 10

3. The EFA Program does not coerce anyone to participate, much less to attend a religious school. ........................................ 11

III. The Free Exercise Clause requires an interpretation of the Establishment Clause that does not discriminate against religious education. ........................................ 12

IV. Plaintiffs lack standing to challenge education options in a program they do not intend to use. ........................................ 13

CONCLUSION ........................................ 17

# TABLE OF AUTHORITIES

## Cases

*Carson v. Makin*,
596 U.S. 767 (2022) ....................1, 6, 12, 13

*Degenfelder v. Wyoming Educ. Ass'n*,
589 P.3d 346 (Wyo. 2026) ....................14

*Espinoza v. Montana Dep't of Revenue*,
591 U.S. 464 (2020) ....................1, 12, 13

*Hilsenrath on behalf of C.H. v. Sch. Dist. of Chathams*,
136 F.4th 484 (3d Cir. 2025) ....................7

*Hoekman v. Educ. Minnesota*,
41 F.4th 969 (8th Cir. 2022) ....................3

*Johnson v. Crooks*,
326 F.3d 995 (8th Cir. 2003) ....................2

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ....................6, 12

*Lemon v. Kurtzman*,
403 U.S. 602 (1971) ....................6

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ....................14

*Meyer v. Nebraska*,
262 U.S. 390 (1923) ....................15

*Nathan v. Alamo Heights Indep. Sch. Dist.*,
173 F.4th 576 (5th Cir. 2026) ....................7

*New Doe Child #1 v. United States*,
901 F.3d 1015 (8th Cir. 2018) ....................7, 8

*Pierce v. Soc'y of Sisters*,
268 U.S. 510 (1925) ....................15

*Shotts v. United States*,
No. 4:08CV1779, 2011 WL 13318284 (E.D. Ark. Feb. 11, 2011) ....................2

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022) ....................6, 10

*Swanson v. Hilgers*,
151 F.4th 992 (8th Cir. 2025) .......... 15

*Town of Greece v. Galloway*,
572 U.S. 565 (2014) .......... 6, 7, 8

*Van Orden v. Perry*,
545 U.S. 677 (2005) .......... 6

*Wallace v. ConAgra Foods, Inc.*,
747 F.3d 1025 (8th Cir. 2014) .......... 14

*Warth v. Seldin*,
422 U.S. 490 (1975) .......... 15

*Zelman v. Simmons-Harris,*
536 U.S. 639 (2002) .......... 1, 2, 3, 4, 5, 6, 9, 11, 12, 15, 16

**Other Authorities**

Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003) .......... 6, 7, 8, 9, 10

Michelle L. Lofton & Marty F. Lueken, *Distribution of Education Savings Account Usage among Families: Evidence from the Florida Gardiner Scholarship Program*, 16 J. School Choice 649 (2022) .......... 5

Stephanie H. Barclay, Brady Earley & Annika Boone, Original Meaning and the Establishment Clause: A Corpus Linguistics Analysis, 61 Ariz. L. Rev. 505 (2019) .......... 7, 9

**Rules**

Fed. R. Civ. P. 56 .......... 2

**Constitutional Provisions**

Ark. Const. art. 14, § 1 .......... 10

# INTRODUCTION

Arkansas's EFA Program does not violate the Establishment Clause. The Supreme Court resolved the controlling constitutional question in *Zelman v. Simmons-Harris*, which held that a religion-neutral benefits program does not violate the Establishment Clause when it "provide[s] aid directly to a broad class of individuals, who, in turn, direct the aid to religious schools or institutions of their own choosing." 536 U.S. 639, 649 (2002). The EFA Program follows that same model, as it makes education benefits available without regard to religion, permits providers to participate without regard to religion, and leaves education decisions to parents. The Constitution does not make a state responsible for the religious preferences of its population. Accordingly, *Zelman* controls.

