**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

GWEN FAULKENBERRY; SPECIAL RENEE SANDERS; ANIKA WHITFIELD; AND KIMBERLY CRUTCHFIELD,

*Plaintiffs,*

v.

Civil Action No. 4:25-cv-00592-DPM

ARKANSAS DEPARTMENT OF EDUCATION; JACOB OLIVA, in his official capacity as Secretary of the Arkansas Department of Education; SARAH MOORE, PH.D., chairwoman of the Arkansas State Board of Education; LISA HUNTER; JEFF WOOD; RANDY HENDERSON; LEIGH S. KEENER; ADRIENNE WOODS; KEN BRAGG; KATHY MCFETRIDGE-ROLLINS; AND GARY ARNOLD, PH.D., members of the Arkansas State Board of Education; SARAH HUCKABEE SANDERS, Governor of the State of Arkansas; THE ARKANSAS DEPARTMENT OF FINANCE AND ADMINISTRATION; and JIM HUDSON, in his official capacity as Secretary of the Arkansas Department of Finance and Administration,

*Defendants,*

and ERIKA LARA, KATIE PARRISH, and NIKITA GLENDENNING

*Intervenor-Defendants.*

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


I. TABLE OF AUTHORITIES ....................................................................4

II. INTRODUCTION.............................................................................6

A. The History and Structure of the LEARNS Act ..................................9

III. JOINT STIPULATIONS AND PLAINTIFFS' UNDISPUTED FACTS ........19

IV. LEGAL STANDARD .........................................................................19

A. Motion for Summary Judgment ........................................................19

B. Standards for Evaluation of Establishment Clause Cases...................21

*i. The Emergence of the Child-Benefit Theory and the Secular Aid Doctrine..........................................................21*

*ii. The Lemon Era: Primary Effect, Religious Divertibility, and Excessive Entanglement...............................................23*

*iii. The Shift Toward Neutrality and Independent Private Choice ........................................................................25*

*iv. The Modern Era: Historical Understandings and Religious Nondiscrimination ................................................27*

V. ARGUMENT ......................................................................................30

A. The Constitutional and Historical Development of Public Funding for Religious Education Establishes the Limits of School-Voucher Programs. .........................................................30

*i. The Establishment Clause must be applied to the EFA Program's actual structure and operation. ..............................36*

B. Arkansas's EFA Program Fails *Zelman*'s Private-Choice Framework Because It Lacks Meaningful Secular Alternatives and Creates Financial Incentives Favoring Religious Schools. ..........38

*i. The EFA Program does not provide meaningful, geographically accessible secular alternatives. .......................39*

*ii. The EFA Program's funding structure creates financial incentives favoring religious schools.......................................44*

iii. *The EFA Program permits participating religious schools to impose discriminatory, religious admission requirements.........................................................................47*

C. The EFA Program's Administration and the Governor's Promotion of Religious Education Raise Establishment Clause Concerns Beyond Those Addressed by *Zelman*. ................................50

i. *Participating religious schools incorporate and require religious instruction and religious commitments in their educational programs. ........................................................56*

ii. *The EFA Program does not require that religious schools separate religious instruction from the education supported by EFA funds.......................................................58*

iii. *The ADE's ongoing administration and the Governor's public statements provide further context for the State's relationship with religious education. .....................................59*

D. The State Cannot "Empower" Parents to Accomplish Indirectly What the State Cannot Constitutionally Do Directly..........................63

i. *The State's involvement in creating and administering the EFA Program cannot be disregarded................................64*

ii. *The State cannot avoid its constitutional obligations by placing an individual between itself and the ultimate beneficiary, and parental choice does not resolve the ultimate Establishment Clause issue.......................................67*

E. The Arkansas Constitution and Arkansas Statutes Independently Restrict Compelled Support of Religion and Religious Discrimination in Publicly Funded Programs. ...................69

i. *The Arkansas Constitution provides strict religious liberties and protections and prohibits compelled belief in any form. ......................................................................69*

ii. *Arkansas Law explicitly prohibits discrimination based on religion by programs that receive tax-sourced funds..........71*

iii. *The state-law protections require independent consideration of the EFA Program's operation. ......................73*

VI. CONCLUSION AND PRAYER FOR RELIEF.............................................74

# I. TABLE OF AUTHORITIES

## Cases

*Agostini v. Felton,* 521 U.S. 203 (1997) .......... 25, 35

*Aguilar v. Felton*, 473 U.S. 402 (1985) .......... 16, 34

*Bd. of Educ. v. Allen*, 392 U.S. 236 (1968) .......... 22, 33

*Bd. of Educ. v. Grumet*, 512 U.S. 687 (1994) .......... 32

*Blum v. Yaretsky*, 457 U.S. 991 (1982) .......... 66

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001) .......... 64

*Carson v. Makin*, 596 U.S. 767 (2022) .......... 28, 36

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 20

*City of Allegheny v. ACLU*, 492 U.S. 573 (1989) .......... 30

*Cochran v. Louisiana State Bd. of Educ.*, 281 U.S. 370 (1930) .......... 22

*Comm. for Public Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756 (1973) .......... 16, 23, 33, 53, 61

*Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020) .......... 28, 36

*Everson v. Bd. of Educ.*, 330 U.S. 1 (1947) .......... 22, 30, 31, 33

*Hawkins v. Counseling Assocs.*, 504 F. Supp. 2d 419 (2007) .......... 20

*Jones v. Forrest City Grocery Inc.*, 564 F. Supp. 2d 863 (2008) .......... 20

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) .......... 31, 51

*Lee v. Macon County Bd. of Educ.*, 267 F.Supp. 458 (1967) .......... 67

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) .......... 18, 23, 33, 51, 52, 61

*Locke v. Davey*, 540 U.S. 712 (2004) .......... 36

*McCreary County v. ACLU*, 545 U.S. 844 (2005) .......... 31

*Meek v. Pittenger*, 421 U.S. 349 (1975) .......... 16, 23, 33

*Michigan v. Long*, 463 U.S. 1032 (1983) .......... 69

*Mitchell v. Helms*, 530 U.S. 793 (2000) .......... 25, 26, 35, 44

*Most Worshipful Grand Lodge of Free & Accepted Masons v. DCG/UGOC Equity Fund*, LLC, 217 F. Supp. 3d 996 (2016) .......... 20

*Mueller v. Allen*, 463 U.S. 388 (1983) .......... 23

*Norwood v. Harrison*, 413 U.S. 455 (1973) .......... 63, 67

*Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781 (1988) .......... 50

*Sch. Dist. of Grand Rapids v. Ball*, 473 U.S. 373 (1985) .......... 7, 16, 25, 34

*Scott v. Union Pac. R.R. Co.*, 595 F. Supp. 3d 758 (2022) .......... 21

*Sloan v. Lemon*, 413 U.S. 825 (1973) .......... 53, 54

*Trinity Lutheran Church of Columbia, Inc.* v. Comer, 582 U.S. 449 (2017) .......... 28, 36

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) .......... 30

*Walz v. Tax Com. of N.Y.*, 397 U.S. 664 (1970) .......... 61

*Winn v. Ariz. Christian Sch. Tuition Org.*, 586 F.3d 649, 652 (2009) .......... 43

*Witters v. Wash. Dep't of Services for Blind*, 474 U.S. 481 (1986) .......... 24, 34

*Wolman v. Walter*, 433 U.S. 229 (1977) .......... 18, 23

*Wooley v. Maynard*, 430 U.S. 705 (1977) .......... 51

*Zelman v. Simmons-Harris*, 536 U.S. 639 (2002) .. 18, 27, 35, 38, 40, 44, 45, 47, 67

*Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1 (1993) .......... 35

**Statutes**

42 U.S.C.S. § 2000d .......... 48

Ark. Code Ann. § 26-73-108 .......... 71, 74

Ark. Code Ann. § 6-18-2503 .......... 14

Ark. Code Ann. § 6-18-2505 .......... 13, 14, 38, 47, 58, 59, 71

Ark. Code Ann. § 6-18-2506 .......... 15

Ark. Code Ann. § 6-18-2507 .......... 48

Ark. Code Ann. § 6-20-2305 .......... 14

Ark. Code Ann. §§ 6-18-2501 et seq .......... 8, 9, 12, 37, 60, 65, 70, 73

**Rules**

Fed. R. Civ. P. 56 .......... 20

**Regulations**

6 CAR § 35-107 .......... 48, 50

**Constitutional Provisions**

Ark. Const. art. 2, § 24 .......... 69

U.S. Const. amend. I .......... 7

## II. INTRODUCTION

"Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I.

What has come to be known as the "Establishment Clause" of the First Amendment to the United States Constitution is short, direct, and appears at first glance to be deceptively straightforward in meaning. However, throughout the history of this country, the Establishment Clause has caused our courts to engage

in intellectual gymnastics to achieve the goal to "give meaning to the sparse language and broad purposes of the Clause, while not unduly infringing on the ability of the States to provide for the welfare of their people in accordance with their own particular circumstances." *Sch. Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 381 (1985). In so doing, the Supreme Court has, through the years, fluctuated in the standards by which compliance or violation of the Establishment Clause should be measured. Currently, we appear to be in a state of flux on which standard should be applied.

This action concerns whether Arkansas may use tax-sourced funds to finance religious education through its grandiloquently named "Educational Freedom Account" Program ("EFA Program")—a state-developed and operated program of financial aid for which students, private schools (both religious and nonreligious[1]), and other third-party service providers are eligible. Plaintiffs seek

[1] For purposes of this Brief, Plaintiffs use the terms "religious" and "nonreligious" to describe private schools according to whether their educational programs are affiliated with, organized around, or incorporate religious beliefs, instruction, or practices. A "religious school" refers to a school that expressly incorporates religious beliefs, teachings, or practices into its educational mission, curriculum, or operations. A "nonreligious school" refers to a school that does not do so. These terms are intended as descriptive classifications of the schools' educational character, not as judgments about the beliefs of their students, families, or employees. Plaintiffs generally avoid the terms "sectarian" and "nonsectarian," which have historically been used in Establishment Clause jurisprudence to distinguish religious from nonreligious institutions, and "secular," which may refer more narrowly to instruction or activities that are nonreligious in content. Accordingly, "religious" and "nonreligious" are used throughout this Brief to describe the schools themselves, while "religious" and "secular" may be used when discussing the content of instruction, activities, or expenditures.

summary judgment on their claim that the EFA Program, established by Ark. Code Ann. §§ 6-18-2501 et seq. (the "LEARNS Act"), violates the Establishment Clause of the First Amendment to the U.S. Constitution.

The picture of the EFA Program that emerges is one of payment of unlimited public funds by the Arkansas Department of Education ("ADE") directly to private religious schools for their unrestricted and unmonitored use to teach students, not only traditional nonreligious subjects, but also the tenets and beliefs of the particular religion—predominantly Christian—that the school represents, a circumstance that the Supreme Court has frequently condemned as forbidden under the Establishment Clause. Despite the Court's inconsistent and evolving jurisprudence regarding the applicable standard, the EFA Program fails under all of those standards.

