**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**

GWEN FAULKENBERRY; SPECIAL RENEE SANDERS; ANIKA WHITFIELD; AND KIMBERLY CRUTCHFIELD,

*Plaintiffs,*

v.

ARKANSAS DEPARTMENT OF EDUCATION; JACOB OLIVA, in his official capacity as Secretary of the Arkansas Department of Education; SARAH MOORE, PH.D., chairwoman of the Arkansas State Board of Education; LISA HUNTER; JEFF WOOD; RANDY HENDERSON; LEIGH S. KEENER; ADRIENNE WOODS; KEN BRAGG; KATHY MCFETRIDGE-ROLLINS; AND GARY ARNOLD, PH.D., members of the Arkansas State Board of Education; SARAH HUCKABEE SANDERS, Governor of the State of Arkansas; THE ARKANSAS DEPARTMENT OF FINANCE AND ADMINISTRATION; and JIM HUDSON, in his official capacity as Secretary of the Arkansas Department of Finance and Administration,

*Defendants,*

ERIKA LARA; KATIE PARRISH; AND NIKITA GLENDENNING,

*Intervenor-Defendants.*

Civil Action No. 4:25-cv-00592-DPM

**DEFENDANTS' BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


Table of Contents ........ ii

Table of Authorities ........ iv

Introduction ........ 1

Standard of Review ........ 2

Background ........ 3

A. The LEARNS Act enhanced educational opportunities for Arkansas students through a comprehensive investment in public and private educational options ........ 3

B. The Freedom Account Program is one way the LEARNS Act expands educational options ........ 7

C. Under the LEARNS act, Arkansas families are empowered to choose the educational option that works best for their children ........ 11

D. Plaintiffs Challenged the Freedom Account Program ........ 16

Argument ........ 18

I. Plaintiffs Lack Article III Standing Because Any Injury Is Not Fairly Traceable to Defendants ........ 18

A. Article III generally prohibits taxpayers from challenging government expenditures based solely on their disagreement with how public funds are used ........ 19

B. Under *Winn*, Plaintiffs cannot establish taxpayer standing because any injury flows from the independent choices of parents, defeating causation ........ 20

C. Plaintiffs have no particularized injury and have not produced evidence to support an as-applied challenge ........ 22

II. The Freedom Account Program Does Not Violate the Establishment Clause under the *Zelman* Line of Cases ........ 23

A. Government programs that are neutral do not violate the Establishment Clause simply because some aid is directed towards religious schools as a result of private choices ........ 24

B. The Freedom Account Program is constitutional under the *Zelman* test because it distributes funds and approves applications according to neutral eligibility criteria based on parental choice ........ 27

*1. The Freedom Account Program is a permissible neutral government program under* Zelman ........ 27

*2. The Freedom Account Program increases parents' options And funds are distributed based on individual private choices* ........ 30

III. The Freedom Account Program is Consistent with Historical Practices and Understandings ........ 35

A. Providing financial support to religious private schools was historically permitted ........ 36

B. The Freedom Account Program exhibits none of the historical hallmarks of establishment ........ 37

IV. No Facial Challenge Lies Under *Salerno*, and the As-Applied Claim Fails for Want of Record Evidence ........ 40

A. A facial challenge fails under *Salerno* because the program is valid in the mine-run of its applications under any legal theory ........ 40

B. The as-applied claim fails under any legal theory because the summary-judgment record contains no evidence of coercion ........ 41

Conclusion ........ 43

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Americans United for Separation of Church and State v. Prison Fellowship Ministries, Inc.*,
509 F.3d 406 (8th Cir. 2007) ........ 20, 31

*Ariz. Christian Sch. Tuition Org. v. Winn*,
563 U.S. 125 (2011) ........ 18-22

*Bedford v. Doe*,
880 F.3d 993 (8th Cir. 2018) ........ 2

*Bolderson v. City of Wentzville*,
840 F.3d 982 (8th Cir. 2016) ........ 2

*Bowen v. Kendrick*,
487 U.S. 589 (1988) ........ 41

*Hilsenrath ex rel. C.H. v. Sch. Dist. of Chathams*,
136 F.4th 484 (3d Cir.) ........ 35-36, 38

*Hilsenrath ex rel. C.H. v. Sch. Dist. of Chathams*,
146 S. Ct. 885 (2025) ........ 35-36

*California v. Texas*,
593 U.S. 659 (2021) ........ 20

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 38, 41, 43

*City of Clarkson Valley v. Mineta*,
495 F.3d 567 (8th Cir. 2007) ........ 18

*Coleman v. Watt*,
40 F.3d 255 (8th Cir. 1994) ........ 22, 42

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008) (plurality opinion) ........ 40

*Espinoza v. Mont. Dep't of Revenue*,
591 U.S. 464 (2020) ........ 23-26, 35-37

*Firewalker-Fields v. Lee*,
58 F.4th 104 (4th Cir. 2023) ........ 36

*Flast v. Cohen*,
392 U.S. 83 (1968) ........ 18-20, 22

*Found. v. Kaler*,
14 F.4th 879 (8th Cir. 2021) ........ 41

*Hein v. Freedom from Religion Found., Inc.*,
551 U.S. 587 (2007) ........ 19, 20

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ........ 23, 35, 38-39

*Lee v. Weisman*,
505 U.S. 577 (1992) ........ 38, 39

*Lemon v. Kurtzman*,
403 U.S. 602 (1971) ........ 23, 35

*Locke v. Davey*,
540 U.S. 712 (2004) ........ 24

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 18, 20

*Marsh v. Chambers*,
463 U.S. 783 (1983) ........ 37

*McCullen v. Coakley*,
573 U.S. 464 (2014) ........ 41

*McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*,
11 F.4th 702 (8th Cir. 2021) ........ 2

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ........ 40

*Mueller v. Allen*,
463 U.S. 388 (1983) ........ 24

*Nathan v. Alamo Heights Indep. Sch. Dist.*,
173 F.4th 576 (5th Cir. 2026) (en banc) ........ 36

*New Doe Child #1 v. United States*,
901 F.3d 1015 (8th Cir. 2018) ........ 35, 37

*Pedersen v. Bio-Med. Applications of Minn.*,
775 F.3d 1049 (8th Cir. 2015) ........ 2

*Pullman Co. v. Knott*,
235 U.S. 23 (1914) .......... 42

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022) .......... 37-39

*Town of Greece v. Galloway*,
572 U.S. 565 (2014) .......... 23, 35, 37

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 22

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017) .......... 26

*United States v. Salerno*,
481 U.S. 739 (1987) .......... 40, 41

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) .......... 19

*Walls v. Petrohawk Props., LP*,
812 F.3d 621 (8th Cir. 2015) .......... 2

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) .......... 40, 42

*Witters v. Wash. Dep't of Servs. for the Blind*,
474 U.S. 481 (1986) .......... 24

*Zayed v. Assoc. Bank, N.A.*,
913 F.3d 709 (8th Cir. 2019) .......... 2

*Zelman v. Simmons-Harris*,
536 U.S. 639 (2002) .......... 21-31, 33-35, 42

*Zobrest v. Catalina Foothills Sch. Dist.*,
509 U.S. 1 (1993) .......... 24

**Statutes**

42 U.S.C. § 2000d .......... 10

Fed. R. Civ. P. 56 .......... 2, 38, 41

Ark. Const. art. 2, § 24 .......... 16

Ark. Code Ann. § 6-8-2507 .......... 10

Ark. Code Ann. § 6-15-503 .......... 12

Ark. Code Ann. § 6-16-1702 .......... 6

Ark. Code Ann. § 6-16-1703 .......... 6

Ark. Code Ann. § 6-18-232 .......... 13

Ark. Code Ann. § 6-18-2502 .......... 3

Ark. Code Ann. § 6-18-2503 .......... 3

Ark. Code Ann. § 6-18-2505 .......... 3

Ark. Code Ann. § 6-18-2505 .......... 3, 28

Ark. Code Ann. § 6-18-2506 .......... 8, 13, 27-28

**Other Authorities**

Mark David Hall, Andrea Picciotti-Bayer, *Ten Commandments in the Public Square and Public Schools*,
34 Wm. & Mary Bill Rts. J. 175 (2025) .......... 37

*Nathan S. Chapman, Forgotten Federal-Missionary Partnerships: New Light on the Establishment Clause*,
96 Notre Dame L. Rev. 677 (2020) .......... 37

## INTRODUCTION

The Arkansas General Assembly enacted the LEARNS Act to empower parents, including those with limited resources, to choose the educational option that best fits their children's needs. Because no single educational option can meet every student's needs, the LEARNS Act expanded and enhanced the options available to Arkansas families, including by creating the literacy coach program in traditional public schools and the Educational Freedom Account Program. The Program enables parents to direct funds toward a broad range of qualifying educational expenses, including tuition, educational materials, tutoring, and other resources suited to their child's needs.

Although the LEARNS Act passed with overwhelming support and expanded and enhanced educational opportunities for Arkansas families, the four Plaintiffs argue the Freedom Account Program violates the Establishment Clause because it allows parents and legal guardians to use Freedom Account funds to pay tuition at religious private schools. Plaintiffs, however, lack Article III standing because their asserted taxpayer injuries are not fairly traceable to Defendants. Even assuming standing, Plaintiffs have not presented sufficient evidence to establish an Establishment Clause violation, and no genuine dispute of material fact exists. The undisputed record instead shows that the LEARNS Act and Freedom Account Program are neutral with respect to religion and leave educational decisions to parents and legal guardians, who then freely choose what educational option best fits their children's and families' needs. The Program is also consistent with historical practices and understandings of the Establishment Clause and does not bear any hallmark of a religious establishment. This Court should therefore grant Defendants' motion for summary judgment and enter judgment in their favor.