Two related doctrinal inquiries reinforce that conclusion. First, because the EFA Program neither establishes state-supported religious institutions nor compels religious participation, it bears no resemblance to practices historically targeted by the Establishment Clause. Second, because many parents of EFA Program participants choose religious education for their children as a way to exercise their religion, the Free Exercise Clause protects their EFA Program choices. In short, the Free Exercise Clause prohibits Arkansas from excluding religious families and religious options from the EFA Program. *See Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464 (2020); *Carson v. Makin*, 596 U.S. 767 (2022). Plaintiffs cannot obtain relief against the entire program based on a constitutional theory that would require religious discrimination. *Espinoza*, 591 U.S. at 487–89.

Finally, Plaintiffs cannot expand their taxpayer-based challenge into a lawsuit asserting injuries belonging to EFA Program participants. None of the Plaintiffs participate in the EFA Program or have any intent to participate. They cannot establish a personal injury from the practical availability of educational options to families in particular counties, nor can they assert the rights of Intervenor Parents or other EFA Program participants. Any alleged inadequacy in the education options available

to EFA Program families does not justify eliminating a neutral benefits program that families voluntarily use.

Because the EFA Program is constitutional under *Zelman*, consistent with the historical understanding of the Establishment Clause, and protected from Plaintiffs' remedy by the Free Exercise Clause, summary judgment is warranted for all Defendants.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *Shotts v. United States*, No. 4:08CV1779, 2011 WL 13318284, at *1 (E.D. Ark. Feb. 11, 2011) (citing Fed. R. Civ. P. 56). The Court views the evidence in the light most favorable to the nonmoving party. *See id.* (citing *Johnson v. Crooks*, 326 F.3d 995, 1005–06 (8th Cir. 2003)).

## ARGUMENT

### I. *Zelman* forecloses Plaintiffs' Establishment Clause challenge.

The U.S. Supreme Court has held that a school choice program which includes religious private schools among many options does not violate the Establishment Clause. *See Zelman*, 536 U.S. at 662–63. The rule is that "where a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause." *Id.* at 652. That rule fully resolves Plaintiffs' remaining claim in favor of Defendants.

#### A. The neutrality framework from *Zelman* is based on the benefits offered, not the state of the private school market.

The Supreme Court applied its neutrality rule to uphold the Cleveland Pilot Project Scholarship Program for several reasons. First, the program "is neutral in all respects toward religion." *Id.* at 653. Second, the program "is part of a general and multifaceted undertaking by the State of Ohio

to provide educational opportunities." *Id.* Third, it "confers educational assistance directly to a broad class of individuals defined without reference to religion." *Id.* Fourth, it "permits the participation of *all* schools within the district, religious or nonreligious," so long as they "meet[] statewide educational standards" and satisfy nondiscrimination requirements. *Id.* at 645, 653.

These factors assess the structure of the benefit, not the religious composition of the private school market, because only the benefit structure is attributable to the state. A claim under Section 1983 requires state action, and the First and Fourteenth Amendments "prohibit only state action." *Hoekman v. Educ. Minnesota*, 41 F.4th 969, 977 (8th Cir. 2022). No Establishment Clause claim exists against the common phenomenon of a "preponderance of religiously affiliated private schools." *Zelman*, 536 U.S. at 656–57. Any other interpretation of the Establishment Clause would discriminate against cities or states with large populations of religious individuals and families by treating the religious composition of the geographic area as state action. *See id.*

### B. The Arkansas EFA Program satisfies the *Zelman* standard.

The *Zelman* factors apply to the Arkansas EFA Program and confirm it is neutral.

- First, the EFA Program does not require, restrict, or direct the religious status, beliefs, or practices of students or service providers. Intervenor-Defendants' Statement of Undisputed Material Facts (hereinafter "Facts") ¶¶ 4, 11–13. Every family in Arkansas is eligible to participate, and families independently determine whether to enroll and, if so, how to use their benefits. *Id.* ¶¶ 4–9, 14–15, 26. Education service providers also independently determine whether to participate, and their participation depends on whether they meet state standards for accreditation rather than any religious or secular aspect of their instruction. *Id.* ¶¶ 10–13.