The Plaintiffs agree that the education of our children is a praiseworthy purpose and should be given priority by our government, both state and federal. Plaintiffs also agree that private schools serve a useful purpose for those who choose to engage in that purpose. However, even that lofty purpose cannot excuse the violation of our Constitution—which we are taught from childhood is the source of our laws and freedoms—through the State's promotion of religion by paying church-sponsored schools to teach their religious views to children. Consequently, this Motion for Summary Judgment is narrowly focused in

challenging the validity of the EFA Program contained in Section 42 of the LEARNS Act, Ark. Code Ann. §§ 6-18-2501 et seq., through which the State is funneling money to religious schools for, among other purposes, the teaching of the religious doctrines of those schools without restraint or oversight.

A. The History and Structure of the LEARNS Act

It is important to discuss and understand the origins of the LEARNS Act, because it was not a haphazard, spur-of-the-moment product of the fertile mind of a state legislator. Rather, it was carefully planned and promoted by Sarah Huckabee Sanders while a candidate for Governor of the State of Arkansas, the daughter of former Arkansas Governor Michael Huckabee, a Baptist minister, and herself a deeply religious person. There is nothing wrong with any of those characteristics, but they are relevant here as Governor Sanders as established on many occasions that she wishes to increase the exposure of the children of Arkansas to religious teachings. *See infra* Section C.iii; *see also* Sarah Huckabee Sanders, *Unapologetic: Clarity and Conviction in a World Gone Crazy* (St. Martin's Press 2026) (discussing Sanders's religious and political convictions and her vision for the role of faith in public life).

Sanders was elected Governor of Arkansas on November 8, 2022, and assumed that office on January 10, 2023. As Governor, the education of the children of Arkansas has been an expressed priority of her administration, and the

Literacy, Empowerment, Accountability, Readiness, Networking, and Safety Act (the "LEARNS Act") has been her crowning accomplishment to achieve that objective. One feature of that educational program is to expand the choice of parents of the schools at which their children could receive their education by providing a program for funding of students to attend private schools, home schools, and other schools in Arkansas. That intent is demonstrated by the following documents, among others.

Thirteen days after her inauguration, Governor Sanders issued a Proclamation on Arkansas Parental Choice Week, in which she stated, among other things, that:

> WHEREAS: Arkansas is home to a multitude of high-quality public and nonpublic schools from which parents can choose for their children, in addition to families who educate their children in the home; ...
>
> WHEREAS: Parents should have the right to choose the schools that's best for their child — whether it is public, private, *parochial*, or homeschool;
>
> WHEREAS: School Choice Week, which should be called "Parental Choice Week," is celebrated across the country by millions of students, parents, educators, schools and organizations to raise the awareness of the need for effective educational options;

Exhibit No. 001, Joint Stipulations, *Proclamation on Arkansas Parental Choice Week* (emphasis added).

On January 29, 2023, Governor Sanders visited Cornerstone Christian Academy in Tillar, Ark., along with ADE Secretary Jacob Oliva and members of

the Arkansas General Assembly. After that visit, the Arkansas Governor's office issued the following statement:

> Today, as part of Parental Choice Week in Arkansas, Governor Sarah Huckabee Sanders visited and toured Cornerstone Christian Academy, a private Christian school in Tillar, with Secretary Jacob Oliva, Rep. Jeff Wardlaw, and Rep. Mark McElroy. The Governor thanked the teachers and staff for the opportunity to visit and emphasized her commitment to empowering parents to make the best decisions for their kids and expanding quality education as part of her Arkansas LEARNS agenda. The delegation also sat down with educators, parents, and community leaders to discuss the importance of improving childhood literacy, preparing kids to take on high paying jobs in the workforce, and giving parents, both in urban and rural areas of our state, a greater role in education — including the right to choose the school that's best for their child — whether it's public, private, *or parochial*.

Exhibit No. 033, *Readout of the Governor's Visit to Cornerstone Christian Academy* (emphasis added).

On February 20, 2023, Senate Bill 294 was formally filed in the State Senate. It passed through the appropriate State Senate committee on February 22, 2023, and was adopted by the full Senate on the next day. It was adopted by the State House of Representatives on March 7, 2023, and the LEARNS Act was signed into law by Governor Sanders on March 8, 2023, becoming Act 237 of 2023. Fact No. 1, *Plaintiffs' Statement of Undisputed Facts*.

Under Section 42 of the LEARNS Act, a program is established entitled the "Arkansas Children's Educational Freedom Account Program" ("EFA Program"). Ark. Code Ann. §§ 6-18-2501 et seq. Under the EFA Program, state funds derived from public taxes assessed and collected under the laws of Arkansas and

"appropriated to the Arkansas Children's Educational Freedom Account Fund or otherwise made available for the Arkansas Children's Educational Freedom Account Program" by the Arkansas General Assembly to the ADE are deposited into an EFA "account" established by the State for or on behalf of an "eligible student" (defined as a resident of the State of Arkansas who is eligible to enroll in a public elementary or secondary school). *Id.* § 6-18-2505. Those EFA account funds are used by the State, acting through its contractor, ClassWallet, to pay tuition, purchase uniforms and other goods and services for such eligible students directly to private schools, and other private service providers, or for home schooling. *Id.* § 6-18-2505(a).

EFA funds are never paid to students or their parents, unless as a reimbursement for an expense that the parent has advanced. *Id.* § 6-18-2505(c). Any unused funds shall revert to the Division of Elementary & Secondary Education (the "Division") and be allocated to fund other accounts. *Id.* § 6-18-2505(e)(3). Consequently, the authority of the parents over the EFA funds is limited only to the selection of the school to which the ADE pays the tuition and, to a lesser degree, the source of materials and supplies. The parents never obtain ownership or possession of the money; the money is not taxable to them, and they may not use the expenses as deduction on their taxes. *Id.* § 6-18-2505(f). In other words, as the Arkansas Attorney General has stated, "EFA funds are state funds

going directly to private schools." Exhibit No. 034, *Attorney General Opinion No. 2023-101*.

Section 42 of the LEARNS Act specifies that the EFA Program and all the particulars identified in the act will be administered by the ADE and the State Board of Education, meaning that public funds will pay the entire costs of administering the EFA Program. Exhibit No. 011, LEARNS Act, Act 237, § 42, 2023 Ark. Acts 1332, 1424. Pursuant to this section, the amount of money to be allocated to the eligible student's EFA account is an amount equal to ninety percent (90%) of the prior year's statewide "foundation funding" allotted per student under Ark. Code Ann. § 6-20-2305, which is approximately $7,200.00 for the 2026–2027 school year. Ark. Code Ann. § 6-18-2505; Exhibit No. 012, *Arkansas Education Freedom Account (EFA) Family Handbook 2026-27*, at 4.

Money allocated into a student's EFA account may thereafter be used by the ADE—and only the ADE through its contractor, ClassWallet—on behalf of the participating student and/or the student's parent(s) or guardian to directly pay to the "participating schools" (i.e., "a private elementary or private secondary school") or to a "participating service provider" (i.e. "a person or an entity, including a participating public or private school, that receives payments from program accounts to provide goods and services that are covered as qualifying expenses under this subchapter"). Ark. Code Ann. § 6-18-2503(10), (11), (12).

Such payments are made by the ADE from the participating student's account directly to the participating private schools or home school, in four (4) equal quarterly installments. Ark. Code Ann. § 6-18-2505(b)(1); Exhibit No. 012, *Arkansas Education Freedom Account (EFA) Family Handbook 2026-27*, at 19, 21, 41 ("Key features of ClassWallet include: [. . .] Tuition Payment Interface: An online interface to pay tuition or fees directly to participating private schools or microschools," "Once approved, payment is sent directly to the vendor from your student's EFA funds," and "Proportionate share-funding is not paid directly to parents," respectively).

The LEARNS Act does not contain, authorize or impose any new tax which would be used to fund the EFA Program, leaving such funds to be derived from existing taxes imposed by the State. The Revenue Stabilization Acts of 2023, 2024, and 2025 separate the EFA appropriation from all other school appropriations and lists it as the "Education Freedom Account Fund" among a handful of non-education agencies and programs, notwithstanding that the EFA program is clearly an "education" fund. Exhibit No. 039–041, *Revenue Stabilization Law Allocations (2023–2025)*. Moving the private-voucher account away from all the other education funds in the Revenue Stabilization Act presumably seeks to avoid the appearance of unconstitutionally using "public school" or "common school" funds to fund the EFA Program.

For the 2025–2026 school year and each year thereafter, the LEARNS Act declares that there will be no limitation on student participation in the EFA Program; i.e., the program will be available, beginning with the 2025–2026 school year, to all students who are residents of Arkansas. Ark. Code Ann. § 6-18-2506. Every parent who enrolls a child in the EFA program is required to sign an agreement promising, among other things, not to enroll the child in a public school while participating in the program, and to use account funds only for "qualifying expenses" of the participating student. *Id.* § 6-18-2506(g).

The undisputed material facts establish that the Arkansas General Assembly enacted the EFA Program as part of the LEARNS Act; the EFA Program appropriates public funds for eligible students and permits those funds to be used for private-school tuition and other educational expenses, including those related to religious education; and the ADE administers the EFA Program and makes payments directly to participating religious and nonreligious schools and service providers alike.

The record also establishes that the EFA Program is not limited to secular education, nor does it require participating private schools to separate religious instruction and activities from the educational expenses financed by the State, as has been a significant factor in a number of Supreme Court decisions. *E.g.*, *Comm. for Public Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756 (1973); *Meek v.*

*Pittenger*, 421 U.S. 349 (1975); *Grand Rapids*, 473 U.S.; *Aguilar v. Felton*, 473 U.S. 402 (1985).

In fact, participating religious schools may, with the consent and approval of the State of Arkansas, incorporate religious doctrine and instruction throughout their curriculum while receiving public funds for tuition and other educational expenses, which includes religious doctrine. In the deposition of Darrell Smith, Assistant Commissioner for the Office of School Choice and Parental Empowerment ("Office of School Choice"), taken August 11th, 2026, Mr. Smith testified regarding the State's lack of concern about the religious content of the private religious schools' curriculum.

> Question (Q): Okay. Let's skip down to the Curriculum requirements. It's about two thirds of the way down.
>
> Darrell Smith (A): Yeah.
>
> Q: The third bullet, "Receipt of Education Freedom Account funds does not impact school's religious affiliation or curriculum." Did I read that right?
>
> A: Yes, sir, you did.
>
> Q: What does that mean?
>
> A: It means that religious affiliation has no determination in the Education Freedom Account.
>
> Q: Does it also mean that the State, your agency, cannot require a school to not teach certain religious subjects?
>
> A: Private schools have the autonomy to teach what they feel is in the best – meets the mission of that school.

> Q: Are schools required to submit their curriculum to the Department of Education?
>
> A: Not to the department, but to their accrediting agency. That's one of the reasons that we require private schools to be accredited is that they are responsible to their accreditors…
>
> Q: What I was getting at was, do the private schools submit the courses that they're going to be offering to the students to the Department of Education for review or approval, or do you care, or do you have any authority to?
>
> Ms. Broyles (Attorney for Darrell Smith): Object to the form.
>
> A: Do we care? I don't know that's a – I think I'd be careful saying we don't care, but no, they do not submit their curriculum. But again, that doesn't fall under the services of the Education Freedom Accounts because that's not part of the criteria. The criteria is for them to have high-quality education, as determined by the accrediting agencies that have been approved by the State Board of Education.