## STANDARD OF REVIEW

Courts "shall grant summary judgment" when movants "show[] [that] there is no genuine dispute regarding any material fact and that [they are] entitled to judgment as a matter of law." *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021); Fed. R. Civ. P. 56(a). There are two ways for a movant to meet its burden: "[I]t can produce evidence negating an essential element of the nonmoving party's case, or it can show that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018). "Once the moving party satisfies this initial burden, the nonmoving party must respond by submitting evidentiary materials of specific facts showing the presence of a genuine issue for trial." *Id.* at 997 (internal quotations omitted). The dispute of fact must be both material and genuine. It is material if it is "outcome determinative under prevailing law," *Walls v. Petrohawk Props., LP*, 812 F.3d 621, 625 (8th Cir. 2015) (quoting Grey v. City of Oak Grove, 396 F.3d 1031, 1034 (8th Cir. 2005)), and it is genuine if a factfinder "could reasonably determine the issue in the non-moving party's favor," *Zayed v. Assoc. Bank, N.A.*, 913 F.3d 709, 714 (8th Cir. 2019). When evaluating a summary-judgment motion, the Court considers the evidence in the light most favorable to the non-moving party. *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015). To survive summary judgment, the nonmoving party must meet "proof with proof." *Bolderson v. City of Wentzville*, 840 F.3d 982, 986 (8th Cir. 2016).

## Background

### A. The LEARNS Act enhanced educational opportunities for Arkansas students through a comprehensive investment in public and private educational options.

In 2023, the General Assembly enacted the LEARNS Act to expand and enhance educational opportunities for Arkansas students. Act 237 of 2023. Among other measures, the LEARNS Act established the Education Freedom Account ("Freedom Account") Program, Ark. Code Ann. § 6-18-2502, which enables families to direct a set amount of funds to qualifying expenses for their child's education, including for example, private-school tuition, homeschool curriculum, tutoring, educational therapies, and other approved expenses, *id.* §§ 6-18-2503, -2505; SUMF ¶¶ 2–3. The funds allocated "to each participating student's account" are calculated by reference to the funding amount allotted per student at public schools. Ark. Code Ann. § 6-18-2505(a)(1) (providing that funds should be "an amount equal to ninety percent (90%) of the prior year's statewide foundation funding allotted per student"). Parents then direct the Freedom Account funds to the participating schools for tuition expenses or towards other participating service providers and permissible expenses. *Id.* § 6-18-2505(d)(1); *see Compl.* Ex. 1 at 8 (explaining that parents use "the ClassWallet portal, where they can then distribute account funds to their participating private school of choice" or "to cover non-tuition eligible expenses (e.g., uniforms) from approved third-party providers").

The Freedom Account Program is only one part of the LEARNS Act's broader approach of improving Arkansas education by expanding educational choices, enhancing educational options, and increasing accountability. The LEARNS Act not only created the Education Freedom Account Program, but it also made changes to traditional public schools and charter schools to enhance the educational opportunities available in those settings. By way of example, the Literacy

Tutoring Grant Program provides tutoring assistance to eligible kindergarten-through-third-grade students in public schools and open-enrollment public charter schools, with parents choosing from approved tutoring providers. SUMF ¶¶ 93–94. The Literacy Tutoring Grant Program makes $1,500 in tutoring assistance available to approved students who are at risk of reading difficulties, do not meet applicable reading standards, or were retained in third grade. SUMF ¶ 93. In the 2024–25 school year, students in 252 Arkansas public school districts were eligible for these grants. SUMF ¶ 96. And during the 2025–26 school year, the Department distributed $15 million through the Program. SUMF ¶ 97.

In 2024, Arkansas replaced its statewide assessment system with the Arkansas Teaching, Learning, and Assessment System ("ATLAS") to better measure student performance and identify opportunities to improve public education. Ex. 7, Johnson Decl. ¶¶ 5, 9; SUMF ¶ 115. Since ATLAS was adopted, students have shown greater interest in their assessment results, including discussing their scores, identifying ways to improve, and encouraging their peers. SUMF ¶ 123.

As part of Arkansas' efforts to improve public education, the Department monitors public-school performance through an A–F accountability system designed to measure student achievement and academic growth. Ex. 7, Johnson Decl. ¶ 11; SUMF ¶ 11. School ratings account not only for the percentage of students achieving proficiency but also for students' academic growth relative to individualized expectations, including growth among students in the lowest-performing quartile. Ex. 7, Johnson Decl. ¶ 11. High-school ratings additionally account for graduation outcomes. *Id.* The Department makes school and district letter grades and performance data publicly available through its online report cards. Ex. 25, Press Release, Ark. Dep't of Educ., Arkansas Releases 2025–2026 School and District Letter Grades, at 2 (Sept. 17, 2026).

Arkansas also provides additional resources to underperforming public schools, and recent assessment results show improvements in student performance. *Id.*; SUMF ¶¶ 99, 118–22. The Department's Office of Public School Accountability classifies schools and districts receiving D or F ratings as failing. Ex. 7, Johnson Decl. ¶ 12. Failing schools and districts receive federal Section 1003 funding that may be used for professional development and instructional materials. SUMF ¶ 99. Elementary schools receiving D or F ratings are also assigned literacy coaches. SUMF ¶ 98. Since ATLAS was adopted, the percentage of students performing at proficient or advanced levels has increased by approximately seven percentage points in each assessed content area. SUMF ¶ 118. During the 2025–26 school year, every Arkansas school district except one increased the percentage of its students classified as proficient or advanced. SUMF ¶ 119. The number of school districts receiving D or F ratings declined from 38 in 2024–25 to 26 in 2025–26, while the number of individual public schools receiving those ratings declined from 219 to 192. SUMF ¶¶ 120–21. During that same period, 23 additional school districts received A or B ratings. SUMF ¶ 122.

The LEARNS Act also provides targeted instructional support to public-school students who need additional academic assistance. Through its High-Impact Tutoring Pilot Program, Arkansas provides grants to public school districts and charter schools to cover major costs associated with providing supplemental English Language Arts and Mathematics instruction. SUMF ¶ 101. The Program prioritizes funding for grades and subjects identified by ATLAS assessments as needing improvement. SUMF ¶ 102. Individual student eligibility is determined by factors including assessment results, reading levels, economic disadvantage, attendance, and retention risk. SUMF ¶ 100. High-impact tutoring is provided during the regular school day as a supplement to core academic instruction, in groups of no more than four students, with a consistent

set of tutors providing instruction throughout the school year at least three times per week. Ex. 5, Pride Decl. ¶ 6. During the 2025–26 school year, the Department distributed $16.5 million through the High-Impact Tutoring Pilot Program, with another $20 million set aside for the 2026–27 school year. E SUMF ¶ 103. During the 2025–26 school year, 99 Arkansas public school districts and charter schools participated in the High-Impact Tutoring Pilot Program, serving at least 15,000 students. SUMF ¶ 104. Of the students receiving high-impact tutoring that year, approximately 59 percent increased their ATLAS scale scores from the previous year, and approximately 25 percent advanced by at least one ATLAS performance level. SUMF ¶ 105.

In addition to enhancing the education at public schools, the LEARNS Act also provides options for students who remain enrolled in public schools to supplement their education. Beginning in the 2026–27 school year, the Course Choice Program permits eligible Arkansas public-school students in grades six through twelve to enroll in approved courses not offered at their resident schools. Ark. Code Ann. §§ 6-16-1702 to –1703 (2025); SUMF ¶ 74. Students attending D- or F-rated schools may also take any course required for graduation through the Course Choice Program, provided that they remain enrolled in and attend at least one course at their resident schools. SUMF ¶ 76. Approved course providers include certain public schools rated A, B, or C, postsecondary educational institutions, and online or virtual educational providers. Ex. 5, Pride Decl. ¶ 20; SUMF ¶ 75. When a student takes a course virtually, the resident school must provide a suitable classroom environment and an adult facilitator to supervise group instructional activities and administer assessments. SUMF ¶ 79. Parents are not responsible for the tuition, fees, or materials required for participation. SUMF ¶ 77.

The LEARNS Act also invested in public-school educators. Beginning with the 2023–24 school year, it established a $50,000 minimum base salary for classroom teachers in Arkansas public school districts and open-enrollment public charter schools. SUMF ¶ 106. According to an April 2024 report by a national education nonprofit, the increase made Arkansas the highest-ranked state for starting teacher salaries, adjusted for cost of living. SUMF ¶ 107. The LEARNS Act also established the Merit Teacher Incentive Fund Program, under which eligible public-school educators may receive annual bonuses ranging from $1,500 to $10,000. SUMF ¶ 108. The program also provides financial incentives for educators teaching in geographic areas experiencing teacher shortages or in subjects for which qualified teachers are in short supply. SUMF ¶ 110. These investments in public-school educators may have helped attract educators from neighboring states. SUMF ¶ 114.

The LEARNS Act programs serve different students and needs. Some supplement instruction at public schools; others expand the courses available to public-school students or support the educators who teach them. The Freedom Account Program likewise expands and enhances educational options by allowing eligible families to choose how to use educational assistance for their children. SUMF ¶¶ 3, 42, 74, 93, 101.

### B. The Freedom Account Program is one way the LEARNS Act expands educational options.

The Freedom Account Program provides financial assistance that parents may direct toward approved educational expenses for their children. SUMF ¶¶ 3–5, 25, 42. Over the Freedom Account Program's first three years, eligibility for the Program continued to expand. Beginning last school year (2025–26), a student is eligible if the student had a parent who was an Arkansas

resident and if the student was eligible to enroll in an Arkansas public elementary or secondary school. Ark. Code Ann. § 6-18-2506(a) (2025); SUMF ¶¶ 6–8.