- Second, the EFA Program is part of Arkansas's comprehensive educational opportunities that include the local traditional public school, school choice transfers

to other public schools, charter schools, and magnet schools. *Id.* ¶¶ 1, 31–47. Every student in Arkansas has access to a traditional public school, and all can access secular online schools. *Id.*

- Third, the EFA Program confers educational assistance directly to a broad class of individuals because it provides scholarships to every school-age child in Arkansas whose parents apply. *Id.* ¶¶ 4–5.
- Finally, the EFA Program permits the participation of all schools that satisfy accreditation and other related requirements without regard to religion. *Id.* ¶¶ 11–13.

These aspects of the EFA Program confirm that it provides neutral benefits to families who independently chose how to use them. The rule from *Zelman* therefore applies with equal force here.

Two immaterial differences between the EFA Program and the Cleveland Pilot Program do not distinguish *Zelman* in any constitutionally meaningful way. First, the EFA Program is a type of education savings account, meaning parents can spend its funds on textbooks, tutoring, and a wide variety of services beyond private school tuition. Facts ¶¶ 8–9. In contrast, the Cleveland Pilot Program was primarily a voucher program, meaning that its funding could be used only to pay tuition for students who left public school. *Zelman*, 536 U.S. at 645. Second, the EFA Program does not include public school tuition because Arkansas does not charge for intradistrict or interdistrict transfer. Facts ¶¶ 45–47. The Cleveland Pilot Program included public schools because Ohio did not have the free transfer program that Arkansas has. *Zelman*, 536 U.S. at 645 (including "tuition aid" for "public or private school").

Put differently, Arkansas offers not only the same education options that were available in Cleveland, but also additional permissible uses of scholarships. As a result, Arkansas's education market may become *less* dominated by religious schools, as families customize education using multiple new, asset-light educational entrepreneurs instead of existing, capital-intensive private schools. *See, e.g.*,

Michelle L. Lofton & Marty F. Lueken, *Distribution of Education Savings Account Usage among Families: Evidence from the Florida Gardiner Scholarship Program*, 16 J. School Choice 649, 659–61, 667 (2022) (finding increased usage for non-tuition options over time, especially in rural areas). Thus, the Arkansas EFA Program provides a religion-neutral benefit to students, and *Zelman* applies to these facts.

Plaintiffs' contrary view relies on Justice Breyer's dissent in *Zelman*. The Complaint is almost a direct quote of Justice Breyer's dissenting argument. *Compare Zelman*, 536 U.S. at 726 (Breyer, J., dissenting) ("They differ in kind because they direct financing to a core function of the church: the teaching of religious truths to young children. For that reason the constitutional demand for 'separation' is of particular constitutional concern."), *with* Compl. ¶ 65 ("The Voucher Program directs financing to a core function of a religious denomination or church that sponsors a private sectarian school: the teaching of religious truths to young children. For that reason, the constitutional demands for 'separation' between the State and religion is of particular constitutional concern."). This Court is bound by *Zelman*'s holding, not its dissenting opinions.

Plaintiffs also cannot challenge the religious or secular nature of educational options available in the EFA Program because the existence of many religious options in Arkansas is caused by the nature of the population of Arkansas, not by state action. The state's population is much more religious than the average American. Facts ¶ 48. And over 80% of Arkansas's private schools are religiously affiliated. Facts ¶ 49. Arkansas neither created these private schools nor determined which existing schools applied for participation. Facts ¶ 11. The state also does not screen applicants based on religious affiliation or intention to use scholarships for religious education. Facts ¶¶ 12–13. While many Arkansas brick-and-mortar private schools are religious, they exist owing to the high degree of religiosity among Arkansans—religiosity that predates the EFA Program. *See id.* Accordingly, the religious composition of Arkansas's private school market cannot be attributed to the EFA Program—

or in any other way to the state. Plaintiffs cannot maintain an Establishment Clause claim merely because the EFA Program makes religious school options available to families. *Zelman*, 536 U.S. at 656–57.