Exhibit No. 025, Smith Dep. 69:7–70:24.

Religious schools constitute a substantial majority of the schools participating in the EFA Program. Fact No. 18–21, *Plaintiffs' Statement of Undisputed Facts*; Exhibit No. 110, *Current List of EFA Approved Schools*; Exhibit No. 027, *Plaintiff's Breakdown of EFA Approved Schools*. The State therefore has created a mechanism through which public funds are routinely used to finance education at schools whose institutional purpose includes religious instruction, while leaving limited to no other nonreligious options for students participating in the EFA Program. The result, as stated by the Supreme Court in *Wolman v. Walter,* is that:

> Substantial aid to the educational function of such schools, accordingly, necessarily results in aid to the sectarian school enterprise as a whole. '[T]he secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. Within the institution, the two are inextricably intertwined.'

433 U.S. 229, 250 (1977) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 657 (1971)).

Plaintiffs recognize that the Supreme Court has held that a state does not necessarily violate the Establishment Clause whenever public funds ultimately reach a religious institution. *See Zelman v. Simmons-Harris*, 536 U.S. 639 (2002). But *Zelman* did not hold that every program involving public funding to private religious schools is constitutionally immune from Establishment Clause scrutiny. Its holding depended upon the structure of the particular program under scrutiny, particularly its neutrality and the genuinely independent choices of private individuals. *Id.*

The dispositive question is, therefore, whether Arkansas's EFA Program possesses the same attributes that placed the program in *Zelman* within constitutional bounds. It does not. The undisputed facts demonstrate that Arkansas has affirmatively constructed, funded, administered, and maintained a program that directs public funds into religious schools without separating publicly financed education from religious instruction, which constitutes a central part of those schools' educational missions. The First Amendment does not permit the

government to establish religion through an accounting mechanism—i.e. parents "directing" EFA funds to a religious school—that allows the State to characterize public financing of religious education as a private transaction. The Plaintiffs maintain that allowing a parent to "direct" funds to a private religious school makes the parent a state actor and attempts to authorize the parent that the State has no power to do itself. *See* Section D. Plaintiffs are therefore entitled to judgment as a matter of law.

## III. JOINT STIPULATIONS AND PLAINTIFFS' UNDISPUTED FACTS

The joint stipulations and Plaintiffs' undisputed facts are being submitted as a separate document entitled "Joint Stipulations and Plaintiffs' Undisputed Facts with Exhibits" along with all exhibits.

## IV. LEGAL STANDARD

### A. Motion for Summary Judgment

Summary judgment must be granted when the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A dispute is genuine when the evidence would permit a reasonable jury to return a verdict for the nonmoving party, and a fact is material only when it could affect the outcome under the governing law. *Jones v. Forrest City Grocery Inc.*, 564 F. Supp. 2d 863, 867 (2008).

The moving party bears the initial responsibility to identify the basis for its motion and the portions of the record demonstrating the absence of a genuine dispute of material fact. *Hawkins v. Counseling Assocs.*, 504 F. Supp. 2d 419, 427 (2007). When the nonmoving party bears the burden of proof, the movant may satisfy its burden by showing an absence of evidence supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant meets its initial burden, the nonmoving party must present specific facts establishing a genuine dispute for trial and may not rely solely on the allegations or denials in its pleadings. *Hawkins*, 504 F. Supp. 2d at 427.

The Court views the evidence in the light most favorable to the nonmoving party and gives that party the benefit of reasonable inferences supported by the record. *Most Worshipful Grand Lodge of Free & Accepted Masons v. DCG/UGOC Equity Fund*, LLC, 217 F. Supp. 3d 996, 1000 (2016). The Court does not weigh the evidence or make credibility determinations at summary judgment. *Thomas v. Borg-Warner Morse TEC LLC*, 362 F. Supp. 3d 610, 613 (2018).

A party asserting that a fact is undisputed must support that assertion by citing particular record materials or by showing that the opposing party cannot produce admissible evidence supporting the fact. *Scott v. Union Pac. R.R. Co.*, 595 F. Supp. 3d 758, 764 (2022). If a party fails to support or address a factual

assertion properly, the Court may consider the fact undisputed and, when the motion and supporting materials warrant it, grant summary judgment. *Id.*

**B. Standards for Evaluation of Establishment Clause Cases**

The Supreme Court has used various standards to evaluate Establishment Clause cases involving religious education. Due to the current flux in the appropriate standard of review for cases based on the Establishment Clause, it would be beneficial to this Court to review each of those standards and approximately what kind of case they involved.

*i. The Emergence of the Child-Benefit Theory and the Secular Aid Doctrine*

The Supreme Court initially distinguished between aid provided to religious schools and aid provided to children that incidentally benefited religious schools. In *Cochran v. Louisiana State Bd. of Educ.*, citizens argued that providing books to religious schools constituted a taking of private property for a private purpose, i.e. to aid private, religious, and other schools not in the public-school system. 281 U.S. 370, 374 (1930). The Court upheld the provision providing textbooks to students attending public and private schools, reasoning that the program benefited the children rather than the schools. *Id.* at 374–75.

In *Everson v. Bd. of Educ.*, taxpayers argued that spending tax-raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it also paid the fares of pupils attending public schools was unconstitutional.

330 U.S. 1, 3–4 (1947). The Court upheld reimbursement of parents for transportation costs incurred sending their children to religious schools. *Id.* at 18. Both cases looked at who actually benefited (the individual student or the religious institution?) from the expenditure of taxpayer funds as the standard under which to evaluate the program. This approach allowed generally available public benefits to reach religious-school students without necessarily constituting government support of religion.

The Court moved from examining the beneficiary to examining whether the principal or primary effect of government assistance was to advance religion. In *Bd. of Educ. v. Allen*, the Court evaluated a program lending textbooks to students at private (including parochial) schools. 392 U.S. 236, 238 (1968). The Court held that the appropriate test to determine if a statute improperly established religion in violation of the First Amendment was to determine whether the purpose and primary effect of the statute was to advance or inhibit religion. *Id.* at 243. The Court upheld the program specifically because it benefited parents and children rather than schools, authorized only secular textbooks approved by public-school authorities, and contained no indication that religious books had been loaned. *Id.* at 243–45. The Court determined that the purpose of the statute was a secular one to encourage school development through the use of textbooks that had been

approved by secular school officials and, therefore, there was no indication that the purpose or effect of the stature was to advance or inhibit religion. *Id.* at 243–248.

*ii. The Lemon Era: Primary Effect, Religious Divertibility, and Excessive Entanglement*

For several decades, the Court applied the three-part *Lemon* test to Establishment Clause challenges. *See, e.g.*, *Lemon*, 403 U.S. at 612–13; *Nyquist*, 413 U.S. at 772; *Meek*, 421 U.S. at 358; *Wolman*, 433 U.S. at 236; *Mueller v. Allen*, 463 U.S. 388, 394 (1983).

*Lemon* articulated three requirements: (1) the statute must have a secular legislative purpose; (2) its principal or primary effect must neither advance nor inhibit religion; (3) it must not foster excessive governmental entanglement with religion. *Lemon*, 403 U.S. at 612–13. Under this evaluation, the Court held the challenged state programs unconstitutional specifically because ensuring that public aid supported only secular education at substantially religious schools would require comprehensive, discriminating, and continuing governmental surveillance. *Id.* at 621–22. The Court identified as entangling both inspection and evaluation of religious content and continuing governmental review of financial records to distinguish religious from secular expenditures. *Id.* Poignantly, the Court stated, "while some involvement and entanglement are inevitable, lines must be drawn." *Id.* at 625.

*Lemon* moved the Court into a line of reasoning that if a state funds a service for which the private religious school is otherwise financially responsible, the effect has been characterized as sponsorship or financial support of religion.

In *Nyquist*, the Court distinguished aid channeled to a religious school's secular educational functions from unrestricted direct aid supporting its religious activities. 413 U.S. at 759. The Court held a maintenance-and-repair grant unconstitutional specifically because the statute did not restrict funds to facilities used exclusively for secular purposes and allowed payment of such expenses as maintaining chapels or renovating, heating, and lighting classrooms used for religious instruction. *Id.* at 796–98.

*Witters v. Wash. Dep't of Services for Blind* applied the *Lemon* framework while asking whether student-directed assistance operated as an impermissible direct subsidy to a religious school. 474 U.S. 481, 482–83, 487 (1986). Relevant considerations included whether: aid was paid to an individual who independently selected the educational institution; the program was generally available without regard to whether the selected institution was religious, nonreligious, public, or private; the program was skewed toward religion or created a financial incentive to pursue religious education; religious use produced greater or broader benefits than secular use; recipients had meaningful secular alternatives; a significant portion of the program's aid was likely to flow to religious education; and the resulting

connection between the government and religious institution was sufficiently attenuated. *Id.* at 487–89. The Court held that assistance for religious vocational training did not violate the Establishment Clause specifically because aid reached the religious school solely through the recipient's independent choice, the program was neutral and offered extensive secular options, no enhanced benefit accompanied religious use, and the record did not show that a significant portion of program funds would support religious education. *Id.* Significantly, however, the Court cautioned:

> It is equally well settled, on the other hand, that the State may not grant aid to a religious school, whether cash or in kind, where the effect of the aid is 'that of a direct subsidy to the religious school' from the State. Aid may have that effect even though it takes the form of aid to students or parents.

*Id.* at 487 (citing *Grand Rapids*, 473 U.S. at 394).

*iii.* *The Shift Toward Neutrality and Independent Private Choice*

*Agostini* modified the *Lemon* framework for school-aid cases, consolidating the entanglement inquiry into the examination of the effect of government assistance. *Agostini v. Felton,* 521 U.S. 203, 232 (1997); *see also Mitchell v. Helms*, 530 U.S. 793, 807 (2000). In *Agostini*, the Court identified three primary criteria for determining whether school aid has the effect of advancing religion: (1) whether it results in governmental indoctrination; (2) whether it defines recipients by reference to religion; (3) and whether it creates excessive entanglement. *Id.* at

234. The Court held that publicly funded remedial instruction on religious-school premises was constitutional specifically because it was provided neutrally by government employees under safeguards that avoided governmental indoctrination, religiously defined eligibility, excessive entanglement, and a reasonable perception of governmental endorsement. *Id.*

*Mitchell* reaffirmed retaining the secular-purpose and religious-effect inquiries rather than treating excessive entanglement as a separate third factor. *Mitchell*, 530 U.S. at 807–08. The effect inquiry asks whether the program results in governmental religious indoctrination or defines recipients by reference to religion. *Id.* at 808. The following considerations informed that analysis: eligibility is determined through neutral criteria; aid is available to religious and secular beneficiaries on a nondiscriminatory basis; aid is distributed through independent private decisions by students or parents; the aid does not have impermissible content; and recipients are not defined by reference to religion. *Id.* at 807–09. The Court held the educational-aid program constitutional specifically because eligibility was religiously neutral, aid followed students through their parents' private school choices, the aid lacked impermissible content, and recipients were not selected by reference to religion. *Id.* at 835–36. The Court treated students as the ultimate beneficiaries even when schools physically received the educational materials. *Id.* at 829. The plurality opinion rejected any distinction between direct

and indirect aid and was concerned neither with the issue of divertibility nor whether the school receiving the aid was pervasively religious. *Id.* at 824.