For the 2026–27 school year, the base Freedom Account Program award is $7,208 per participating student. SUMF ¶ 4. If funds are insufficient to fund all Freedom Accounts, priority is given to students in certain categories, such as students who participated in the Freedom Account Program the prior year, disabled students, homeless students, and students who were enrolled in a public school with a "D" or "F" rating the prior year. Ark. Code Ann. § 6-18-2506(b)(1), (3)–(4), (6). Parents apply through the Arkansas Department of Education ("Department"), which reviews applications and determines whether students meet the applicable eligibility requirements. SUMF ¶ 7. Participation does not require enrollment in a private school, although participating students may not simultaneously enroll full-time in public schools. SUMF ¶¶ 9–10.

The Freedom Account Program is not limited to private-school tuition or students attending private schools. Parents may direct their children's funds toward approved expenses such as homeschool curriculum and textbooks, school uniforms, tutoring, educational therapies, transportation to educational-service providers, and expenses related to extracurricular activities. SUMF ¶¶ 3, 16, 22–23, 28. Other qualifying expenses include educational supplies; computers, tablets, and other educational technology; educational software and subscriptions; standardized testing and educational assessments; and qualifying academic enrichment, co-curricular instruction, physical education, and field trips. SUMF ¶¶ 22–23. Families may use Freedom Account Program funds to obtain approved educational services from participating online schools, microschools, learning pods, tutors, therapists, and other approved providers. SUMF ¶¶ 30–33,

83–84. Indeed, Arkansas families have used Freedom Account funds for a range of educational expenses other than private-school tuition. During the 2025–26 school year, Freedom Account expenditures included approximately $31.3 million for curriculum, $15.4 million for educational supplies, $14.9 million for technology, $8.2 million for core and co-curricular instructional services, $7.4 million for extracurricular activities, physical education, and field trips, and $3.7 million for tutoring. SUMF ¶ 24.

Parents also determine which approved schools and educational-service providers receive their children's Freedom Account funds. SUMF ¶ 42. The Department does not instruct parents which educational option to select. SUMF ¶ 44. Rather, the Department deposits funds quarterly into accounts established in participating students' names through ClassWallet, a digital payment platform. SUMF ¶¶ 12–14. Parents direct payments from those accounts to their selected schools or providers, purchase qualifying materials through approved vendors, or seek reimbursement for qualifying purchases. SUMF ¶¶ 16–18, 20. The Department reviews payment and reimbursement requests to ensure that the expenditures satisfy applicable eligibility requirements. SUMF ¶ 26. Although parents control how their children's Freedom Account funds are directed, they do not possess or directly access those funds except through approved reimbursements for qualifying purchases. SUMF ¶ 15. Unused funds may carry forward to the following school year, subject to an $8,500 rollover limit, if the student continues participating in the Freedom Account Program; remaining funds are returned to the State if the student withdraws or does not renew participation. SUMF ¶ 21.

To participate in the program and be eligible to receive Freedom Account funds, private schools must meet accreditation requirements (or have applied for accreditation), "[d]emonstrate

fiscal soundness," certify that they will not discriminate based on race, color, or national origin under 42 U.S.C. § 2000d, and satisfy other criteria. Ark. Code Ann. § 6-8-2507; SUMF ¶ 37; Among other requirements, participating schools must be accredited by an approved accrediting agency and satisfy applicable safety and financial-viability standards. SUMF ¶ 37. But the Department does not consider whether a school is religious or secular when reviewing its application. SUMF ¶ 38. Participating schools include secular private schools, such as Pulaski Academy, as well as Catholic, Protestant, and Muslim schools. SUMF ¶¶ 87–89. Pulaski Academy, a secular private college preparatory school, was among the participating private schools with the highest Freedom Account Program enrollment during the 2025–26 school year. SUMF ¶ 88. Participating private schools also include specialized schools like ACCESS Schools in Little Rock, a 501(c)(3) nonprofit school serving K–12 students with special needs and learning differences across two main campuses and seven host sites throughout the state. SUMF ¶¶ 90–92. During the 2025–26 school year, 140 Freedom Account Program students attended ACCESS Schools, which received approximately $936,488 in Freedom Account funding. SUMF ¶ 92. The Department also approved ACCESS Schools to participate in the Freedom Account Program for the 2026–27 school year, serving students in kindergarten through twelfth grade. SUMF ¶ 90. Participating private schools, like Pulaski Academy and ACCESS Schools, retain autonomy over their curricula and submit their curricula to their accrediting agencies, rather than to ADE. SUMF ¶ 41.

The Freedom Account Program has expanded substantially since its inception. By the 2025–26 school year, participation had increased to 44,524 students, including 16,541 homeschooled students, and 1,295 students attending microschools. SUMF ¶ 54. That year, the

Freedom Account Program included 157 private schools, 108 microschools, and approximately 3,200 approved vendors and educational-service providers. SUMF ¶ 55. As of September 15, 2026, the Department had approved 55,649 students to participate in the 2026–27 school year. SUMF ¶ 56.

**C. Under the LEARNS Act, Arkansas families are empowered to choose the educational option that works best for their children.**

The LEARNS Act, including the Freedom Account Program, enhanced rather than displaced the educational options Arkansas families already had. Families may still choose traditional public schools, public charter schools, private schools, or homeschooling. SUMF ¶ 60. Within the public-school system, Arkansas permits certain transfers between schools within or outside students' resident districts, subject to statutory limitations. SUMF ¶ 62. Arkansas also offers open-enrollment and district-conversion public charter schools, with open-enrollment charter schools drawing students from across district boundaries. SUMF ¶¶ 64, 66–69. Full-time virtual-school options are available to Arkansas students both within and outside the Freedom Account Program. SUMF ¶ 70. Families may also continue enrolling their children in public schools that are benefiting from increased teacher pay, merit bonuses, and literacy coaches. SUMF ¶¶ 98, 106, 108, 100.

For families who elect to participate, the Freedom Account Program simply offers additional educational options. Parents may direct their children's Freedom Account funds toward approved online schools, microschools, tutors, educational therapists, other educational-service providers, or private-school tuition. SUMF ¶¶ 22, 3 –33, 83–84. Participation in the Freedom Account Program does not require private-school enrollment; parents may use Freedom Account funds for a variety of qualifying expenses, including educational materials, tutoring, therapy,

transportation to educational-service providers, and costs incurred to participate in extracurricular activities. SUMF ¶¶ 10, 22–23, 28. During the 2025–26 school year, Freedom Account Program participants had access to approximately 3,200 approved vendors and educational-service providers. SUMF ¶ 55.

Microschools provide another option for Freedom Account Program participants. SUMF ¶ 83. These tuition-based organizations employ instructors or facilitators to provide part-time or full-time academic instruction to groups of homeschooled students in a shared setting. SUMF ¶ 84. During the 2025–26 school year, 108 microschools participated in the Freedom Account Program. SUMF ¶ 55. The Freedom Account Program's approved microschools are located in communities across Arkansas, including smaller cities and towns such as Danville, De Witt, Hazen, Star City, and Yellville. Ex. 8, 2025–26 EFA Annual Report, at 20–22, tbl. 5. For the 2026–27 school year, the Department has approved 156 microschools to participate in the Freedom Account Program. SUMF ¶ 86.

The Freedom Account Program also can increase the resources available to families who choose homeschooling. Parents who decide to homeschool remain subject to Arkansas's notice-of-intent requirements, Ark. Code Ann. § 6-15-503 (2025), but may use Freedom Account funds for qualifying curriculum, tutoring, and other educational expenses without enrolling their children in private schools. SUMF ¶¶ 49–50, 82. Freedom Account Program participants who choose to homeschool may still participate in certain public-school interscholastic activities, subject to traditional homeschooling eligibility requirements. SUMF ¶ 81. And these options are used by thousands of families. During the 2025–26 school year, 16,541 Freedom Account Program participants were homeschooled. SUMF ¶ 54.

Nor does participation in the Freedom Account Program foreclose access to part-time public-school instruction. Although Freedom Account Program participants may not enroll full-time in public schools, "a participating student may take approved courses at a public school participating as an approved provider." Ark. Code Ann. § 6-18-2506(g)(1)(A) (2025); SUMF ¶¶ 9, 71–72. Participating students may enroll in qualifying public-school or open-enrollment charter-school courses if they satisfy applicable residency, academic, and course requirements. SUMF ¶ 72. The State funds up to six such courses per participating student, without charging the student's parents. SUMF ¶ 73. That opportunity is not limited to Freedom Account Program participants, as students attending private schools or homeschools may enroll in individual academic courses at public schools or open-enrollment public charter schools, subject to residency requirements, school policies, and statutory limitations. Ark. Code Ann. § 6-18-232(a)–(b).

The parties' educational choices here illustrate the range of available options in Arkansas. The school-aged children of Plaintiffs Gwen Faulkenberry, Special Renee Sanders, and Kimberly Crutchfield attend public schools and have never participated in the Freedom Account Program. SUMF ¶ 124. The three Intervenors, by contrast, have chosen different educational arrangements for their children and use Freedom Account funds to help meet their children's particular educational needs.