## II. The EFA Program does not resemble any historical establishment of religion.

The "historical practices and understandings" test for the Establishment Clause independently confirms that the EFA Program is constitutional. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)). "'[T]he line' that courts and governments 'must draw between the permissible and the impermissible' has to 'accor[d] with history and faithfully reflec[t] the understanding of the Founding Fathers.'" *Id.* at 535–36 (quoting *Town of Greece*, 572 U.S. at 577). This new test does not require revisiting *Zelman* because, like *Kennedy*, that opinion also rejected application of *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *See, e.g.*, *Van Orden v. Perry*, 545 U.S. 677, 686 (2005) (plurality op.) (citing *Zelman* as a recent case that did not apply *Lemon*). Nothing in *Kennedy* overruled or displaced *Zelman*. To the contrary, the Supreme Court continued to rely on *Zelman* in the same term that it overruled *Lemon*. *See Carson*, 596 U.S. at 781. Thus, whatever changes *Kennedy* made to the Establishment Clause framework, it did not alter *Zelman*'s rule that neutral government benefits reaching religious institutions through independent private choice is constitutional. Nevertheless, the historical practices and understandings test confirms that *Zelman* applies to this case.

### A. The Establishment Clause targeted six categories of historical religious establishments, all centering on coercion.

The Supreme Court has identified coercion as a hallmark of an establishment of religion while also citing scholarship identifying other historical characteristics of religious establishments. *Kennedy*, 597 U.S. at 537 & n.5 (citing Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2144–2146 (2003) and *Shurtleff v. City of Boston*, 596 U.S. 243, 284–88 (2022) (Gorsuch, J., concurring)). Two circuit courts have subsequently

used Professor McConnell's six categories to organize their historical analysis. *See Nathan v. Alamo Heights Indep. Sch. Dist.*, 173 F.4th 576, 601 & nn.44-45 (5th Cir. 2026) (en banc); *Hilsenrath on behalf of C.H. v. Sch. Dist. of Chathams*, 136 F.4th 484, 491 & nn.53–54 (3d Cir. 2025) (stating that plaintiffs bear the burden to prove other categories are relevant).

In Professor McConnell's view, six categories encompass the traditional types of religious establishment targeted by the Establishment Clause. McConnell, 44 Wm. & Mary L. Rev. at 2131. Those categories are: "(1) control over doctrine, governance, and personnel of the church; (2) compulsory church attendance; (3) financial support; (4) prohibitions on worship in dissenting churches; (5) use of church institutions for public functions; and (6) restriction of political participation to members of the established church." *Id.* Other scholars agree that McConnell's categories constitute a valid general summary of historical evidence. *See, e.g.*, Stephanie H. Barclay, Brady Earley & Annika Boone, Original Meaning and the Establishment Clause: A Corpus Linguistics Analysis, 61 Ariz. L. Rev. 505, 566 (2019) (describing "significant confirming evidence" in a corpus linguistics analysis for Professor McConnell's first, second, fourth, and sixth categories); *see also id.* at 558 (describing evidence for his third category as concerning "support given in a way that preferred established churches to other congregations").