Finally, *Zelman* upheld Ohio's school-voucher program because the program was neutral toward religion and aid reached religious schools only through the independent choices of parents. *Zelman*, 536 U.S. at 662–63. The Court stated that aid reaching religious organizations through beneficiaries must do so at those beneficiaries' direction and that governmental aid must be available to religious and secular beneficiaries on a nondiscriminatory basis. *Id.* at 652. It further treats program neutrality as turning on the opportunities offered rather than merely on the percentage of beneficiaries who ultimately choose religious. *Id.* at 658. The Court held that the program was entirely neutral with respect to religion. *Id.* at 662. It provided benefits directly to a wide spectrum of individuals, defined only by financial need and residence in a particular school district. *Id.* It permitted such individuals to exercise genuine choice among options public and private, secular and religious. *Id.* The program was therefore a program of true private choice. *Id.* In keeping with an unbroken line of decisions rejecting challenges to similar programs, the Court held that the program did not offend the Establishment Clause. *Id.* at 662–63.

*iv. The Modern Era: Historical Understandings and Religious Nondiscrimination*

Recently, the Supreme Court has evaluated religious-school funding restrictions under the Free Exercise Clause, rather than solely under the Establishment Clause. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020); *Carson v. Makin*, 596 U.S. 767 (2022).

In *Espinoza*, the U.S. Supreme Court held that applying Montana's constitutional no-aid provision to exclude religious schools from a private-school scholarship program violated the First Amendment's Free Exercise Clause. *Espinoza*, 591 U.S. at 488. The Court held the exclusion unconstitutional specifically because Montana disqualified otherwise eligible schools and families solely based on the schools' religious status. *Id.* at 477. Although a state need not subsidize private education, once it does so, it may not disqualify private schools solely because they are religious. *Id.* at 487. The Court stated that there is no "historic and substantial" tradition against aiding religious schools comparable to the tradition against state-supported clergy. *Id*. at 483. Additionally, the Court stated that the Establishment Clause was not offended because the government program was neutral. *Id.* at 474.

Finally, in *Carson v. Makin*, the Supreme Court held that Maine's exclusion of religious schools from a generally available tuition-assistance program violated the First Amendment's Free Exercise Clause. 596 U.S. at 788. The Supreme Court

held that Maine's program was not neutral because it paid private-school tuition only when the selected school was not religious, thereby identifying and excluding otherwise eligible schools based on religious exercise. *Id.* While the latest cases focus on the Free Exercise Clause as it pertains to institutions, this is not a replacement for the Establishment Clause analysis. It is a separate constitutional inquiry that must be considered when a state restricts access to public benefits.

For school vouchers or other taxpayer-funded assistance involving private religious schools, the supplied authorities collectively identify these recurring factors that determine eligibility: whether the program has a secular purpose; whether eligibility and distribution are neutral and nondiscriminatory; whether aid reaches a religious school through genuine independent private choice; whether recipients have meaningful secular alternatives; whether the program creates incentives favoring religious education; whether the aid has impermissible religious content or finances religious functions directly; whether recipients are defined by religion; whether the government itself indoctrinates; and whether administration creates excessive governmental entanglement.

The precise framework for evaluating the constitutionality of such programs has changed over time and each case seems to depend on not one, but a variety of the factors discussed, and whether the challenged measure involves direct

institutional funding, restricted secular assistance, tax benefits, individual aid, or vouchers.

## V. ARGUMENT

### A. The Constitutional and Historical Development of Public Funding for Religious Education Establishes the Limits of School-Voucher Programs.

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

The Establishment Clause strictly prohibits the government from establishing religion by directly supporting religious activity or by favoring religion over nonreligion. *City of Allegheny v. ACLU*, 492 U.S. 573, 660 (1989). This prohibition is a direct reflection of the desires of the early settlers of this country to "escape the bondage of laws which compelled them to support and attend government-favored churches." *Everson*, 330 U.S. at 8. The U.S. Supreme Court, in interpreting the Establishment Clause, has recognized that Constitution's religious clauses were framed with the same intent as the Virginia Bill for Religious Liberty, which Thomas Jefferson drafted to protect citizens, among other things, from being taxed to support religion. *Id.* at 12–13.

The Court has recently emphasized that when evaluating an Establishment Clause claim, courts must interpret the Clause by reference to "historical practices and understandings." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022). Previously, the Court had interpreted what the early settlers and drafters intended, explicitly stating that the purpose of the Establishment Clause means at least this:

> Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. […] No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. […] In the words of Jefferson, the clause against establishment of religion by law was intended to erect "a wall of separation between church and State.

*Everson*, 330 U.S. at 15–16.

The First Amendment requires the government to remain neutral when it comes to religious institutions, neither granting nor denying benefits to them on the basis of their religion. *Id.* at 16. The government may not favor religion over nonreligion or adherence to religion generally. *McCreary County v. ACLU*, 545 U.S. 844, 860 (2005). Specifically, the government cannot constitutionally pass laws or impose requirements that aid all religions as against non-believers, nor can it aid religions based on a belief in the existence of God as against those founded on different beliefs. *Bd. of Educ. v. Grumet*, 512 U.S. 687, 715 (1994). When the government acts with a purpose to favor religion, it unconstitutionally sends a

message to nonreligious persons that they are outsiders and not full members of the political community, while signaling to religious adherents that they are favored insiders. *McCreary*, 545 U.S. at 860.

However, the Supreme Court has recognized that the commanded neutrality does not require the government to be completely oblivious to the impositions that state power may place on religious practices. *Grumet*, 512 U.S. at 704. There is room for "benevolent neutrality," which permits the government to accommodate religious practices without violating the Establishment Clause, so long as religious exercise can exist without governmental sponsorship, interference, or active preference. *Id.* at 705.

The Supreme Court's labyrinthine—and often confounding—history regarding the use of tax-sourced funds on private religious institutions, particularly the use of public-school funds on private religious schools through government voucher programs, has evolved from a strict focus on separation and state entanglement under the Establishment Clause to include a mandate of neutrality, true private choice, and non-discrimination. The progression (and digression) of that involvement is seen in the following cases.

*See Everson*, 330 U.S. at 18 (upholding a reimbursement program for bus transportation to parochial schools because the program provided a neutral general welfare benefit (safe transportation) to all children regardless of religion as part of

a general program, without contributing funds directly to the religious schools or their religious instruction, analogous to providing police protection, fire services, or public infrastructure);

*Allen*, 392 U.S. at 243 (holding that the appropriate test to determine if a statute improperly established religion in violation of the First Amendment was to determine whether the purpose and primary effect of the statute was to advance or inhibit religion);

*Lemon*, 403 U.S. at 612–13 (establishing a three-part framework for evaluating the constitutionality of a program: (1) the statute must have a secular legislative purpose; (2) its principal or primary effect must neither advance nor inhibit religion; (3) it must not foster excessive governmental entanglement with religion);

*Nyquist*, 413 U.S. at 775 (distinguishing aid channeled to a religious school's secular educational functions from unrestricted direct aid supporting its religious activities);

*Meek*, 421 U.S. at 372–73 (upholding a state's textbook loan program because aid was distributed directly to students for secular purposes, but invalidated the direct loan of instructional materials and equipment to predominantly religious schools and the auxiliary services program because both

advanced religious activity and required excessive government surveillance, creating unconstitutional entanglement);

*Grand Rapids*, 473 U.S. at 397–98 (holding unconstitutional a program that provided classes for nonpublic school students financed by public funds because it impermissibly advanced religion in that the teachers involved risked inculcating particular religious beliefs, the teachers risked creating a symbolic link between government and religion, and the teachers risked a direct promotion of religion by subsidizing the religious institutions involved);

*Aguilar*, 473 U.S. at 414 (holding a state educational program violated the Establishment Clause because sending publicly funded teachers into pervasively religious schools to provide remedial instruction required permanent state monitoring through monthly unannounced supervisory visits and administrative coordination between public and parochial personnel, creating the excessive entanglement prohibited in *Lemon* and *Meek*);

*Witters*, 474 U.S. at 485–90 (applying the *Lemon* framework while asking whether student-directed assistance operated as an impermissible direct subsidy to a religious school);

*Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 13–14 (1993) (holding that a school district's refusal to provide a sign-language interpreter to a student at a religious school violated the Establishment Clause analysis because it was a

neutral program dispensing aid to individual handicapped children without regard to school type, and the interpreter's presence resulted solely from the parents' private choice to enroll the student at the school in question, and the interpreter would merely transmit classroom content without adding religious instruction);

*Agostini*, 521 U.S. at 234 (identifying three primary criteria for determining whether school aid has the effect of advancing religion: (1) whether it results in governmental indoctrination; (2) whether it defines recipients by reference to religion; (3) whether it creates excessive entanglement);

*Mitchell*, 530 U.S. at 807 (holding that *Agostini* modified *Lemon* for purposes of evaluating aid to schools by retaining the secular-purpose and religious-effect inquiries rather than treating excessive entanglement as a separate third factor);

*Zelman*, 536 U.S. at 662–63 (holding that aid reaching religious organizations through beneficiaries must do so at those beneficiaries' direction and that governmental aid must be available to religious and secular beneficiaries on a nondiscriminatory basis);

*Locke v. Davey*, 540 U.S. 712, 725 (2004) (holding that a prohibition against the use of state scholarship funds to pursue a theology degree was not unconstitutional since it was not hostile to religion, but rather reflected the state's substantial interest against the establishment of religion);

*Trinity*, 582 U.S. at 466–67 (holding a state's anti-establishment interest did not constitute a compelling state interest sufficient to satisfy strict scrutiny for a playground resurfacing grant);

*Espinoza*, 591 U.S. at 488–89 (holding a state constitution's no-aid provision to exclude religious schools from a scholarship program solely because they were controlled in whole or in part by any church, sect, or denomination constituted impermissible status-based discrimination that failed strict scrutiny);

*Carson*, 596 U.S. at 779–80 (holding that a state cannot disqualify otherwise eligible private schools from a tuition assistance program because they provide religious instruction or make religious use of the funds).

Under prevailing precedent, governments might sometimes be constitutionally or statutorily barred from giving public funds to religious activities but also cannot exclude religious institutions from eligibility solely because of their religious character (i.e. the government must operate in a way that is neutral towards religion). As a result, the use of state-created public funding to support religious education is subject to rigorous constitutional scrutiny.

*i. The Establishment Clause must be applied to the EFA Program's actual structure and operation.*

The challenged government action here is Arkansas's creation, funding, and administration of the EFA Program. The Arkansas General Assembly established the EFA Program through the LEARNS Act, appropriated public funds for its

operation, and authorized the Arkansas Department of Education ("ADE") to administer the Program. Ark. Code Ann. §§ 6-18-2501 et seq.; Exhibit No. 011, Act 237 of 2023, § 42; Exhibit No. 046, Act 156 of the Fiscal Session, 2026, § 23, at 14. Private religious schools are direct beneficiaries of the EFA Program. Exhibit No. 110, *Current List of EFA Approved Schools*; Exhibit No. 025, Smith Dep. 117:1–13.