Katie Parrish, for example, initially enrolled her son at Greene County Tech, a traditional public school, in part because he needed speech therapy. SUMF ¶¶ 136–37. But he struggled in school and was repeatedly sent to the office for behaviors Parrish later learned were associated with his autism diagnosis. SUMF ¶ 137. Parrish withdrew him during first grade and enrolled him at Arkansas Virtual Academy, where she believed his specific needs could be better met. SUMF

¶ 136. She subsequently homeschooled him during third and fourth grades so that she could select his curriculum. SUMF ¶ 139. Although she considered homeschooling an improvement, she became concerned about his limited opportunities for socialization as an only child. SUMF ¶ 137. Parrish ultimately selected Arrows Academy, a specialized microschool that combines individualized instruction with therapy for children with autism and provides opportunities for socialization. SUMF ¶ 140. Since enrolling there, Parrish reports improvements in her son's academic performance and conversational abilities. SUMF ¶ 138. He also receives much of his education and therapy in one setting. SUMF ¶ 138. Before the Freedom Account Program, Parrish had considered other educational options but could not afford their tuition. SUMF ¶ 141. She now directs her son's Freedom Account funds toward Arrows Academy's tuition and fees. SUMF ¶ 142. Although the funds do not cover his full tuition, they make it easier for her family to afford his schooling alongside other necessary expenses, including specialized food, footwear, and sensory-related items. SUMF ¶¶ 143–44.

Erika Lara previously enrolled her children in public schools. SUMF ¶ 129. Her older son attended Gibbs Magnet School through fifth grade before enrolling at Horace Mann, where Lara believes the school was unable to meet his specific needs and abilities. SUMF ¶¶ 130–32. She withdrew her son in January 2024 and enrolled him at St. Theresa Catholic School, which offered smaller classes and daily homework. SUMF ¶ 131. In 2025, Lara also withdrew her younger son from public school and enrolled him at St. Theresa after she became eligible to apply for Freedom Account funds. SUMF ¶¶ 129, 131–32. Her older son now attends Catholic High School for Boys, while her younger son remains at St. Theresa. SUMF ¶¶ 132. Lara had previously considered smaller private schools but could not afford them. SUMF ¶ 132–33. Without the Freedom Account

Program, she could not afford to continue sending her children to their current schools. SUMF ¶ 133. Lara directs the tuition payments herself: after receiving an invoice, she logs into ClassWallet and initiates a transaction, which must be reviewed and approved before payment issues. SUMF ¶ 134. Lara admits that she freely chose to enroll her children at St. Theresa Catholic School and to direct their Freedom Account funds to that school. SUMF ¶ 135.

Nikita Glendenning's family illustrates a different use of the Freedom Account Program. She has educated her children through public schools, private schools, and homeschooling, choosing different arrangements at different stages to accommodate their educational and social needs. SUMF ¶ 146. Her two youngest children have been homeschooled since kindergarten, beginning in 2020 and 2023, respectively. SUMF ¶¶ 147–48. Glendenning chose homeschooling because it allows her to tailor instruction to her children's strengths, weaknesses, and interests, including providing more challenging material when appropriate and devoting additional attention to subjects in which they struggle. SUMF ¶ 149. Before receiving Freedom Account Program assistance, however, she often could not afford supplemental curriculum materials or specialized tutoring beyond the basic costs of homeschooling. SUMF ¶ 149. Freedom Account Program funds have allowed her to pursue additional educational opportunities, including tutoring, workbooks, educational applications, piano lessons, gymnastics, musical equipment, and other learning supplies. SUMF ¶ 151. For Glendenning, the Freedom Account Program has expanded the resources available for the homeschooling arrangement she independently chose before the LEARNS Act was enacted. SUMF ¶¶ 148–153.

Although these families selected different educational arrangements, the Intervenor-Defendants acknowledge that public-school options remain available. SUMF ¶ 155. They also

acknowledge that the Freedom Account Program has not coerced, compelled, or pressured them to adopt any religious beliefs or direct Freedom Account funds toward religious educational options. SUMF ¶¶ 158, 160.

### D. Plaintiffs Challenged the Freedom Account Program.

On June 13, 2025, two years after the LEARNS Act was enacted, three parents and one legal guardian (collectively, "Plaintiffs") filed this lawsuit challenging the Freedom Account Program and alleging that the LEARNS Act violates the Establishment Clause and Equal Protection Clause of the U.S. Constitution, along with Article 2, § 24 of the Arkansas Constitution. Compl. ¶¶ 10–13, 62–81. Plaintiffs allege that "approximately eighty percent (80%)" of currently participating schools "are sectarian (i.e., religious-affiliated or sponsored) schools," *id.* ¶ 38, and that EFA Account funds have been directed to "Protestant, Catholic, Jewish and Muslim private schools," *id.* ¶ 69. Plaintiffs conclude that allowing parents to direct Freedom Account funds to "private sectarian schools" furthers "religious beliefs and doctrines held and advocated by the religion, church or other organization that is the school's sponsor" and "fosters an excessive government entanglement with religion" that "is a violation of the Establishment Clause" of the U.S. Constitution. Id. ¶ 42. Plaintiffs also alleged equal protection claims and state constitutional claims, *see generally id.* ¶ 1, but those claims have all been dismissed, ECF No. 38.

On July 9, 2025, three parents whose children participate in the Freedom Account Program—Lara, Parrish, and Glendenning—moved to intervene as defendants to defend the Program. ECF Nos. 2–3. Defendants moved to dismiss on July 28, 2025. ECF No. 9. On October 24, 2025, the Little Rock School District moved to intervene as a plaintiff, ECF No. 20, which Defendants opposed, ECF No. 22.

On February 17, 2026, the Court held a hearing on the pending motions. ECF No. 37. At the hearing, Plaintiffs orally moved to voluntarily dismiss their equal-protection claims, and the Court granted that motion. *Id.* The next day, the Court granted Defendants' motion to dismiss in part and denied it in part, permitting Plaintiffs' federal Establishment Clause claim to proceed and dismissing their remaining claims without prejudice. ECF No. 38, at 2. The Court also dismissed Governor Sanders as a defendant and granted the three parents' motion to intervene in support of Defendants. ECF No. 38, at 2. The Court explained that Little Rock School District's motion to intervene in support of Plaintiffs remains under submission and requested supplemental briefing on Little Rock School District's standing. *Id.* The parties have since completed that briefing, ECF Nos. 39–40, 44, 46, and Little Rock School District's motion remains pending, ECF No. 20.

On February 27, 2026, the Court issued its Final Scheduling Order. ECF No. 41. The parties thereafter conducted discovery concerning the Freedom Account Program and Plaintiffs' allegations. Following an extension, Plaintiffs' responses to Defendants' discovery requests were due on November 9, 2026. ECF No. 58. As of the date of this filing, Plaintiff Crutchfield's responses to Defendants' interrogatories remain outstanding. As noted in the parties' November 12, 2026 joint status report, Plaintiffs' counsel reported that he had been unable to communicate with Plaintiff Crutchfield and is attempting to obtain her remaining discovery responses and verifications. ECF No. 63, at 2. Defendants therefore move for summary judgment on the existing record. Should Plaintiff Crutchfield subsequently provide information material to this motion, Defendants will seek leave to supplement their submissions if appropriate.

# ARGUMENT

## I. Plaintiffs Lack Article III Standing Because Any Injury Is Not Fairly Traceable to Defendants.

The Court should enter judgment for Defendants because Plaintiffs lack Article III standing—"a jurisdictional prerequisite that must be resolved before reaching the merits." *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007). Article III limits the jurisdiction of federal courts to actual cases and controversies, so a plaintiff invoking federal jurisdiction must establish (1) a concrete and particularized injury in fact, (2) a causal connection making that injury fairly traceable to the defendant rather than to the independent action of a third party not before the court, and (3) a likelihood that a favorable decision will redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). At the summary-judgment stage, Plaintiffs may no longer rest on allegations but must set forth specific facts, by affidavit or other evidence, establishing each element. *Id.* at 561.

Plaintiffs cannot carry that burden. Suing only as taxpayers, they assert the kind of generalized grievance that Article III has always placed outside the judicial power. *See id.* at 575–576. Although the narrow *Flast* exception sometimes allows taxpayers to raise an Establishment Clause challenge, it does not relieve them of showing causation. *See Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 143 (2011). On this record, Plaintiffs have failed to show that their taxpayer injuries are fairly traceable to Defendants' allegedly unlawful conduct. Any aid that reaches a religious school does so only through a parent's independent choice, an intervening decision that severs the chain between the State's appropriation and Plaintiffs' asserted injury. *See id.* Plaintiffs accordingly lack standing.

### A. Article III generally prohibits taxpayers from challenging government expenditures based solely on their disagreement with how public funds are used.

Defendants preserve the argument that Plaintiffs lack taxpayer standing to assert their claims. After all, the record contains no evidence that any Plaintiff suffered a particularized Establishment Clause injury. *See id.* at 134 (defining a particularized injury as one that "affect[s] the plaintiff in a personal and individual way" (citation omitted)). None of Plaintiffs' children attend a religious private school, none of them participate in the Freedom Account Program, and Plaintiffs have no intentions for their children to participate in the Freedom Account program in the future. SUMF ¶¶ 124–26, 128. Instead of providing evidence of particularized injuries, Plaintiffs assert standing as Arkansas taxpayers. ECF No. 1, ¶¶ 10–13; Hr'g Tr. at 38:21–40:13. But generally, "the interest of a [state] taxpayer in seeing that [state] funds are spent in accordance with the Constitution does not give rise to the kind of redressable 'personal injury' required for Article III standing." *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 599 (2007). In *Flast v. Cohen*, 392 U.S. 83 (1968), however, the Supreme Court recognized "a narrow exception to the general constitutional prohibition against taxpayer standing" for Establishment Clause claims. *Hein*, 551 U.S. at 602. The *Flast* exception is inconsistent with Article III and separation-of-powers principles, but Defendants recognize this Court is bound by it. Accordingly, Defendants simply preserve their argument that "*Flast* should be overruled," including for the reasons articulated by Justice Scalia. *See id.* at 637 (Scalia, J., concurring in the judgment).