The Eighth Circuit's test for the Establishment Clause currently predates those authorities, but it functions similarly. *See New Doe Child #1 v. United States*, 901 F.3d 1015, 1021–24 (8th Cir. 2018). First, the court examines historical practices. *See id.* at 1021. If "history shows that the specific practice is permitted," that evidence ends the inquiry. *Id.* (quoting *Town of Greece*, 572 U.S. at 577). Otherwise, the court "look[s] to the historical understandings of the Establishment Clause as informed by other relevant practices." *Id.* (quoting *Town of Greece*, 572 U.S. at 577). Professor McConnell's categories provide a useful framework for identifying the historical understandings relevant at this stage. Second, regardless of historical practices, the court examines whether the government is "coerc[ing] its citizens

to support or participate in any religion or its exercise." *Id.* at 1023 (quoting *Town of Greece*, 572 U.S. at 586). If the challenged activity is consistent with historical practices and not coercive, it does not violate the Establishment Clause. *See id.* at 1024.

### B. The EFA Program does not fit any of the categories of historical religious establishments.

The EFA Program is consistent with historical practices and understanding of the Establishment Clause. There is no alleged control over a church for category (1), no attendance requirement for category (2), no alleged restriction on certain churches for category (4), and no official state church for category (6). Only a discussion of (3) financial support and (5) use of church institutions for public functions is arguably relevant on the facts of this Program, and neither category fits.

First, the EFA Program is not the type of financial support for religion that constitutes an establishment because it provides scholarships that are not restricted to any particular church or religion. Instead, it provides funding to students to obtain services for a fee rather than direct financial support to any institution. Second, Arkansas does not use church institutions for public functions; the state and its local public subdivisions continue to operate a system of traditional public schools in addition to the EFA Program. Furthermore, the EFA Program does not coerce anyone because providing scholarships to families that they may choose to use at religious or nonreligious options does not require any religious exercise.

#### 1. The Arkansas EFA Program funds independent parental choices, not established religious institutions.

The Arkansas EFA Program does not operate like historic financial support for churches. Such financial support took two forms: land grants and religious taxes called tithes. McConnell, 44 Wm. & Mary L. Rev. at 2147. The EFA Program is purely a financial program and does not grant any land. Facts ¶¶ 6–7. It also does not provide funds "for the support of churches and ministers,"

McConnell, 44 Wm. & Mary L. Rev. at 2152, or any other religious institution. *See also Zelman*, 536 U.S. at 652 ("The incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits.")

Historically, the distinction between a religious establishment and other funding of religious schools was whether education was restricted to a particular church. *Barclay* et al., 61 Ariz. L. Rev. at 549–550. For example, "a law that only allowed members of an established church in England to teach in schools" was viewed as an establishment because it "prevented parents from sending their children to a religious school that was consistent with the parents' religious beliefs." *Id.* at 550; *see also id.* at 557–58.

This historical category does not encompass every neutral government benefit that may ultimately reach a religious institution. Instead, the founders were concerned with support for institutions, not about whether education should be religious. During the colonial era, the largest system of schools was established by "the missionary arm of the Church of England." McConnell, 44 Wm. & Mary L. Rev. at 2173. Well after independence from England, and "[e]ven after disestablishment of religion, most schools in the United States were conducted under religious auspices." *Id.* At the federal level, the Northwest Ordinance of 1787 set aside lands for education in new territories that would advance "[r]eligion, morality, and knowledge." *Id.* at 2151 & n.286 (quoting Northwest Ordinance art. III (July 13, 1787)). The founders did not consider religious education to be an establishment, even if public support reached those schools. *See id.*

The EFA Program fits within that historical understanding because it makes education benefits available to families without regard to religion. The State does not designate a church or religious institution to receive public support, nor does it direct families to religious providers. Furthermore, no religious institution has any entitlement to EFA funds. Facts ¶¶ 15–18. Instead, each

family independently decides how to use its funds. *Id.* The combination of optional EFA Program participation and intervening private choice distinguishes the EFA Program from historical governmental support for established religious institutions. No one is compelled to participate in the EFA Program and make a choice, let alone to exercise private choice in favor of a religious institution. Accordingly, the EFA Program is not an establishment of religion under the financial support factor.