The undisputed facts establish that the EFA Program is not merely a private arrangement between parents and schools. Arkansas created a publicly funded mechanism through which eligible students may use EFA funds to pay private-school tuition and other qualifying educational expenses. Ark. Code Ann. § 6-18-2505. The ADE determines eligibility, approves participating schools and students, and administers the EFA Program. *Id.* Participating religious schools receive funds through this state-created mechanism. *Id.*

The constitutional question must therefore be evaluated in light of the EFA Program's statutory structure and actual operation, including the nature of the education purchased with EFA funds and the conditions, if any, imposed on participating schools' use of those funds. Plaintiffs do not contend that every government benefit reaching a religious institution violates the Establishment Clause. Rather, Plaintiffs contend that the particular structure and operation of

Arkansas's EFA Program must be assessed under the governing constitutional principles and the undisputed record.

### B. Arkansas's EFA Program Fails *Zelman*'s Private-Choice Framework Because It Lacks Meaningful Secular Alternatives and Creates Financial Incentives Favoring Religious Schools.

The State is likely to rely on *Zelman v. Simmons-Harris*, which upheld an Ohio school-choice program under the Establishment Clause. *Zelman*, 536 U.S. at 662–63. In *Zelman*, the Supreme Court explained that a neutral program providing assistance to a broad class of citizens, who direct the aid to religious schools through their own genuine and independent private choices, ordinarily does not violate the Establishment Clause. *Id.* at 649–53. Plaintiffs recognize that *Zelman* held that a state-funded school-choice program is not unconstitutional simply because some participating schools are religious or because public funds ultimately reach those schools. *Id.* at 652–53.

However, *Zelman* did not hold that every program labeled "school choice" necessarily provides genuine private choice. The Court examined whether the Ohio program, considered as a whole, afforded families genuine opportunities to select among religious and nonreligious educational options. *Id.* at 655–56. The relevant issue, therefore, concerns not simply whether parents formally may select a school, but whether the program's actual operation provides meaningful opportunities to choose among available alternatives.

Arkansas's EFA Program differs from the program upheld in *Zelman*. The evidence shows that religious schools constitute the overwhelming majority of approved private schools, that nonreligious alternatives are geographically concentrated in a small fraction of Arkansas counties, that the EFA Program's structure provides financial incentives for religious schools, and that participating religious schools may impose religious, discriminatory eligibility and admission requirements. These features, considered together, raise a substantial question whether Arkansas families have the genuine and independent educational choices on which *Zelman* relied.

*i. The EFA Program does not provide meaningful, geographically accessible secular alternatives.*

Arkansas's EFA Program is materially distinct from the voucher program at issue in *Zelman*. The *Zelman* Court was clear: "Our holding thus rested not on whether few or many recipients chose to expend government aid at a religious school but, rather, on whether recipients generally were empowered to direct the aid to schools or institutions of their own choosing." *Id.* at 651. In other words, the Court weighed the constitutionality of the Ohio program on whether families could exercise genuine choice among school options public and private, nonreligious and religious. This neutrality, the Court held, creates a "program of true private choice" that does not offend the Establishment Clause. *Id.* at 653.

Ohio enacted the Pilot Project Scholarship Program, which gave educational assistance and additional school choices to families with children residing in the Cleveland City School District, whose public schools were among the nation's worst performing. *Id.* at 644. The program specifically targeted families based on financial need and residence in the covered school district. *Id.* at 644–45. Fifty-six private schools located within the Cleveland City School District participated, 82% of which identified as religious. *Id.* at 647. In other words, the program was specific in scope: supporting families based on need at schools that were directly available to them in their school district. This, the Court held, created a neutral effect of allowing families true private choice in what school they chose to send their child; therefore, it was the individual family's choice where the public funds flowed and not at the direction of the government. *Id.* at 653.

In addition to this limited scope, participating private schools had specific requirements they had to meet in order to qualify for the program. *Id.* at 645. Participating private schools could be religious or nonreligious, had to meet statewide educational standards, and could not discriminate based on race, religion, or ethnic background. *Id.* The program permits the participation of all schools within the district that meet these requirements, religious or nonreligious. *Id.* at 652.

Arkansas's EFA Program presents a materially different factual picture. First, it fails to provide genuine, accessible nonreligious (or even alternative religion-based) educational opportunities for participating families, thereby failing to provide a true private choice. A substantial majority (79%, or 133/169 as of July 2026) of the schools on the ADE's roster of private schools are religiously affiliated or operated. Exhibit No. 110, *Current List of EFA Approved Schools*. More specifically, these EFA-approved private religious schools identify overwhelmingly as Christian: 131 of the 133 EFA-approved private religious schools (98.5%) identify as Christian, either generally or through a specific Christian denomination. *Id.* Only one school identifies as Islamic, while one additional school is categorized as "faith-based" without a specific denomination established. *Id.*; Exhibit No. 027, *Plaintiff's Breakdown of EFA Approved Schools*.

Additionally, the geographic distribution of nonreligious schools further limits the choices available to Arkansas families. Participating nonreligious private school options are limited in availability to only 10 of the 75 counties in Arkansas, some of which are the most populous counties in the state (Benton, Carroll, Craighead, Jefferson, Lee, Phillips, Pulaski, Sebastian, St. Francis, Washington). Exhibit No. 110, *Current List of EFA Approved Schools*; Exhibit No. 015, *EFA Approved Schools Map*. Families in other counties may have few or no participating nonreligious private schools available to them.

For example, Miller County has only three EFA-approved schools, all classified as Christian; Greene County likewise has only three approved schools, all classified as Christian; and Union County has only two approved schools, both classified as Christian. Exhibit No. 110, *Current List of EFA Approved Schools*; Exhibit No. 015, *EFA Approved Schools Map*. For families in these counties, the formal ability to choose a nonreligious private school does not translate into a practical opportunity to use EFA funds for nonreligious education.

That distinction matters under *Zelman*. The Court evaluated the full range of educational options available to families, rather than treating the formal availability of a voucher as sufficient to establish genuine choice. *Zelman*, 536 U.S. at 655–56. Where participating nonreligious schools are geographically unavailable, families may be unable to direct EFA assistance toward a nonreligious private-school alternative. The statewide availability of an EFA account cannot, by itself, establish that every family has a meaningful choice among nonreligious and religious schools.

The Ninth Circuit's decision in *Winn v. Ariz. Christian Sch. Tuition Org.* provides additional persuasive authority for examining whether the structure and operation of an aid program leave families with meaningful secular options. 586 F.3d 649, 652 (2009). There, the court considered evidence that limited access to scholarships for secular schools could pressure families toward religious options.

*Id.* The same concern warrants examination here: if nonreligious schools are unavailable or inaccessible to families in particular communities, the EFA Program leaves those families with a nominal choice rather than a genuine one. Accordingly, the relevant issue is not simply how many approved schools are religious. It is whether families eligible for EFA assistance can realistically access participating nonreligious alternatives, considering the schools available in their communities and the costs of attending them.

The State may argue that the availability of secular virtual schools provides adequate alternatives for families in counties with few or no participating nonreligious private schools. But the theoretical availability of online education does not establish that virtual schooling is a practical alternative for every family. Arkansas Virtual Academy, for example, requires students to have access to a computer and internet service, and its program requires that a parent, guardian, or other trusted adult be assigned responsibility for supporting the student's learning, monitoring coursework, communicating with teachers, and reporting daily attendance. Exhibit No. 110(x). Those requirements impose practical demands that not every household can readily or will meet. Census Bureau data show that, during 2020–2024, 13.3% of Arkansas households lacked a broadband internet subscription and 6.4% lacked a computer. U.S. Census Bureau, *QuickFacts: Arkansas*, (2020–2025) https://www.census.gov/quickfacts/AR. Arkansas's Digital

Skills and Opportunity Plan also identifies broadband-service availability as a significant barrier for rural residents. Ark. Dep't of Com., *Arkansas Digital Skills and Opportunity Plan* 54–66 (Feb. 2024) https://broadband.arkansas.gov/wp-content/uploads/2024/06/Arkansas-Digital-Skills-and-Opportunity-Plan-Final.pdf. Although these figures do not establish that every affected household lacks access to virtual education, they demonstrate that access to the technology and connectivity required for online learning cannot be presumed. The State therefore cannot overcome the geographic disparity in participating nonreligious private schools simply by pointing to virtual education in the abstract.

As the Court explained, when "numerous private choices, rather than the single choice of a government, determine the distribution of aid," under neutral eligibility criteria, the government is less able to confer special favors that could lead to religious establishment. *Zelman*, 536 U.S. at 652–53 (quoting *Mitchell*, 530 U.S. at 810). But that reasoning presupposes a meaningful choice, and a choice made by circumstance is not the same as a choice freely made. When families lack accessible, affordable nonreligious alternatives, the question is whether their decisions truly reflect independent private choice or are constrained by the options available to them.

*ii. The EFA Program's funding structure creates financial incentives favoring religious schools.*

The availability of secular alternatives must also be considered in light of the financial consequences of choosing among them. In *Zelman*, the Supreme Court emphasized that Ohio's program did not create financial incentives skewing parental choices toward religious schools. 536 U.S. at 653–54. Families could receive tutorial assistance while remaining in public school, and the aid available for private-school attendance was less generous than the public funding associated with other school options. *Id.* at 654–55. The question, therefore, is not simply whether religious and nonreligious schools formally may participate in the EFA Program, but whether families can realistically afford the educational options available to them.

Plaintiffs' tuition data reveals a substantial and persistent disparity between the average tuition charged by religious and nonreligious EFA-approved schools. In the 2023–24 school year, average tuition at religious schools was $7,620, compared with $12,151 at nonreligious private schools: a difference of $4,531. Exhibit No. 027, *Plaintiff's Breakdown of EFA Approved Schools*. In 2024–25, the difference increased to $4,872, with average tuition of $7,272 at religious schools and $12,144 at nonreligious private schools. *Id.* In 2025–26, average tuition was $7,930 at religious schools and $12,672 at nonreligious schools, a difference of $4,742. *Id.* By 2026–27, average tuition at religious schools was $8,602, compared with $13,088 at nonreligious schools: a difference of $4,486. *Id.* Thus, throughout

the four school years reflected in Plaintiffs' data, average tuition at nonreligious EFA-approved schools exceeded average tuition at religious EFA-approved schools by approximately $4,500 to $4,900 annually. *Id.* In 2026–27, average tuition at nonreligious schools was approximately 52% higher than average tuition at religious schools. *Id.* These figures demonstrate that the nominal availability of both religious and nonreligious schools does not necessarily mean that families face comparable financial choices.

This disparity takes on particular significance when considered alongside the geographic distribution of participating schools. As discussed above, participating nonreligious private schools are concentrated in only 10 of Arkansas's 75 counties. Exhibit No. 110, *Current List of EFA Approved Schools*; Exhibit No. 015, *EFA Approved Schools Map*. In many areas, religious private schools charge lower tuition rates than secular private schools. Because the EFA program provides a capped disbursement (90% of the prior year's statewide foundation funding per student) parents who cannot afford the remaining tuition balance of higher-cost secular private schools will be forced to choose lower-cost religious schools. Ark. Code. Ann. § 6-18-2505. In practice, the EFA benefit is only usable if the recipient chooses a religious school, creating a constitutionally impermissible windfall and incentive to select a religious education. Families in counties with few or no participating nonreligious schools therefore face both a shortage of accessible

secular alternatives and a substantial tuition difference between religious and nonreligious schools where both are available.