Regardless, the *Flast* exception does not extend to every government program that incidentally benefits religious institutions. *See Winn*, 563 U.S. at 138–39. It is instead limited "to challenges directed 'only [at] exercises of congressional power' under the Taxing and Spending Clause." *Hein*, 551 U.S. at 604 (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of*

*Church & State, Inc.*, 454 U.S. 464, 479 (1982)). Accordingly, under *Flast* standing alone, Plaintiffs still lack standing. But Defendants note the Eighth Circuit has extended the *Flast* exception "to state taxpayer challenges of state expenditures contrary to the Establishment clause" in *Americans United for Separation of Church and State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 420 (8th Cir. 2007), which is binding on this Court. Defendants thus simply preserve the argument that the Eighth Circuit was mistaken to extend the *Flast* exception, and that a future en banc panel should walk back that extension based on the Supreme Court's continued refusal to extend *Flast*. *See Hein*, 551 U.S. at 610. In short, Defendants preserve their argument that the *Flast* exception does not apply to state expenditures, while acknowledging that this Court is bound by contrary precedent.

**B. Under *Winn*, Plaintiffs cannot establish taxpayer standing because any injury flows from the independent choices of parents, defeating causation.**

Nevertheless, even under the *Flast* exception as extended by the Eighth Circuit, Plaintiffs do not have a justiciable claim to challenge the Freedom Account Program. That's because clearing the *Flast* threshold establishes only the first element of standing; it does not relieve a plaintiff of the independent obligation to show that the challenged conduct causes the asserted injury. *See Winn*, 563 U.S. at 143. Plaintiff cannot satisfy that obligation.

Where a plaintiff's asserted injury depends on the independent choices of third parties not before the court, standing is substantially more difficult to establish. *See Lujan*, 504 U.S. at 561--62. A plaintiff in that posture must show that the third parties will likely react in the ways needed to produce the injury, and at summary judgment, the plaintiff must support that contention with specific facts rather than allegations. *See California v. Texas*, 593 U.S. 659, 675 (2021).

The Supreme Court applied these principles to a school-aid program in *Winn* and held them fatal to taxpayer standing. *See* 563 U.S. at 143. The Court explained that when private

individuals, rather than the government, independently decide where to distribute educational funds, any resulting aid to religious schools is not "fairly traceable to the government." *Id. Winn* thus confirms that a State inflicts no cognizable injury on taxpayers when it administers a religiously neutral program that channels education funds through private choice. *See id.*

Because the Freedom Account Program distributes funds based on parents' independent choices, *Winn*'s reasoning controls here. The State disburses funds into students' ClassWallet accounts, and then parents choose where to send those funds. SUMF ¶¶ 13, 42. The decision whether to direct funds to a particular private school, online school, or microschool, or to homeschool, rests with the parent. SUMF ¶¶ 45, 49, 51. Funds are paid to the school or provider the parent selects. SUMF ¶ 16. The intervenor parents provide a useful illustration of how parents can freely direct their children's Freedom Account funds to a variety of education options: Lara directs her child's funds to a Catholic school, SUMF ¶ 135, Parrish directs her child's funds to a microschool serving children with autism, SUMF ¶¶ 140, 142, and Glendenning uses her child's funds to pay for homeschooling costs, SUMF ¶ 151. All Intervenors agree that they freely choose to direct their child's Freedom Account funds to their preferred educational option. SUMF ¶¶ 135, 145, 153. As the above examples show, the State's role, for all relevant purposes, ends when it disburses the funds to a student's ClassWallet account, and only a parent's private choice can cause funds to reach a religious school. *See Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002) ("Because the program ensured that parents were the ones to select a religious school as the best learning environment for their handicapped child, the circuit between government and religion was broken, and the Establishment Clause was not implicated."). Because any funds reaching religious private schools is the result of these independent parental choices, Plaintiffs' asserted injury is not

fairly traceable to the State. *See Winn*, 563 U.S. at 143. Plaintiffs accordingly do not have standing to seek "a permanent injunction enjoining the Defendants from any further actions related to the establishment, implementation, or administration of the [Freedom Account] program." ECF No. 1, at 35; *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek.").

### C. Plaintiffs have no particularized injury and have not produced evidence to support an as-applied challenge.

Independent of their status as Arkansas taxpayers, Plaintiffs lack any concrete, particularized connection to the Freedom Account Program. Each Plaintiff with school-aged children has them in public school, SUMF ¶ 124, one plaintiff has no children at all, SUMF ¶ 128, and none have participated or intend to participate in the Freedom Account Program, SUMF ¶ 126. These are not plaintiffs who have encountered the program and been harmed by it; they are taxpayers objecting in the abstract to how the State spends public money.

Even if Plaintiffs could conceivably have standing to challenge some hypothetical applications of the Freedom Account Program under the *Flast* exception, there is no evidence that any parents have been coerced to send their children to religious private schools. *See Zelman*, 536 U.S. at 655–56 ("The Establishment Clause question is whether [the State] is coercing parents into sending their children to religious schools."). If particular individuals ever allege that the Freedom Account Program has caused them an Establishment Clause injury, those individuals may bring an as-applied claim in some circumstances. *See Winn*, 563 U.S. at 145. But because there is no evidence in the record of such an alleged injury here, the case-or-controversy requirement for an as-applied challenge "has not been satisfied." *Id.*; *see Coleman v. Watt*, 40 F.3d 255, 259 (8th

Cir. 1994) ("A speculative or hypothetical claim of future injury is insufficient to generate standing."). This Court therefore should grant Defendants summary judgment because Plaintiffs lack standing to assert their only remaining claims.

## II. The Freedom Account Program Does Not Violate the Establishment Clause under the *Zelman* Line of Cases.

The Freedom Account Program does not violate the Establishment Clause. In arguing otherwise, Plaintiffs have relied only on elements from the discredited test from *Lemon v. Kurtzman*, 403 U.S. 602 (1971). Plaintiffs contend that the Freedom Account Program violates the Establishment Clause because public funds reach religious schools that incorporate religious beliefs into their curricula. Compl. ¶¶ 6, 41–42. In Plaintiffs' view, those payments advance religion and foster excessive governmental "entanglement" with religious institutions. Compl. ¶ 42; Hr'g Tr. 37:24–38:4. Plaintiffs' alleged establishment claims thus rely on *Lemon* and related decisions in arguing that the Freedom Account Program impermissibly advances religion and creates excessive governmental entanglement. Compl. ¶ 42 (citing *Lemon* and four cases from 1971 to 1977).

But the Supreme Court has officially rejected the *Lemon* test, explaining that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)), and government aid to religious schools is consistent with historical practice, *see Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 480–81 (2020), *infra* 35-36. In any event, long before *Kennedy*, the Supreme Court had already repeatedly rejected constitutional challenges to government programs that provide aid on religiously neutral terms and that "aid reaches religious schools only as a result of the genuine and independent choices of private individuals." *See, e.g.*, *Zelman*, 536 U.S. 649–53. Under this line of cases, the Freedom

Account Program is constitutional as a matter of law. That's because the Freedom Account Program makes educational assistance available without regard to religion, permits families to choose among a variety of secular and religious educational options—including schools, programs, and services—and leaves decisions about where to direct a set amount of funds to the parents. Plaintiffs' establishment claims thus fail, and Defendants are entitled to summary judgment under the *Zelman* line of cases.

**A. Government programs that are neutral do not violate the Establishment Clause simply because some aid is directed towards religious schools as a result of private choices.**

Multiple Supreme Court decisions establish that neutral educational-assistance programs that allow individuals to direct government benefits to religious institutions do not violate the Establishment Clause. *See, e.g., Zelman*, 536 U.S. at 649–50; *Espinoza*, 591 U.S. at 474; *Locke v. Davey*, 540 U.S. 712, 725 (2004). For example, in *Zelman*, the Supreme Court held an Ohio scholarship program that permitted parents to use publicly funded scholarships toward tuition at participating religious and secular private schools was constitutional. 536 U.S. at 643–44, 662–63. The Supreme Court explained that it had previously "rejected" similar "challenges to neutral government programs that provide aid directly to a broad class of individuals, who, in turn, direct the aid to religious schools or institutions of their own choosing." *Id.* at 649; *see, e.g., Mueller v. Allen*, 463 U.S. 388 (1983); *Witters v. Wash. Dep't of Servs. for the Blind*, 474 U.S. 481 (1986); *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1 (1993). From these cases, the Supreme Court reasoned that as long as a government aid program was "neutral with respect to religion and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious

schools wholly as a result of their own genuine and independent private choice," it would be permissible under the Establishment Clause. *Zelman*, 536 U.S. at 652.

Applying that two-step inquiry of neutrality and private choice, *Zelman* examined both the Ohio program's religious neutrality and the educational choices available to Cleveland families. *Id.* at 653–60. There, Ohio's scholarship program was neutral because the program permitted the participation of all schools, "religious or nonreligious," and the program benefits were "available to participating families on neutral terms, with no reference to religion." *Id.* at 653. As to private choice, there "[wa]s no evidence that the program fail[ed] to provide genuine opportunities for Cleveland parents to select secular educational options for their school-age children." *Id.* at 655. Students had the opportunity to "remain in public school with publicly funded tutoring aid," obtain a scholarship to attend private school, or attend a community school or magnet school. *Id.* Although 82 percent of participating private schools were religiously affiliated and 96 percent of scholarship recipients attended religious schools, *id.* at 647, 657–58, the relevant "Establishment Clause question [wa]s whether Ohio [wa]s coercing parents into sending their children to religious schools," which required evaluating "*all options* Ohio provides Cleveland schoolchildren." *Id.* at 655–56 (second emphasis added). The Supreme Court thus rejected an approach that would "attribute constitutional significance to [the 82%] figure," as such an approach "would lead to the absurd result that a neutral school-choice program might be permissible in some parts of Ohio but not in inner-city Cleveland, where the preponderance of religious schools happens to be greater," or where "an identical private school choice program might be constitutional in some States, . . . but not in others" with a higher percentage of private religious schools. *Id.* at 657–58. Accordingly, consistent "with an unbroken line of decisions rejecting challenges to similar programs," the

Supreme Court held that Ohio's scholarship program "d[id] not offend the Establishment Clause," because it was "entirely neutral with respect to religion," and it permitted parents "to exercise genuine choice among options public and private, secular and religious." *Id.* at 662–63.