**2. The Arkansas EFA Program does not replace traditional public schools and their civic function.**

The EFA Program also does not involve use of church institutions for civic functions because Arkansas maintains a traditional public school system in addition to the EFA Program. Public education and public schools remains a responsibility of the state both before and after the creation of the EFA Program. Ark. Const. art. 14, § 1; Facts ¶ 1.

In the historical establishments, the state used private religious schools as the sole means of meeting education needs. McConnell, 44 Wm. & Mary L. Rev. at 2171–74. That is why Professor McConnell alternatively refers to those establishments as "Use of the State Church," *id.* at 2169, and Justice Gorsuch has referred to this factor as fulfilled "often by giving the established church a monopoly over a specific function." *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring).

Arkansas does not give a monopoly over education to an official state church, or even to religion more generally, because it maintains multiple public options for education. Facts ¶¶ 1, 31–44. The EFA Program provides options for parents to spend funds at non-government providers and does not turn any of those participating providers into government institutions. Facts ¶¶ 9–14. It does not require participating private schools to meet public school obligations or delegate governmental authority to those schools, let alone grant them a monopoly over education. *See id.* Families independently select private providers while Arkansas continues to operate its traditional public school system. Facts ¶¶ 1, 14–18, 26. No religious institution operates Arkansas's traditional public school system or has otherwise been designated to perform that function. Facts ¶¶ 1, 31–32. Instead, EFA

Program participants are families exercising additional education options while the State continues to maintain its core education system. Accordingly, the EFA Program is not an establishment of religion under the fifth factor for historic establishments.

**3. The EFA Program does not coerce anyone to participate, much less to attend a religious school.**

The EFA Program also does not violate the Establishment Clause because participation is voluntary. Every student in Arkansas has a local traditional public school to attend. Facts ¶¶ 1, 31–32. Students participate in the EFA Program only by their parents' choice. *Id.* ¶¶ 4–5.

No family can be compelled to receive religious education through a program that no family is required to use. The possibility that a family may have limited practical options in the EFA Program does not establish government-compelled religious exercise because that family remains free to use the traditional public school system and is never required to enroll in the EFA Program. Families also have the choice of Arkansas's public school transfer program at a minimum, with charter or magnet school options potentially available as well. Facts ¶¶ 31–44. Families also can change their minds after enrolling in the EFA Program and return their children to the public school program, meaning that enrollment in EFA does not compel them to use any EFA service provider. Facts ¶¶ 1, 8–9, 14.

Accordingly, because families remain free to use the traditional public school system, and because both participation in the EFA Program and the use of EFA funds for any religious instruction are entirely voluntary, the EFA Program is not compulsory.

***

In short, even if this Court applies the historical practices and understanding of the Establishment Clause independent of *Zelman*, the EFA Program does not establish religion. Accordingly, Plaintiffs' claim fails even under the latest Establishment Clause jurisprudence.

## III. The Free Exercise Clause requires an interpretation of the Establishment Clause that does not discriminate against religious education.

Even aside from *Zelman* and the historical practices and understanding test, Plaintiffs' theory fails for an additional reason: they cannot obtain relief against the EFA Program that imposes discrimination against religious families or schools. The Establishment Clause and Free Exercise Clauses must be interpreted together, *Kennedy*, 597 U.S. at 533, and the latter independently forecloses Plaintiffs' proposed remedy.

Under recent precedent, the Free Exercise Clause prohibits Arkansas from excluding religious schools or religious parents from a public benefits program because of their religion. *Espinoza*, 591 U.S. at 475–76; *see also Carson*, 596 U.S. at 789. Because it chose to operate a publicly funded benefits program for parents, Arkansas is required to allow participants like Intervenor Parents to use the funds at both religious and secular providers. *Espinoza*, 591 U.S. at 487.