Under these circumstances, the EFA Program's funding structure places families under financial pressure to choose religious schools over nonreligious alternatives. Plaintiffs do not contend that a tuition disparity alone establishes an Establishment Clause violation. Rather, the disparity is relevant evidence of the practical choices families face under the EFA Program. A family's choice is not meaningfully independent merely because the family formally may select either type of school if the available secular option is substantially more expensive or geographically inaccessible. When considered alongside the concentration of religious schools, the limited geographic availability of nonreligious alternatives, and the program's funding structure, the tuition data support Plaintiffs' contention that the EFA Program does not provide the meaningful and independent choice necessary to sustain the State's reliance on *Zelman*.

*iii. The EFA Program permits participating religious schools to impose discriminatory, religious admission requirements.*

*Zelman* made clear that participating schools must agree to comply with certain statutory requirements, including a prohibition on religious discrimination, among other provisions. *Zelman*, 536 U.S. at 645. The EFA Program, however, makes no such agreement with schools or service providers. In fact, under Arkansas law and corresponding department rules, participating private schools are

given freedom to operate without governmental control, and the ADE is prohibited from imposing additional regulations beyond those expressly set out by statute. 6 CAR § 35-107(k)(2)(A); Ark. Code Ann. § 6-18-2507. A school or service provider must only agree to adhere to Title VI of the Civil Rights Act of 1964, which prohibits discrimination based on race, color, or national origin by any organization receiving federal aid. Ark. Code Ann. § 6-18-2507(a)(3); 42 U.S.C.S. § 2000d; 6 CAR § 35-107(d)(2)(A). Specifically, participating schools are not required to alter their creed, practices, admissions policies, or curricula to accept account funds. 6 CAR § 35-107(k)(2)(A); Exhibit No. 013, *Information for Private Schools*; Fact No. 35.

This means that schools are permitted by the statute to discriminate against students and families based on religion. This potential discrimination is not hypothetical. Apostolic Christian Academy, a participating Christian EFA school in Faulkner County, reserves enrollment for members of First Apostolic Church in order to ensure "our educational community remains closely connected to our founding ministry." Exhibit No. 110(f), *Current EFA Approved Schools List*. Wisdom & Truth Classical Academy, a participating Christian EFA school in Benton County, requires "at least one of the parents of a WTCA student must be a Christian who is a member in good standing at a Protestant Bible-believing local church." Exhibit No. 110(m). Little Rock Christian Academy, a participating

Christian EFA school in Pulaski County, asks that "at least one parent (or legal guardian) of each student be a devoted follower of the Lord Jesus Christ as demonstrated in testimony, lifestyle choices, and conduct, to adhere the LRCA Doctrinal Statement, and to be an active member of a local denomination of the historical Christian church." Exhibit No. 110(n). Finally, Conway Christian School, a participating Christian EFA school in Faulkner County, "requires that at least one parent or legal guardian of each student be a devoted follower of Jesus Christ as evidenced by a faith walk, testimony and active participation in a local historical Christian church." Exhibit No. 110(k).

The policy of the EFA Program is that religious private schools are not required to change their admission criteria or policies as a condition of participating in the EFA Program. Exhibit No. 025, Smith Dep. 69:7–70:24; 6 CAR § 35-107(k)(2)(A). Thus, schools are permitted by the EFA Program to decline to admit students and families who are not of a certain faith, do not participate at a certain church or in certain religious activities, and who hold beliefs opposite of the benefiting school. Consequently, non-adhering students and parents are effectively denied access to program benefits on neutral terms.

These examples demonstrate that participation in the EFA Program does not require religious schools to open admission on terms that disregard religious affiliation or adherence. A family that does not share a participating school's faith

may therefore be unable to use EFA assistance at that school, even if the school is geographically accessible and otherwise affordable. The constitutional significance of these admission requirements must be considered alongside the shortage of nonreligious alternatives. Where families have few or no accessible secular options, religious admission requirements further narrow the set of schools at which they can use EFA assistance. If the program's real-world implementation restricts parents' practical access to secular private schools or creates financial pressures that steer families toward lower-cost religious institutions, then the EFA program fails to provide "true private choice." Under such circumstances, the program fails to break the circuit between government and religion, resulting in an Establishment Clause violation.

### C. The EFA Program's Administration and the Governor's Promotion of Religious Education Raise Establishment Clause Concerns Beyond Those Addressed by *Zelman*.

The First Amendment's very purpose is to preclude the government from "assuming a guardianship of the public mind" by regulation of the press, speech, and religion. *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 791 (1988). "To this end, the government, even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners." *Id.* "Where the State's interest is to disseminate an ideology, no matter how acceptable to some, such

interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Wooley v. Maynard*, 430 U.S. 705, 717 (1977).

Although the Supreme Court has increasingly relied on *Zelman* and the Free Exercise Clause to protect religious institutions from discriminatory exclusion, earlier precedent emphasized the Constitution's protection of individual religious liberty. In *Lemon v. Kurtzman*, the Supreme Court considered state programs providing financial assistance to religious schools for educational expenses. *Lemon*, 403 U.S. at 606–08. Although the legislatures' stated purpose was to improve the quality of secular education, the Court concluded that administering the programs required excessive government supervision of religious schools. *Id.* at 613–22.

The Court recognized the constitutional difficulty of separating secular education from religious instruction when religious schools receive public assistance, particularly where ensuring compliance requires continuing government oversight of teachers, instruction, and school finances. *Id.* at 620–22. Although *Kennedy v. Bremerton School District*, rejected *Lemon*'s three-part test as the governing Establishment Clause framework, *Lemon* illustrates the historical constitutional concerns implicated when government funding and administration intersect with religious education. *See id.*; *Kennedy*, 597 U.S. at 543–44.

In somewhat chilling language, the Court laid out a stern warning about the progression of funding religious schools and how easily and quickly these programs can grow:

> The progression argument, however, is more persuasive here. We have no long history of state aid to church-related educational institutions comparable to 200 years of tax exemption for churches. Indeed, the state programs before us today represent something of an innovation. We have already noted that modern governmental programs have self-perpetuating and self-expanding propensities. These internal pressures are only enhanced when the schemes involve institutions whose legitimate needs are growing and whose interests have substantial political support. Nor can we fail to see that in constitutional adjudication some steps, which when taken were thought to approach "the verge," have become the platform for yet further steps. A certain momentum develops in constitutional theory and it can be a "downhill thrust" easily set in motion but difficult to retard or stop. Development by momentum is not invariably bad; indeed, it is the way the common law has grown, but it is a force to be recognized and reckoned with. The dangers are increased by the difficulty of perceiving in advance exactly where the "verge" of the precipice lies. As well as constituting an independent evil against which the Religion Clauses were intended to protect, involvement or entanglement between government and religion serves as a warning signal.

*Lemon*, 403 U.S. at 624–25.

Plaintiffs argue that the principles underlying *Lemon*, as applied in the Supreme Court's school-funding precedents, demonstrate the constitutional deficiencies of the EFA Program, and that *Zelman* does not resolve the distinct constitutional concerns presented by the Program's structure and operation.

In *Nyquist* and *Sloan v. Lemon*, the Supreme Court evaluated comparable examples to the EFA Program under the *Lemon* test and found the programs

unconstitutional. *Nyquist*, 413 U.S. at 761–64, 798; *Sloan v. Lemon*, 413 U.S. 825 (1973).

In *Nyquist*, under the first *Lemon* criterion, the Court found an adequate secular legislative purpose for the program in question. *Nyquist*, 413 U.S. at 773. New York legitimately sought to preserve safe educational environments, promote pluralism and diversity, and prevent additional burdens on its public-school system. *Id.*

However, a proper legislative purpose does not neutralize a law whose primary purpose is to advance religion and/or effectively entangle the government in religion. *Id.* at 774. Under the effects criterion, the tuition-reimbursement grants were unconstitutional because they contained no restrictions guaranteeing separation between secular and religious educational functions or ensuring that state funds supported only secular functions. *Id.* The Court held that the tuition grants advanced religion specifically because the reimbursing of parents through grants relieved the cost of attending religion-oriented schools and thereby provided financial support to nonpublic, religious institutions. *Id.* at 780. Payment to parents did not create per se constitutional immunity; it was merely one factor in examining the program's substance. *Id.* at 781.

In *Sloan*, the Court held that a Pennsylvania tuition assistance program had the impermissible primary effect of advancing religion specifically because 90% of

students attending nonpublic schools attended religious schools and the reimbursements were unrestricted. *Sloan*, 413 U.S. at 830–31. Both decisions treated *Lemon's* purpose, effects, and entanglement issues as independent factors. A legitimate secular purpose and reduced administrative entanglement did not cure programs whose unrestricted tuition assistance primarily supported religious education.

Here, Arkansas's EFA Program raises the same constitutional concerns identified in *Nyquist* and *Sloan*. Participating schools incorporate religious instruction into their educational programs, yet the EFA Program does not require schools to separate religious instruction, worship, or religious activities from educational expenses supported by EFA funds. Consequently, public funds do subsidize the religious functions of participating schools, even when those funds are nominally designated for educational expenses. Moreover, the State maintains an ongoing administrative role in determining eligible providers, distributing funds, and overseeing the EFA Program, raising additional concerns regarding excessive governmental entanglement with religious institutions. In his deposition, Assistant Commissioner Smith illustrated how he and the sixteen (16) other employees in the Office of School Choice review one aspect of the EFA Program: the reimbursement process:

> Question (Q): And you say that your division looks at all the expenses that have been paid for or been paid out of the accounts?
>
> Darrell Smith (A): The requests, the submissions that are requested, so.
>
> Q: Out of the accounts?
>
> A: Uh-huh.
>
> Q: How do you do that? Isn't, there are a lot of them?
>
> A: Approximately 600,000.
>
> Q: 600,000 transactions?
>
> A: Uh-huh.
>
> Q: And how do you do that? How do you look at that?
>
> A: So a parent submits their reimbursement or their education expenses to ClassWallet or a private school submits their invoice for tuition. At that point, it comes to one of our reviewers. Our reviewer reviews each submission and ensures that it meets all the criteria set forth in the law and the rules. If it meets the eligibility requirements, then it's approved. If it doesn't then it's disallowed and denied.

*Id.* Exhibit No. 025, Smith Dep. 36:3–25, 56:8–57:3.

As in *Nyquist* and *Sloan*, the use of parents or individual accounts as intermediaries does not eliminate the constitutional concern when the practical effect is to provide financial support to religious schools without adequate restrictions on religious use. Accordingly, Plaintiffs contend that the EFA Program must be evaluated under the principles articulated in *Lemon*, particularly whether its structure and operation permit public funds to advance religious instruction and

whether preventing such use requires excessive governmental entanglement with participating schools.

*i. Participating religious schools incorporate and require religious instruction and religious commitments in their educational programs.*

The religious character of participating schools is reflected in their own descriptions of their educational missions, curriculum, and requirements. *See* Exhibit No. 110(a)–(x). These descriptions establish that, at the identified schools, religion is not necessarily confined to an optional activity separate from academic instruction. For example, Anthem Classical Academy describes its educational approach as "a classical perspective centered around a biblical worldview." Exhibit No. 110(e). Kingdom Christian School states that it equips students to pursue truth, serve others, and follow Jesus "in every area of life." Exhibit No. 110(i). Bentonville Christian Academy describes its approach as intertwining a biblical worldview with academic foundations. Exhibit No. 110(h).