Recently, when analyzing a challenge under the Free Exercise Clause, the Supreme Court reaffirmed that "the Establishment Clause is not offended when religious observers and organizations benefit from neutral government programs." *Espinoza*, 591 U.S. at 474. It then went further, explaining that while "[a] State need not subsidize private education," if it "decides to do so, it cannot disqualify some private schools solely because they are religious." *Id.* at 487. *Espinoza* thus shows not only that an Establishment Clause challenge to a neutral government program is "unavailing" where government support goes to religious schools "only as a result of [a State's residents] independently choosing to spend their scholarships at such schools," but also that prohibiting government aid to private religious school while allowing it to flow to secular private schools would create a free exercise problem. *Id.* at 474, 487; *see Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) (explaining that "denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion").

Therefore, under the *Zelman* test, the Freedom Account Program is constitutional as long as funds are distributed on religiously neutral terms and reaches religious institutions through independent private choices. *Zelman*, 536 U.S. at 652–56; *Espinoza*, 591 U.S. at 474. As explained below, the undisputed record establishes both requirements.

### B. The Freedom Account Program is constitutional under the *Zelman* test because it distributes funds and approves applications according to neutral eligibility criteria based on parental choice.

Because the Freedom Account Program is neutral with respect to religion, and parents exercise genuine, independent choice in determining how to use their children's Freedom Account funds, Plaintiffs' establishment claims fail under *Zelman* and related cases. Plaintiffs' reliance on the religious affiliation of participating schools, the proportion of participating schools that are religiously affiliated, and the funding those schools receive does not establish otherwise. Defendants are therefore entitled to summary judgment.

#### *3. The Freedom Account Program is a permissible neutral government program under* **Zelman.**

Plaintiffs have no evidence that the Freedom Account Program favors religious schools over secular schools or is otherwise not neutral in regards to religion. To the contrary, the undisputed evidence shows that the program is neutral under *Zelman*. *See* 536 U.S. at 652–56.

The Freedom Account Program makes educational assistance available to eligible Arkansas students on a neutral basis—without regard to their religious beliefs or the religious character of the educational options their parents select. SUMF ¶¶8, 29, 38–40. The Freedom Account Program initially limited eligibility to specified categories of students—including students with disabilities, foster children, and students attending low-performing public schools—before expanding to universal eligibility in the 2025–26 school year. SUMF ¶ 6. Since then, a student has been eligible to participate if the student: (1) "[h]as a parent who is a resident of the State of Arkansas," and (2) "[i]s eligible to enroll in a public elementary or secondary school" in Arkansas. Ark. Code Ann. § 6-18-2506(a) (2025); SUMF ¶¶ 6, 8. Neither requirement turns on religion. Participating students also receive funds on a neutral basis. For the present 2026–27 school year,

participating students receive a base award of $7,208 in Freedom Account funds, while former Succeed Scholarship participants receive $8,011, subject only to general eligibility and funding criteria. SUMF ¶ 4. Those amounts are based on a fixed percentage of the prior year's statewide foundation funding per student. Ark. Code Ann. § 6-18-2505(a). If available funding is insufficient, the statute prioritizes applicants based on factors such as prior participation, disability, homelessness, and previous attendance at a low-performing public school. Ark. Code Ann. § 6-18-2506(b)(1), (3)–(4), (6). Neither those funding rules nor the program's general eligibility requirements distinguish between families seeking religious education and those seeking secular education. SUMF ¶¶ 8, 29, 38–40. Indeed, the Freedom Account Program's eligibility criteria are *broader* than those considered in *Zelman*, where educational assistance was limited to families residing in Cleveland's failing school district. *See Zelman*, 536 U.S. at 644–45, 653. Yet the Supreme Court held that Ohio's program was neutral because it made assistance available without reference to religion and preferred low-income families, not religious education. *Id.* at 653–54. Arkansas likewise determines Freedom Account eligibility and allocates funds based on factors unrelated to religion, satisfying the neutrality prong of the *Zelman* inquiry.

The Freedom Account Program likewise imposes neutral eligibility requirements on participating schools. Schools must satisfy applicable accreditation, safety, and financial-viability requirements, among other criteria. SUMF ¶ 37. The Department does not consider whether a school is religious or secular when reviewing its application. SUMF ¶ 38. As a result, participating institutions include secular private schools, such as Pulaski Academy, as well as Catholic, Protestant, and Muslim schools. SUMF ¶¶ 87, 89. The Freedom Account Program's requirements neither give religious schools preferential access to funds nor exclude schools because of their

religious affiliation. The Department does not classify or otherwise track participating schools by religious affiliation. SUMF ¶¶ 39.

Plaintiffs' allegations about the religious affiliation of participating schools or their curricula do not establish otherwise. Plaintiffs allege that approximately 80 percent of participating private schools are religiously affiliated and that, in 2023, nine of the ten schools receiving the most Freedom Account funding—and twenty-eight of the top thirty—were religious schools. Compl. ¶ 38; Hr'g Tr. 34:10–24. But even if Plaintiffs had evidence to substantiate those allegations, they still do not show that Arkansas favors religious schools or that participating families lack genuine secular alternatives as a matter of law. Indeed, *Zelman* rejected an Establishment Clause challenge even where a greater percentage of schools were religious (82 percent) and where 96 percent of scholarship recipients attended religious schools. 536 U.S. at 657–60. And in doing so, the Supreme Court expressly rejected attributing "constitutional significance" to such percentages, warning that "would lead to the absurd result that a neutral school-choice program might be permissible" in some parts of a State, but not others, or in one State but not another. *Id.* at 657–58. Thus, whatever the prevalence of religious schools receiving Freedom Account funds, the Freedom Account Program is still neutral and does not favor religious options over secular options.

Indeed, the undisputed record establishes that the Department evaluates schools under requirements unrelated to their religious character. SUMF ¶¶ 37–40. There is no evidence of a different eligibility standard for religious schools, no preference for religious schools in the approval process, nor any funding advantage tied to religious affiliation. And the amount of funding a school receives may reflect the number of parents who select it, but it does not establish any preference by the Department for any particular religious affiliation or lack of religious affiliation. Accordingly,

the undisputed evidence establishes that the Freedom Account Program is neutral toward religion under the *Zelman* analysis.

#### *4. The Freedom Account Program increases parents' options and funds are distributed based on individual private choices.*

The Freedom Account Program is also a "true private choice program[]" under *Zelman*. 536 U.S. at 649. Although Plaintiffs focus on the percentage of parents who freely choose to send their children to religious schools and direct Freedom Account funds to tuition payments, they overlook that percentages don't have constitutional significance and ignore that private individuals are making independent choices. *See id.* at 657–58. In any event, under *Zelman*, courts must consider "*all* options" available to families in determining whether the State is "coercing parents into sending their children to religious schools." 536 U.S. at 655–56. Indeed, the Supreme Court considered traditional public schools, community schools, magnet schools, and publicly funded tutoring alongside private-school scholarships in determining whether Ohio afforded parents genuine educational choices. *Id.* at 655. Applying that inquiry here, Arkansas provides parents with multiple educational options under the LEARNS Act generally and under the Freedom Account Program specifically. Indeed, far from restricting private choices or pressuring parents, the LEARNS Act and Freedom Account Program empower parents by increasing and enhancing the educational options in Arkansas. *See supra* 5-13.

The record establishes that parents and guardians choose where their children's Freedom Account funds are directed, subject to general requirements governing approved educational expenses, schools, and providers. SUMF ¶¶ 25–26, 42, 44. The Department places Freedom Account funds into individual student accounts through ClassWallet, a digital payment platform. SUMF ¶¶ 12–14. Parents then direct payments to their selected participating schools or

educational-service providers, purchase qualifying educational materials, or request reimbursement for approved expenses. SUMF ¶¶ 16, 18, 20, 42. Although the Department reviews expenditures for compliance with applicable program requirements, it does not instruct parents which educational option to select and places no thumb on the scale for religious options. SUMF ¶¶ 26–27, 44. Thus, if Freedom Account funds reach a religiously affiliated school or service provider, it is because of the independent, private choice of the parent "not . . . the government." *Zelman*, 536 U.S. at 652.

Nor is there evidence that Arkansas families lack a "full opportunity to expend" Freedom Account funds on "wholly secular" programs or to choose free secular educational options for their children, such as traditional public schools and charter schools. *Americans United*, 509 F.3d at 425–26 (cleaned up); *Zelman*, 536 U.S. at 655 (emphasizing there was "no evidence that the program fail[ed] to provide genuine opportunities for Cleveland parents to select secular educational options"). To the contrary, the record here is replete with evidence of ways that Arkansas parents can direct Freedom Account funds to numerous secular options, including secular private schools, micro-schools, homeschooling, online schools, learning pods, tutoring, educational therapies, curriculum and textbooks, educational technology, academic enrichment, and other approved educational services and materials. *Supra* 10–19. Participation in the Freedom Account Program does not require a student to attend a religious school—or any private school at all. SUMF ¶¶ 10, 22–23, 28, 83–84.