The Free Exercise Clause also prohibits Plaintiffs from obtaining an injunction against the entire program under the theory that only the *religious* participation is unlawful. *See id.* at 487–89. In *Espinoza*, the Montana Supreme Court struck down the entire program under the theory that allowing religious participation was unconstitutional. *Id.* The Supreme Court reversed, holding that Plaintiffs could not obtain an injunction against the entire program because the remedy relied on an errant legal premise regarding religious participation. *Id.*

Here, Plaintiffs seek exactly the finding and remedy that *Espinoza* forbids. They want a declaration that government funding reaching religious schools in any form is unlawful. Compl. ¶¶ 67, Prayer for Relief ¶ (i). Then, they want an injunction against not only religious schools but also the entire EFA Program in order to alleviate the resulting religious discrimination. Compl. Prayer for Relief ¶ (iv). This Court is bound by *Espinoza* to deny that request.

Intervenor Parents' use of the EFA Program illustrates this problem. Nikita's family is not religious and uses the EFA Program for homeschool materials that are not religious. Facts ¶¶ 23–25.

Her participation illustrates that the EFA Program is not financing religious instruction for all participants, instead letting parents decide how to use the funds. In contrast, Erika does use the EFA Program for religious Catholic schools. Facts ¶¶ 19–20. The distinction between Nikita's use and Erika's use is precisely why Plaintiffs' interpretation fails: Nikita's use of EFA funds is not an establishment of religion, and Erika cannot be singled out for her religious use of the same scholarship. *Espinoza*, 591 U.S. at 475–76. Concluding otherwise would either (1) subject Erika to differential treatment in violation of the Free Exercise Clause or (2) deprive Nikita of her secular use of scholarships merely because other families use the scholarship for religious reasons. That is why *Espinoza* prohibits Plaintiffs' requested remedy in this case: they cannot single out Erika's use of EFA Funds for constitutional disfavor, regardless whether the remedy also applies to secular uses.

In short, because the EFA Program includes nonreligious uses like Nikita's use, it cannot exclude religious uses without violating the Free Exercise Clause. Because that clause and the Establishment Clause are construed together, the Establishment Clause cannot prohibit what the Free Exercise Clause requires. Accordingly, Plaintiffs' Establishment Clause claim cannot succeed under *Espinoza* and *Carson*, and summary judgment is warranted for all Defendants.

## IV. Plaintiffs lack standing to challenge education options in a program they do not intend to use.

Finally, even if Plaintiffs could identify some constitutional concern from the practical availability of educational options in particular counties, they are not the proper parties to litigate that issue. The Court has interpreted the Complaint to include the claim that "in some counties the parent faced with a failing public school, or an imperfect one, does not have a real choice." ECF No. 43, Feb. 17, 2026 Motion Hearing Tr. at 101:5–7. Those alleged injuries belong, if they exist at all, to parents who encounter the asserted limitations. Plaintiffs may have standing to assert a taxpayer-based Establishment Clause challenge to the program generally, but that standing does not automatically

give them standing to challenge the practical availability of educational options to individual EFA participants.

First, these Plaintiffs lack personal injury from the educational options available in the program. "[T]he alleged 'injury must affect the plaintiff in a *personal and individual* way.'" *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). These Plaintiffs are taxpayers, not EFA Program participants. Compl. ¶¶ 10–13. All four have asserted that they are parents of public-school children and active taxpayers, without pleading any intent to participate in the EFA Program. *Id.* They have also disclaimed any plans or intentions to participate in the EFA Program. Facts ¶¶ 27–29. Thus, they have no personal injury from any lack of options in the EFA Program.

As the Wyoming Supreme Court recently explained, parents who are happy with their public schools and do not intend to change schools suffer no injury from a potential lack of options in a school choice program. *Degenfelder v. Wyoming Educ. Ass'n*, 589 P.3d 346, 355–56 (Wyo. 2026). In the relevant part, the Wyoming plaintiffs had asserted an injury because they lacked equal access to education options in Wyoming's school choice program due to alleged discriminatory policies. *Id.* That court held that even assuming Plaintiffs' injury allegations were true, the plaintiffs suffered no injury from restricted options in the school choice program because they had no intent to use the program. *See id.* at 356. The same is true here: even if these Plaintiffs lived in counties that had only religious options for using EFA funds, and otherwise had failing public schools, they could not assert an injury from the restricted options because they have no intent to use the EFA Program.