Other participating schools describe religious instruction or worship as part of students' school experience. First Academy requires "students attend chapel weekly where they are actively involved in worship through praying, quoting Scripture, singing worship songs, and listening to lessons utilizing Biblical application." Exhibit No. 110(l). Shiloh Christian School lists "Biblical Studies" under its required courses for the 2025–26 school year, as well as scheduled chapel services and religious speakers throughout the academic year. Exhibit No. 022,

*Responses to Requests for Production from Religious Schools, Document 6*. CAC Schools require "Kindergarten through 5th grade students attend Bible class daily for approximately 30 minutes, following a prescribed curriculum. Sixth through Twelfth Grades take Bible class for 45 minutes daily each semester." Exhibit No. 016, *Responses to Requests for Production from Religious Schools, CAC*, at 4; *see also* Exhibit No. 017, *2025–26 Student & Parent Handbook*. Additionally, "Chapel" is required of all students and faculty members. Exhibit No. 017, *2025–26 Student & Parent Handbook*.

Some participating schools also impose religious requirements on students or their parents. For example, Apostolic Christian Academy states that, with a specified exception, students must be members of First Apostolic Church to attend. Exhibit No. 099(f). Little Rock Christian Academy requires at least one parent or guardian to be a devoted follower of Jesus Christ and an active member of a local denomination of the historical Christian church. Exhibit No. 110(n). Conway Christian School "requires that at least one parent or legal guardian of each student be a devoted follower of Jesus Christ as evidenced by a faith walk, testimony and active participation in a local historical Christian church." Exhibit No. 110(k).

These examples do not establish that every EFA-participating religious school operates identically. They do, however, demonstrate that participating schools include institutions in which religious beliefs, instruction, and practices are

integrated into the education for which families pay tuition. That evidence provides important context for evaluating how the State's funding and administration of the EFA Program interact with the religious educational activities occurring at participating schools.

*ii. The EFA Program does not require that religious schools separate religious instruction from the education supported by EFA funds.*

The EFA Program permits funds to be used for private-school tuition. Ark. Code Ann. § 6-18-2505. Yet the ADE guidance identified in the record does not require participating religious schools to separate their religious educational activities from the remainder of their educational programs as a condition of receiving EFA funds. Exhibit No. 013, *ADE Information for Private and Micro Schools*. Nor does that guidance require schools to establish that public funds are used exclusively for instruction independent of the school's religious mission. *Id.*

Central Arkansas Christian Schools' discovery response illustrates the practical significance of this structure. The school stated that it "does not formally segregate or report [EFA] funds by specific expense categories" and that "[a]ll such funds are incorporated into overall tuition and operating revenue." Exhibit No. 016. This evidence supports Plaintiffs' contention that, at least at the identified school, EFA funds are incorporated into general tuition and operating revenue rather than formally assigned to discrete expense categories.

The statutory payment mechanism further establishes the State's role in the EFA Program. The ADE administers EFA accounts and makes payments directly to participating schools and service providers. Ark. Code Ann. § 6-18-2505(b). The statute also prohibits funds from being refunded, rebated, or shared with parents or participating students. *Id.* These provisions demonstrate that the EFA Program does not simply provide families with unrestricted cash assistance. Instead, the State establishes and administers a system through which public funds pay for designated educational expenses, including tuition at schools that incorporate religious instruction into their educational programs.

Plaintiffs do not contend that direct payment to a religious school, standing alone, establishes an Establishment Clause violation. Rather, the payment mechanism, the absence of a requirement to separate religious instruction from the educational program supported by tuition, and the evidence of schools' actual practices must be considered together. That evidence raises the question whether the EFA Program's structure adequately addresses the constitutional concerns that arise when public funding supports educational programs in which religious and secular instruction are integrated.

*iii. The ADE's ongoing administration and the Governor's public statements provide further context for the State's relationship with religious education.*

The EFA Program is established and funded by the Arkansas General Assembly and administered by ADE. Ark. Code Ann. §§ 6-18-2501 et seq. The ADE determines eligibility, approves participating schools and students, determines the amount of available funding, and facilitates and administers the process through which EFA payments are made. Exhibit No. 012, *Arkansas Education Freedom Account (EFA) Family Handbook 2025-26*. The EFA Program also permits funds to be used for tuition at schools whose educational programs expressly incorporate religious instruction. Exhibit No. 110, *Current List of EFA Approved Schools*; Exhibit No. 013, *ADE Information for Private and Micro Schools*; Exhibit No. 025, Smith Dep. 69:20–22.

The record reflects an ongoing administrative relationship between the ADE and participating schools. An example of that relationship and entanglement is shown by communications between ADE's Office of School Choice and Shiloh Christian School concerning school and student recertification, participating-student lists, disbursements, invoices, account administration, testing, orientations, close-out meetings, and program updates. Exhibit No. 024*, Selected Communications Between ADE Office of School Choice and Shiloh Christian School Regarding EFA Administration*. These communications span March 2024 through April 2026 and reflect recurring administration of the EFA Program at the school level.

The record also includes public statements by Governor Sarah Huckabee Sanders describing the EFA Program's role in facilitating enrollment at religious schools. In her 2025 State of the State address, the Governor described a student named Elijah who attended St. Theresa's Catholic School after his family obtained an EFA. Exhibit No. 006, *Governor Sanders Delivers State of the State Address*. She discussed the school's faith-based environment and the family's connection to Bible study through the school community. *Id.* The Governor also described the EFA Program as enabling students to attend Christian schools using tax-sourced funds. Exhibit No. 008, *Governor Sanders Delivers State of the State Address*.

The Court in *Nyquist* was clear: "What our cases require is careful examination of any law challenged on establishment grounds with a view to ascertaining whether it furthers any of the evils against which that Clause protects. Primary among those evils have been "sponsorship, financial support, and active involvement of the sovereign in religious activity.'" *Nyquist*, 413 U.S. at 772 (citing *Walz v. Tax Com. of N.Y.*, 397 U.S. 664, 668 (1970); *Lemon*, 403 U.S. at 612).

Governor Sanders's own statements and actions make clear her administration's desire to promote religion through government institutions. *See* Act 573, 2025 Ark. Acts 573; *see also* Sarah Huckabee Sanders, *Unapologetic: Clarity and Conviction in a World Gone Crazy* (St. Martin's Press 2026). In 2025,

Sanders signed legislation requiring the display of the Ten Commandments in public-school classrooms and libraries. *Id.* She later declared that she was proud to have placed the Commandments in "every classroom" and calling upon Arkansans to unite in following the: "[T]oday I ask that we come together, and we send a clear message: 'Here we are from every corner of our state, every background, every denomination united in one God to say, in one prayer, in one voice, that we will always stand and we will always follow the one true Creator.'" Exhibit No. 045, *Governor Sanders delivers remarks at the National Day of Prayer Arkansas Observance*, at 38:17–38:22, 38:57–39:24.

She likewise used an official gubernatorial proclamation announcing the closure of state offices to affirm Christian theological beliefs and direct state employees to spend the holiday "giving thanks for Christ's birth." Exhibit No. 044, *Proclamation Declaring December 25, 2025, as Christmas Day*. She has used this same official platform to "urge the citizens of the state" to participate in a National Day of Prayer. Exhibit No. 043, *Proclamation on National Day of Prayer in Arkansas*. And when promoting the EFA Program in her 2025 State of the State address, Sanders celebrated a family's decision to use public funds to enroll their child in a Catholic school, specifically highlighting the family's participation in the school's weekend Bible study. Exhibit No. 006, *Governor Sanders Delivers State of the State Address*.

These statements do not, by themselves, establish that the EFA Program was adopted for an unconstitutional purpose. They do, however, provide context for evaluating the State's public characterization of the EFA Program alongside its statutory structure and actual administration. The record establishes that Arkansas funds and administers a program through which tuition payments reach schools that expressly incorporate religious instruction into their educational programs, without requiring those schools to separate that instruction from the education supported by tuition. Taken together, this evidence raises concerns beyond the question whether parents have a genuinely independent choice among educational options. It also places before the Court the relationship between the State's funding mechanism and the religious educational activities supported through participating schools. Plaintiffs therefore ask the Court to evaluate the EFA Program's actual structure and operation under the governing Establishment Clause principles, rather than treating its designation as a parental-choice program as dispositive of its constitutionality.

### D. The State Cannot "Empower" Parents to Accomplish Indirectly What the State Cannot Constitutionally Do Directly

The State cannot accomplish indirectly what it is constitutionally prohibited from accomplishing directly. *Norwood v. Harrison*, 413 U.S. 455, 465 (1973).

*i. The State's involvement in creating and administering the EFA Program cannot be disregarded*

The Constitution does not permit the government to avoid scrutiny of its own conduct by placing private individuals between its actions and the ultimate beneficiaries of those actions. Courts must examine the substance of the relationship between the State and the challenged conduct, not merely the formal identity of the immediate recipient or middleman. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–302 (2001).

In *Brentwood*, the Court held that a private organization's status does not, by itself, protect its actions from constitutional scrutiny. *Id.* at 298. Although the Tennessee Secondary School Athletic Association (TSSAA) was organized as a private nonprofit corporation, the Court concluded that its activities constituted state action because public institutions and officials were pervasively entwined in its operations, management, and control—there was such a "close nexus" between the State and challenged action that the alleged private behavior could be treated as that of the State. *Id.* at 295, 298–302. In reaching that conclusion, the Court looked beyond TSSAA's nominally private character to the practical reality of its relationship with the State, recognizing that constitutional accountability cannot be avoided through organizational structures and intermediaries. *Id.* at 295–98. As the Court explained, constitutional protections cannot be confined by drawing "a simple line between States and people operating outside formally governmental

organizations"; courts must examine how the State and private actors interact beyond that formal boundary. *Id.* at 295.

The same principle requires examination of the actual operation of the EFA Program. The State has created the statutory framework, appropriated the public funds, established the eligibility requirements, approved the participating students, schools, and providers, and assigned the ADE Division's Office of School Choice the responsibility for administering the accounts and facilitating disbursements. *See* Ark. Code Ann. §§ 6-18-2501 et seq. Parents and family participation occurs within a government-created and government-financed program whose operation depends upon the State's continuing administrative involvement. But for the State's involvement, those families would not be able to participate, and private religious schools would not receive public funds for tuition.

The ADE's relationship with participating schools extends beyond the initial authorization of a parent's account. The Office of School Choice communicates directly with schools concerning student recertification, account administration, quarterly disbursements, invoices, testing reports, and the closeout of accounts. *See* Fact No. 3–16; *see, e.g.*, Exhibit No. 022, Shiloh Christian School Requests for Production. The State, through the ADE's Office of School Choice, dedicates seventeen (17) full-time employees to the administration of the EFA Program. Fact No. 5, *Plaintiffs' Statement of Undisputed Facts*; Exhibit No. 025, Smith Dep.