Nor are those alternatives merely theoretical. During the 2025–26 school year, 44,524 students participated in the Freedom Account Program, including 16,541 homeschooled students and 1,295 students attending microschools. SUMF ¶ 54. Participating families had access to 157

approved private schools, 108 microschools, and approximately 3,200 approved vendors and educational-service providers. SUMF ¶ 55. And participating families used Freedom Account funds for a wide range of educational expenses beyond private-school tuition. During that school year, Freedom Account Program expenditures included approximately $31.3 million for curriculum, $15.4 million for educational supplies, $14.9 million for technology, $8.2 million for core and co-curricular instructional services, $7.4 million for extracurricular activities, physical education, and field trips, and $3.7 million for tutoring. SUMF ¶ 24. These expenditures demonstrate that Arkansas families have exercised their freedom to direct assistance toward educational options and services beyond private-school tuition.

And parents who prefer private-school education are not limited to religious institutions. During the 2025–26 school year, Pulaski Academy, a secular private school, enrolled 1,173 Freedom Account students and received approximately $8 million in Freedom Account funds directed by Arkansas parents. SUMF ¶¶ 87–88. Participating private schools also include specialized institutions such as ACCESS Schools, which serve students with special needs and learning differences. SUMF ¶¶ 90–92. Plaintiffs' focus on tuition payments to religious schools thus ignores both the availability of secular private schools and the substantial assistance Arkansas parents have directed toward other educational options.

Intervenors' experiences further illustrate that the Freedom Account program is a true private choice option. Parrish initially enrolled her son in a traditional public school, then selected virtual schooling and homeschooling, and ultimately enrolled him in a specialized microschool that combines individualized instruction with therapy for children with autism. SUMF ¶¶ 136–45. In contrast, Lara opted to enroll her children in private Catholic schools that she believed better suited

their educational needs. SUMF ¶¶ 129–35. And Glendenning illustrates yet another use of the Freedom Account Program. She selected homeschooling for her two youngest children before the LEARNS Act was enacted and subsequently used Freedom Account funds to supplement that arrangement with tutoring, educational applications, workbooks, and extracurricular learning opportunities. SUMF ¶¶ 146–53. Each Intervenor freely and independently selected the educational option that was best for her child and directed their Freedom Account funds accordingly. SUMF ¶¶ 135, 145, 153. Although Lara selected religious institutions, her decision was no less independent than Parrish's and Glendenning's decision. Under *Zelman*, any resulting benefit to Lara's chosen schools is attributable to her independent decision, not a governmental preference for Catholic education. 536 U.S. at 652–53. What's more, Intervenors acknowledge that public-school alternatives remain available and that the Freedom Account Program has not compelled or pressured them to select religious education. SUMF ¶¶ 154–60.

Intervenors' admissions are unsurprising, because Arkansas offers myriad educational options even beyond the Freedom Account Program itself. Arkansas families may enroll their children in traditional public schools or public charter schools, and they can choose to transfer their children to different public schools. SUMF ¶ 60, 62, 64, 66. Full-time virtual-school options are available both within and outside the Freedom Account Program. SUMF ¶ 70.

Nor are the public-school options and Freedom Account Program always mutually exclusive. Although Freedom Account participants may not enroll full-time in public schools, they may take qualifying public-school or open-enrollment charter-school courses part-time. SUMF ¶¶ 9, 71–72. Arkansas funds up to six such courses per participating student without charging the student's parents. SUMF ¶¶ 72–73. Homeschooled students may also participate in certain

public-school extracurricular activities, subject to applicable eligibility requirements. SUMF ¶ 81. Thus, participating in the Freedom Account Program does not necessarily foreclose public-school instruction or extracurricular opportunities. Across the board, the LEARNS Act expands choices and enhances educational options, rather than limiting choices or detracting from public-school options.

After all, the LEARNS Act also improves educational opportunities at public schools, including by increasing salaries to attract and retain well-qualified and effective educators. *See supra* 4-9. The LEARNS Act's Course Choice Program, for example, permits eligible public-school students in grades six through twelve to take approved courses unavailable at their resident schools, including courses offered by postsecondary institutions, vocational or technical providers, and online educational providers, without requiring parents to pay tuition, fees, or instructional-material costs. SUMF ¶¶ 74–77. The LEARNS Act also establishes literacy and high-impact tutoring programs for eligible public-school and charter-school students. SUMF ¶¶ 93–105. During the 2025–26 school year, the High-Impact Tutoring Pilot Program served at least 15,000 students across 99 participating public-school districts and charter schools. SUMF ¶ 104. These educational opportunities further demonstrate that the LEARNS Act expands the educational options available to families and that Defendants are fostering individual choice, not directing parents to one option—much less a religious option.

In sum, Plaintiffs have no evidence that the Freedom Account Program somehow deprives parents of their ability to make a private, independent choice about whether to have their children participate in the Program and, if so, where to direct their funds. That is because it doesn't. As Defendants' evidence establishes, Arkansas parents have genuine opportunities to select secular

educational options, and thousands have actually used Freedom Account assistance for educational arrangements and expenses other than religious private-school tuition. Accordingly, both *Zelman* requirements are met here, because the Freedom Account Program is *neutral* toward religion, and private individuals decide where to direct the funds. Defendants are thus entitled to summary judgment under the *Zelman* line of cases. That some parents choose religious schools—and that those schools receive Freedom Account funds as a result—is precisely what the Supreme Court has held constitutionally permissible. *Zelman*, 536 U.S. at 652–53; Espinoza, 591 U.S. at 474.

## III. The Freedom Account Program is Consistent with Historical Practices and Understandings.

Plaintiffs assert that the Freedom Account program violates the Establishment Clause because some funds ultimately are directed to religious schools. ECF No. 1, ¶¶ 62–70. They built their claim on *Lemon v. Kurtzman* and its excessive-entanglement test, *id.* ¶ 67, but that framework is no longer the law, *see Kennedy.*, 597 U.S. at 534–35. The Supreme Court has replaced *Lemon* with an inquiry into historical practices and understandings to determine whether the challenged practice bears the "hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id.* at 535–37. Under this test, courts should first determine whether "history shows that the specific practice is permitted." *New Doe Child #1 v. United States*, 901 F.3d 1015, 1021 (8th Cir. 2018) (quoting *Galloway*, 572 U.S. at 577). If it does, the Establishment Clause claim fails. *Id.* If history is silent as to the specific practice at hand, courts should "look to the historical understandings of the Establishment Clause as informed by other relevant practices." *Id.* In other words, they should focus on "original meaning and history," assessing whether the challenged practice or law implicates the "hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Kennedy*, 597 U.S. at 536–37. And it is

Plaintiffs' burden to show that the challenged law or action "resembles one of these hallmarks of religious establishment." *Hilsenrath ex rel. C.H. v. Sch. Dist. of Chathams*, 136 F.4th 484, 491 (3d Cir.), *cert. denied sub nom.*, 146 S. Ct. 885 (2025); *see Nathan v. Alamo Heights Indep. Sch. Dist.*, 173 F.4th 576, 594 (5th Cir. 2026) (en banc); *Firewalker-Fields v. Lee*, 58 F.4th 104, 122 n.7 (4th Cir. 2023).

Because Plaintiffs cannot carry their burden and lack any evidence to support their claim that the LEARNS Act violates the Establishment Clause, Defendants are entitled to summary judgment. Not only is there no evidence to support Plaintiffs' claim, but also the evidence rebuts it. Evidence establishes that the LEARNS Act and Freedom Account Program are consistent with historical practices and understandings. Indeed, providing financial support to religious private schools was permitted during founding era, and the Freedom Account Program exhibits none of the historical hallmarks of a religious establishment. Plaintiffs' Establishment Clause claims therefore fail as a matter of law.

**A. Providing financial support to religious private schools was historically permitted.**

As the Supreme Court recognized in *Espinoza*, there is a long history of various levels of "governments provid[ing] financial support to private schools, including denominational ones." 591 U.S. at 480–81 "[E]arly state constitutions and statutes actively encouraged this policy," and "[l]ocal governments provided grants to private schools, including religious ones, for the education of the poor." *Id.* (citation omitted). Indeed, even when States banned "government-supported clergy," many still "provided various forms of aid to religious schools." *Id.* at 481. The federal government likewise provided financial support to religious schools, including through land grants. *Id.*. Congress also "provided support to denominational schools in the District of Columbia until 1848, and Congress paid churches to run schools for American Indians through the end of the 19th

century." *Espinoza*, 591 U.S. at 481 (citation omitted). And federal support for religious schools continued after the Civil War as well, with Congress spending "large sums on education for emancipated freedmen, often by supporting denominational schools in the South through the Freedmen's Bureau." *Id.* Based on this history (and despite some anti-Catholic laws in the second half of the 19th century prohibiting aid from going to "sectarian" schools), the Supreme Court concluded that "there is no 'historic and substantial' tradition against aiding [private religious] schools." *Id.* at 482-83;*cf. Marsh v. Chambers*, 463 U.S. 783, 794 (1983) (recognizing that Congress and many States have historically compensated chaplains); Mark David Hall, Andrea Picciotti-Bayer, *Ten Commandments in the Public Square and Public Schools*, 34 Wm. & Mary Bill Rts. J. 175, 189 (2025) (same). That is unsurprising because "virtually every federal official in the early republic, including James Madison and Thomas Jefferson, used federal funds to directly support schools run by religious groups." *Nathan S. Chapman, Forgotten Federal-Missionary Partnerships: New Light on the Establishment Clause*, 96 Notre Dame L. Rev. 677, 680 (2020).

Accordingly, both precedent and history establish that the "specific practice" of providing aid to religious schools in a neutral manner was historically permitted. *See New Doe Child #1*, 901 F.3d at 1021 (quoting *Galloway*, 572 U.S. at 577). That means Plaintiff's establishment claims fail, and the Court should grant summary judgment for Defendants.