Second, Plaintiffs lack redressability for a lack of options in the EFA Program because their proposed remedy would not solve any injury from a lack of options. Their asserted injury must be redressable by a favorable decision. *Lujan*, 504 U.S. at 561. If their children were being denied a realistic opportunity for a secular education by the state, then the remedy would be to provide access to that

education, not to harm *other* children that have realistic opportunities. In contrast, if their pocketbook were injured by paying for scholarships that reach religious schools, then the remedy would be to stop those payments throughout the state, not in discrete geographic areas. Plaintiffs are attempting to use the former injury to obtain the latter remedy, and they cannot do that under *Zelman*. 536 U.S. at 656–57. The Establishment Clause does not require depriving kids in failing public schools of any alternative merely because they live in a religious state. *See id.* Plaintiffs cannot evade *Zelman* by challenging less than the entire program, and they cannot obtain remedies against the entire program based on injuries that allegedly occur to others in discrete geographic areas.

Third, Plaintiffs cannot remedy their lack of standing by asserting injuries to third-party EFA Participants. Plaintiffs generally "cannot rest [their] claim to relief on the legal rights or interests of third parties." *Swanson v. Hilgers*, 151 F.4th 992, 996 (8th Cir. 2025) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). An exception permits third-party standing if a plaintiff "demonstrates (1) a close relationship to the third party and (2) a hindrance to the third party's ability to bring suit." *Id.* Plaintiffs have neither pled nor proven either requirement for third-party standing.

In addition, such third-party standing here would violate federal parental rights. Under federal law, all EFA parents have the fundamental constitutional right to direct the education and upbringing of their own children. *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 401 (1923). Under Plaintiffs' interpretation of the Establishment Clause, Intervenor Parents' five children have a constitutional right to secular options, and these Plaintiffs can sue to challenge an alleged deprivation of those rights, regardless of the views (and parental decisions) of Erika, Katie, and Nikita as to whether their children's constitutional rights are satisfied at their schools. Such transfer of the children's rights from parents to the Plaintiffs would violate Intervenor Parents' parental rights by permitting Plaintiffs to interfere in how Intervenor Parents educate their children.

Similarly, transferring the rights of other nonparty parents to Plaintiffs would violate those parents' rights.

Of course, the problems with the injury and the remedy stem from Plaintiffs' attempt to avoid *Zelman*, which forecloses any claim for their true alleged injury. A choice between public schools and scholarships functionally usable only at religious schools in some areas did not violate the Establishment Clause in *Zelman*. 536 U.S. at 656–58 (majority op.), 704–05 (Souter, J., dissenting). Plaintiffs cannot convert their taxpayer standing for a *Zelman*-style claim into roving third-party standing to assert claims on behalf of EFA participants. Accordingly, any challenge in the Complaint to the choices practically available to participants in the EFA Program is not available to these Plaintiffs.

## CONCLUSION

For the reasons stated, this Court should grant summary judgment to all Defendants.

Dated: November 19, 2026

Respectfully submitted,

*/s/ Bryan G. Cleveland*
Thomas M. Fisher*
Bryan G. Cleveland*
EDCHOICE LEGAL ADVOCATES
111 Monument Circle, Suite 2650
Indianapolis, IN 46204
Tel: (317) 681-0745
tfisher@edchoice.org
bcleveland@edchoice.org

W. Whitfield Hyman
(Ark. Bar #2013237)
King Law Group, PLLC
300 North 6th Street
Fort Smith, AR 72901
Tel: (479) 782-1125
hyman@arkansaslawking.com

*Attorneys for Parent Intervenors*
* Admitted *pro hac vice*