36:8, 37:3–10. That includes the review and approval or disapproval of over a half-million transactions by parents using state funds to purchase school-related products and services for their children. Exhibit No. 025, Smith Dep. 56:8–57:19. These ongoing administrative relationships demonstrate that the State does not simply distribute funds and withdraw from the transaction, and that its involvement is, therefore, not incidental to the EFA Program. Rather, it maintains an active and pivotal role in the machinery through which public money flows into private religious schools. A parent's involvement does not relieve the State of responsibility for the public funds it has chosen to make available.

The Court has likewise held that the State can be held responsible for private decisions "when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Although governmental regulation or financial assistance alone does not automatically convert private conduct into state action, the dispositive factor is whether the State has become sufficiently involved in the particular conduct to warrant constitutional attribution. *Id.* The State therefore cannot resolve the constitutional defect merely by pointing to the parent's role in selecting a participating school while disregarding the governmental structure that creates, finances, and facilitates that transaction.

*ii. The State cannot avoid its constitutional obligations by placing an individual between itself and the ultimate beneficiary, and parental choice does not resolve the ultimate Establishment Clause issue.*

The involvement of private individuals does not absolve the government from constitutional responsibility. In *Norwood*, Mississippi attempted to argue in an analogous situation that its provision of free textbooks to students attending private schools did not violate the Constitution because the State itself was not operating schools that discriminated based on race. *Norwood*, 413 U.S. at 460–61. The Court rejected that formal distinction, explaining that a State may not "induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Id.* at 465 (citing *Lee v. Macon County Bd. of Educ.*, 267 F.Supp. 458, 475–76 (1967).

Here, the issue is not simply whether an individual parent independently selects a school, but whether Arkansas may establish and finance a program that directs substantial public resources to private institutions while disclaiming constitutional responsibility for the religious education those resources support. The State cannot make that question disappear by inserting a private middleman into the distribution process. Where the government creates the funding mechanism, determines the eligible recipients, administers the accounts, and facilitates the transfer of public funds, the Court must examine the government's own role and the actual operation and effect of the program.

Moreover, *Zelman* does not establish that the mere presence of a parental decision automatically resolves every constitutional challenge to a publicly funded education program. Its analysis depended upon other factors as well, including the program's neutrality and the genuine availability of independent private choice. *Id.* at 652. The Court emphasized that the government's role ended with the disbursement of benefits and that the aid reached religious schools through recipients' genuine and independent private choices. *Id.* at 652–53. Accordingly, the State cannot simply invoke the word "choice" as a substitute for examining the statutory structure, the practical alternatives available to families, and the extent to which the program's operation reflects governmental rather than genuinely independent private decision-making.

The distinction is particularly significant where the State's program provides public funding for private education while the practical availability of secular alternatives remains limited. *See* Section B.i; Exhibit No. 027, *Plaintiff's Breakdown of EFA Approved Schools*; Exhibit No. 015, *EFA Approved Schools Map*. If the overwhelming majority of realistic participating options are religious institutions, the existence of a formal parental selection does not, standing alone, establish that the resulting distribution reflects the kind of genuine and independent private choice contemplated by *Zelman*.

Ultimately, Arkansas cannot avoid constitutional scrutiny by characterizing the distribution of public funds as a series of private parental decisions while retaining control over the program that makes those distributions possible. The Establishment Clause evaluation must account for the State's own affirmative conduct in creating, financing, and administering the EFA Program; parental choice cannot, by itself, render that conduct constitutionally irrelevant.

**E. The Arkansas Constitution and Arkansas Statutes Independently Restrict Compelled Support of Religion and Religious Discrimination in Publicly Funded Programs.**

The Court has explicitly stated that it is "fundamental that state courts be left free and unfettered by us in interpreting their state constitutions." *Michigan v. Long*, 463 U.S. 1032, 1041 (1983). In *Michigan v. Long*, the Court acknowledged that state courts can interpret their own state constitutions to provide greater protections for individual rights than the U.S. Supreme Court provides under the federal Constitution. *Id.* at 1040–41. However, the Court ruled that if a state court wants to do this, it must explicitly and clearly state that its decision rests on "bona fide separate, adequate, and independent grounds" of state law. *Id.* at 1041.

*i. The Arkansas Constitution provides strict religious liberties and protections and prohibits compelled belief in any form.*

Article 2, Section 24 of the Arkansas Constitution takes a broader and stricter stance on religious liberties to better protect its citizens:

> All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can, of right, be compelled to attend, erect, or support any place of worship; or to maintain any ministry against his consent. No human authority can, in any case or manner whatsoever, control or interfere with the right of conscience; and no preference shall ever be given, by law, to any religious establishment, denomination or mode of worship, above any other.

Ark. Const. art. 2, § 24.

This article expressly protects individual rights to religious freedom and prohibits compelling a person to support a place of worship or maintain a ministry against that person's consent. It also prohibits the State from preferring one religious establishment, denomination, or mode of worship over another. These protections provide an independent state constitutional basis for examining the relationship between public funding and religious education.

Arkansas has established and funded the EFA Program through which public funds pay tuition at participating private schools, including schools that expressly incorporate religious instruction into their educational programs. Ark. Code Ann. §§ 6-18-2501 et seq.; Exhibit No. 110, *Current List of EFA Approved Schools*. The EFA Program does not require participating schools to separate religious instruction from the educational programs supported through tuition. *Supra* Section C.ii; Exhibit No. 013, *ADE Information for Private and Micro Schools*. At least one participating school, Central Arkansas Christian Schools, has stated that EFA funds are incorporated into its overall tuition and operating revenue rather than

formally segregated by expense category. Exhibit No. 016, *Central Arkansas Christian Schools, Responses to Requests for Production from Religious Schools*.

These facts raise the question whether the State's funding arrangements comport with Article 2, Section 24's protections against compelled support of worship and government preference among religious establishments. Plaintiffs do not contend that the mere participation of religious schools establishes a violation of the Arkansas Constitution. Rather, the Court should evaluate the EFA Program's actual funding structure and operation under the text and controlling interpretations of Article 2, Section 24, independently of the federal Establishment Clause analysis.

*ii. Arkansas Law explicitly prohibits discrimination based on religion by programs that receive tax-sourced funds.*

Arkansas has separately addressed religious discrimination in programs receiving public funds, providing:

> No citizen in the State of Arkansas in a county, city, or local community on the grounds of race, color, religion, or national origin shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination of services or participation under any program or activity receiving Arkansas tax funds.

Ark. Code Ann. § 26-73-108(a)(1).

Subsection (a)(2) further provides that a county, city, local community, or agency empowered to extend financial assistance using Arkansas state, county, or city tax funds shall not engage in discrimination in participation, employment,

services, or other human involvement. Subsection (b) provides for impoundment of the relevant public funds in the event of a violation. Ark. Code Ann. § 26-73-108(a)(2), (b).

The EFA Program uses Arkansas tax funds to provide tuition assistance at participating private schools. Ark. Code Ann. § 6-18-2505. However, the program does not require those schools to eliminate religious admission requirements as a condition of participation. *See supra* Section B.iii. Some participating schools condition admission on a student and/or parent's religious beliefs, church membership, or adherence to a Christian doctrinal statement. In fact, the record identifies participating schools that condition enrollment on religious affiliation, church membership, or parental adherence to Christian beliefs. For example, Apostolic Christian Academy generally requires students to be members of First Apostolic Church, while Little Rock Christian Academy and Conway Christian School require at least one parent or guardian to profess Christian faith and participate in a Christian church. *Supra* Section B.iii; Exhibit No. 110(f), 110(n), 110(k).

These policies raise a question distinct from whether religious schools may participate in a publicly funded program: whether a program receiving Arkansas tax funds may permit otherwise eligible families to be excluded from participation or denied program benefits on the basis of religion. Plaintiffs contend that the State

cannot resolve this issue merely by characterizing EFA payments as benefits administered through parental choice. The Court must examine the statutory language, the structure of the EFA Program, and the exclusions reflected in the record.

The application of Section 26-73-108 to the EFA Program and the admission decisions of participating private schools requires consideration of the statute's scope and the relationship between the State, the Program, and those schools. If the statute covers the challenged funding arrangements and exclusions, its nondiscrimination requirements must be given effect. The Court should therefore determine whether the Program's structure and the religious admission requirements permitted under it are consistent with Section 26-73-108.

*iii. The state-law protections require independent consideration of the EFA Program's operation.*

The record establishes that Arkansas created and funds the EFA Program, that the ADE administers the Program and makes payments to participating schools, and that some recipient schools incorporate religious instruction and religious commitments into their educational programs. Ark. Code Ann. §§ 6-18-2501 et seq., 6-18-2505; Exhibit No. 110, 012, 013, 016. The record also identifies participating schools that condition admission on religious affiliation or parental religious commitments. *See supra* Section B.iii; Exhibit No. 110(f), 110(k), 110(n).

These facts must be considered under the distinct protections afforded by the Arkansas Constitution and statutes. Article 2, Section 24 protects against compelled support of worship and prohibits legal preference among religious establishments, denominations, and modes of worship. Section 26-73-108 prohibits religious discrimination in covered programs receiving Arkansas tax funds. Neither provision should be treated as merely duplicative of the federal Establishment Clause analysis.

For these reasons, Plaintiffs request that the Court independently evaluate the EFA Program under Article 2, Section 24 of the Arkansas Constitution and Ark. Code Ann. § 26-73-108 to the extent those provisions apply to the challenged EFA Program and conduct and grant the declaratory and injunctive relief supported by the governing law and summary-judgment record.

## VI. CONCLUSION AND PRAYER FOR RELIEF

For these reasons, Plaintiffs respectfully requests that the Court grant the Motion for Summary Judgment and:

1. Grant Plaintiffs' Motions for Summary Judgment;
2. Declare the Arkansas Children's Educational Freedom Account Program unconstitutional under the Establishment Clause to the extent identified above;

3. Enjoin Defendants from further implementation of the Program in violation of the First Amendment;
4. Alternatively, enter partial summary judgment prohibiting the use of EFA funds to finance religious instruction, worship, or educational activities that constitute religious exercise or inculcation; and
5. Grant such other relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Richard H. Mays*

Richard H. Mays
Ark. Bar No. 61043
Hannah Gore Gipson
Ark. Bar No. 24024
Attorneys for Plaintiffs
MAYS GORE GIPSON LAW FIRM PLLC
2226 Cottondale Lane - Suite 210
Little Rock, AR 72202
Tel: 501-891-6116
rmays@richmayslaw.com
hgoregipson@richmayslaw.com

## CERTIFICATE OF SERVICE

I certify that on November 19, 2026, I filed the foregoing Brief in Support through the Court's electronic filing system, which served all counsel of record registered to receive electronic notice, including:

Autumn Hamit Patterson
Ark. Bar No. 2025095
Solicitor General
M. Erica Crouse
Ark. Bar No. 2026016
Assistant Solicitor General
Arkansas Attorney General's Office
101 West Capitol Avenue
Little Rock, AR 72201
(501) 682-1019
(501) 682-2591 fax
autumn.patterson@arkansasag.gov
erica.crouse@arkansasag.gov

***Counsel for Defendants***

Bryan G. Cleveland
EdChoice Legal Advocates
111 Monument Circle, Suite 2650
Indianapolis, IN 46204
(317) 681-0745
bcleveland@edchoice.org

***Counsel for Intervenor Defendants***

Dated: November 19, 2026

*Richard H. Mays*
Richard H. Mays