**B. The Freedom Account Program exhibits none of the historical hallmarks of establishment.**

The Freedom Account program bears none of the historical hallmarks of a religious establishment. In Justice Gorsuch's concurrence in *Shurtleff v. City of Boston*, 596 U.S. 243 (2022), he identified six hallmarks of a religious establishment:

(1) the government exert[ing] control over the doctrine and personnel of the established church[;]

(2) the government manda[ting] attendance in the established church and punish[ing] people for failing to participate[;]

(3) the government punish[ing] dissenting churches and individuals for their religious exercise[;]

(4) the government restrict[ing] political participation by dissenters[;]

(5) the government provid[ing] financial support for the established church, often in a way that preferred the established denomination over other churches[; and]

(6) the government us[ing] the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function.

*Id.* at 286 (Gorsuch, J., concurring in the judgment). In *Kennedy*, the Supreme Court favorably cited to Justice Gorsuch's *Shurtleff* concurrence, along with Justice Scalia's dissent in *Lee v. Weisman*, 505 U.S. 577, 640–42 (1992), and Professor McConnell's scholarship, when it explained that "coercion" like mandatory church attendance and participation in formal religious exercises were "among the foremost hallmarks of religious establishments the framers sought to prohibit." *Kennedy*, 597 U.S. at 537 & n.5.

Regardless of whether the six hallmarks are "an exhaustive list of practices that violate the Establishment Clause under a historical approach," *Hilsenrath*, 136 F.4th at 491 n.54, or "whether the hallmarks should be considered in the aggregate," *id.* at 494 & 495 n.3 (Phipps. J., concurring in the judgment), Plaintiffs' claims fail. That is because Plaintiffs cannot show that the Freedom Account Program implicates a single hallmark, much less the hallmarks in the aggregate, nor can they show that it resembles anything else that possibly "would have historically been understood as an establishment of religion." *Id.* at 491 n.54 (majority opinion). Indeed, Plaintiffs have no evidence at all that the Freedom Account Program is unconstitutional under the historical-practices-and-understandings test. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("Rule

56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

The Freedom Account Program bears none of the hallmarks of a religious establishment. It compels no religious observance, and participation does not require attending any private school, let alone a religious one, and the funds may be used for homeschooling, tutoring, online schooling, and other qualifying expenses. SUMF ¶¶ 3, 10, 22–23, 28. It controls no religious doctrine or personnel, punishes no dissenter, and imposes no tax to support a church; it simply funds an account that parents alone direct. Ex. 2, Smith Decl. ¶ 14. The Freedom Account Program therefore resembles no historical hallmark and is not coercive. *See Shurtleff,* 596 U.S. at 286 (Gorsuch, J., concurring) (explaining that "most of these [six] hallmarks reflect forms of coercion"); *Lee*, 505 U.S. at 640-42 (Scalia, J., dissenting) (explaining the Establishment Clause is concerned about legal coercion, not peer pressure or psycho-coercion). And even assuming coercion were a free-floating factor untethered from historical practices and how coercion was historically understood, Intervenors confirm the absence of any psychological pressure or coercion too. They admit that the program does not coerce them or their children into any religious exercise, and that secular education options are available to their children. SUMF ¶¶ 154–60.

In short, a neutral program under which parents may choose religious or secular options, and under which no one is compelled to engage in any religious exercise, is not an establishment of religion under the *Kennedy* test. *See Kennedy*, 597 U.S. at 537. Further, the record is void of any psychological coercion as applied to any specific parent, *see infra* Section III.B, much less any legal

coercion as historically understood. Because the Freedom Account Program bears no hallmarks of a religious establishment, Plaintiffs' Establishment Clause claim fails as a matter of law.

## IV. No Facial Challenge Lies under *Salerno*, and the As-Applied Claim Fails for Want of Record Evidence.

As explained, Plaintiffs claim as a matter of law, including because their legal theories are flawed. Yet even overlooking flawed legal theories, their claims still fail because they have no evidence to support their flawed theories. In the Complaint, Plaintiffs characterize their Establishment Clause claim as an as-applied challenge, ECF No. 1, at 4, 28, yet Plaintiffs seek relief that would reach every application of the program, *id.* at 11, 23. Whether the claim is facial or as-applied, it cannot succeed. A facial challenge fails because the program is indisputably valid in the mine-run of its applications no matter what the legal theory. And the as-applied challenge fails under any legal theory too because, after full discovery, the record contains no evidence that any parent was coerced into sending their children to a religious school.

### A. A facial challenge fails under *Salerno* because the program is valid in the mine-run of its applications under any legal theory.

To the extent plaintiffs press a facial challenge, it fails as a matter of law. Facial challenges are disfavored because they "threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (citation omitted). The Supreme Court "has therefore made facial challenges hard to win." *Id.* To win a facial challenge, the plaintiff must establish that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). "A facial challenge must fail where the statute has a 'plainly legitimate sweep.'" *Crawford v. Marion*

*Cnty. Election Bd.*, 553 U.S. 181, 202 (2008) (plurality opinion) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).

The Freedom Account Program has a vast legitimate sweep. It operates constitutionally in every application in which a family uses the account for a secular option or freely chooses a religious school without coercion, which, on this record, is every application the evidence discloses. SUMF ¶¶ 42, 154–60. Because the program is valid in the mine-run of its applications, any facial theory fails as a matter of law. *See Salerno*, 481 U.S. at 745; *see also Bowen v. Kendrick*, 487 U.S. 589, 612 (1988) (explaining it is not "the [Supreme] Court's practice, in considering facial challenges to statutes of this kind," to hold laws unconstitutional "in anticipation that particular applications may result in unconstitutional use of funds" (citation omitted)).

**B. The as-applied claim fails under any legal theory because the summary-judgment record contains no evidence of coercion.**

The as-applied claim fares no better. For Plaintiffs' as-applied Establishment Clause claim to survive summary judgment, they must point to a specific unconstitutional application, and this record is void of such applications. *See Young Am.'s Found. v. Kaler*, 14 F.4th 879, 890 (8th Cir. 2021) (granting summary judgment to defendants because plaintiffs failed to provide evidence of an unconstitutional application); *see also McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014) (noting that "a plaintiff generally cannot prevail on an *as-applied* challenge without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally *applied*"). Because Plaintiffs bear the burden of proof on their claim, the State may obtain judgment by pointing to the absence of evidence supporting an essential element. *Celotex Corp.*, 477 U.S.at 325. And Rule 56 requires Plaintiffs to come forward with specific facts showing a genuine issue for trial. *See id.* at 324. "[A]

complete failure of proof concerning an essential element . . . renders all other facts immaterial" and entitles the moving party to judgment as a matter of law. *Id.* at 322–23.

For Plaintiffs' as-applied Establishment Clause claim to survive summary judgment under any legal theory, Plaintiffs must provide evidence that the State has "coerc[ed] [a] parent into sending their children to [a] religious school[ ]." *Zelman*, 536 U.S. at 655–56. But discovery has closed, ECF Nos. 50, 52, 58, and the record contains no evidence that any parent was coerced into choosing a religious school. No Plaintiff has had any interaction with the Freedom Account program, nor do they intend to. SUMF, ¶126. None of the witnesses Plaintiffs have identified are parents of children participating in the Freedom Account Program. Ex. 14, Faulkenberry Interrog. Resp. No. 6; Ex. 15, Sanders Interrog. Resp. No. 6; Ex. 16, Whitfield Interrog. Resp. No. 6. And Intervenors affirmatively disclaim any coercion. SUMF, ¶¶ 154–60.

Although the Court suggested there could be a hypothetical situation that some rural family might someday only have religious options, Hr'g Tr. 16:12–22:7; 100:19–101:11, that is speculation, and Plaintiffs have no evidence that any family was coerced or will likely be coerced in the future. *See Wash. State Grange*, 552 U.S. at 455 ("A statute 'is not to be upset upon hypotheticals and unreal possibilities, if it would be good upon the facts as they are.'" (quoting *Pullman Co. v. Knott*, 235 U.S. 23, 26 (1914))); *cf. Coleman*, 40 F.3d at 259 ("A speculative or hypothetical claim of future injury is insufficient to generate standing."). Indeed, the evidence in the record shows that such a hypothetical is exceedingly unlikely. Under the LEARNS Act, parents have a multitude of schooling options for their children. *See Zelman*, 536 U.S. at 656 ("The Establishment Clause question . . . must be answered by evaluating *all* options [the State] provides . . . ."). These include traditional public schools within or outside the student's resident school district, charter schools,

virtual schools, secular private schools, religious private schools, micro-schools, and homeschooling. SUMF ¶¶ 29, 60, 62, 64, 70, 80–89. The LEARNS Act also provides additional educational options for students who remain enrolled in public schools through the Course Choice Program. *See supra* 9. Given all these choices, it's unsurprising that Plaintiffs were unable to find even one instance where a parent was coerced to send their child to a religious school. Plaintiffs' complete failure to provide proof of coercion under any legal theory entitles the State to judgment on the as-applied claim. *See Celotex Corp.*, 477 U.S. at 323.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant their motion for summary judgment in its entirety and dismiss this case.

Respectfully submitted,

TIM GRIFFIN
Attorney General

AUTUMN HAMIT PATTERSON
Solicitor General

By: M. Erica Crouse
Ark. Bar No. 2026016
Assistant Solicitor General

Skylar Burton
Ark. Bar No. 2026120
Assistant Solicitor General

Arkansas Attorney General's Office
101 West Capitol Avenue
Little Rock, AR 72201
(501) 682-1019
(501) 682-2591 fax
erica.crouse@arkansasag.gov
skylar.burton@arkansasag.gov
*Counsel for Defendants*